1  ROBBINS GELLER RUDMAN
       & DOWD LLP
2  DAVID C. WALTON (167268)
   655 West Broadway, Suite 1900
3  San Diego, CA 92101
   Telephone: 619/231-1058
4  619/231-7423 (fax)
   davew@rgrdlaw.com
5      – and –
   SAMUEL H. RUDMAN
6  MARY K. BLASY (211262)
   58 South Service Road, Suite 200
7  Melville, NY  11747
   Telephone: 631/367-7100
8  631/367-1173 (fax)
   srudman@rgrdlaw.com
9  mblasy@rgrdlaw.com

10 HOLZER HOLZER & FISTEL, LLC
   MICHAEL I. FISTEL, JR.
11 MARSHALL P. DEES
   200 Ashford Center North, Suite 300
12 Atlanta, GA  30338
   Telephone: 770/392-0090
13 770/392-0029 (fax)

14 Attorneys for Plaintiff

15                  UNITED STATES DISTRICT COURT

16                  CENTRAL DISTRICT OF CALIFORNIA

17 BRADY ADAMS, Individually and on )   **VIA FAX**
   Behalf of All Others Similarly Situated, )
18                                        )   Case No.SACV 13 - 01300 JST (FFMx)
                           Plaintiff,     )
19                                        )   CLASS ACTION
        vs.                               )
20                                        )   COMPLAINT FOR VIOLATIONS OF
   BIOLASE, INC., FEDERICO                )   THE FEDERAL SECURITIES LAWS
21 PIGNATELLI and FREDERICK D.            )
   FURRY,                                 )
22                                        )
                           Defendants.    )   DEMAND FOR JURY TRIAL
23 _____)

24

25

26

27

28

Plaintiff Brady Adams ("Plaintiff"), individually and on behalf of all other persons similarly situated, by Plaintiff's undersigned attorneys, for Plaintiff's complaint against Defendants, alleges the following based upon personal knowledge as to Plaintiff and Plaintiff's own acts, and upon information and belief as to all other matters based on the investigation conducted by and through Plaintiff's attorneys, which included, among other things, a review of Securities and Exchange Commission ("SEC") filings by Biolase, Inc. ("Biolase" or the "Company"), as well as conference call transcripts and media and analyst reports about the Company. Plaintiff believes that substantial evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## NATURE OF THE ACTION

1.      This is a securities class action on behalf of all purchasers of the common stock of Biolase between January 7, 2013 and August 12, 2013, inclusive (the "Class Period"). Plaintiff seeks to pursue remedies against Biolase and several of its most senior executives under §§10(b) and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act"), and Rule 10b-5 promulgated thereunder.

## JURISDICTION AND VENUE

2.      Jurisdiction is conferred by §27 of the Exchange Act. The claims asserted herein arise under §§10(b) and 20(a) of the Exchange Act and Rule 10b-5 promulgated thereunder. This Court has jurisdiction over the subject matter of this action under 28 U.S.C. §§1331 and 1337, and §27 of the Exchange Act.

3.      Venue is proper in this District pursuant to §27 of the Exchange Act and 28 U.S.C. §1391(b) as the Company is headquartered in this District and the alleged misconduct was transacted in and emanated from this District.

4.      In connection with the acts alleged in this Complaint, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including, but not limited to, the mails, interstate telephone communications and the facilities of the national securities markets.

**PARTIES**

5.     Plaintiff Brady Adams, as set forth in the accompanying Certification, which is incorporated by reference herein, purchased securities of Biolase during the Class Period and has been damaged thereby.

6.     Defendant Biolase, headquartered in Irvine, California, manufactures and distributes dental lasers.  The Company was founded as Biolase Technology, Inc. in 1984 and changed its name to Biolase, Inc. in 2012.  The Company's common stock is listed on the NASDAQ, an efficient market, under the ticker symbol "BIOL" and, as of August 2, 2013, the Company had approximately 34 million shares of its common stock outstanding.

7.     Defendant Federico Pignatelli ("Pignatelli") is, and was throughout the Class Period, Biolase's Chief Executive Officer ("CEO"), a director and Chairman of its Board of Directors (the "Board").

8.     Defendant Frederick D. Furry ("Furry") is, and was throughout the Class Period, Biolase's Chief Financial Officer ("CFO").

9.     The Defendants referenced above in ¶¶7-8 are referred to herein as the "Individual Defendants."  Biolase and the Individual Defendants are referred to herein, collectively, as "Defendants."

**CLASS ACTION ALLEGATIONS**

10.     Plaintiff brings this action as a class action pursuant to Federal Rule of Civil Procedure 23(a) and (b)(3) on behalf of a class consisting of all purchasers of the common stock of Biolase during the Class Period (the "Class").  Excluded from the Class are Defendants, the officers and directors of the Company, at all relevant times, members of their immediate families and their legal representatives, heirs, successors or assigns and any entity in which Defendants have or had a controlling interest.

11.     The members of the Class are so numerous that joinder of all members is impracticable.  Throughout the Class Period, Biolase common stock and other publicly-traded securities were actively traded on the NASDAQ.  While the exact

number of Class members is unknown to Plaintiff at this time and can only be ascertained through appropriate discovery, Plaintiff believes that there are hundreds of thousands of members in the proposed Class. Record owners and other members of the Class may be identified from records maintained by Biolase or its transfer agent and may be notified of the pendency of this action by mail, using the form of notice similar to that customarily used in securities class actions.

12.     Plaintiff's claims are typical of the claims of the members of the Class as all members of the Class are similarly affected by Defendants' wrongful conduct in violation of federal law that is complained of herein.

13.     Plaintiff will fairly and adequately protect the interests of the members of the Class and has retained counsel competent and experienced in class and securities litigation.

14.     Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class. Among the questions of law and fact common to the Class are:

(a)     whether the Exchange Act was violated by Defendants as alleged herein;

(b)     whether statements made by Defendants misrepresented material facts about the business, operations and management of Biolase; and

(c)     to what extent the members of the Class have sustained damages and the proper measure of damages.

15.     A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable. Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it impossible for members of the Class to individually redress the wrongs done to them. There will be no difficulty in the management of this action as a class action.

**BACKGROUND**

16.    Defendant Biolase is a biomedical company that develops, manufactures, and markets lasers in dentistry and medicine in the Unites States and internationally. The Company offers WaterLase systems for cutting soft and hard tissue; and diode laser systems, which are used in soft tissue, pain therapy, and cosmetic procedures, such as teeth whitening. Dentists, periodontists, endodontists, oral surgeons, and other specialists use its laser dental systems to perform a range of dental procedures, including cosmetic and complex surgical applications, using lasers designed to reduce pain during oral procedures. Dental lasers use a light beam to cut away tooth decay before filling cavities, purportedly resulting in less vibration and pain than traditional drills.

17.    The Company also markets and distributes dental imaging equipment comprising extra-oral and intra-oral dental digital imaging devices, as well as provides precision intuitive diagnosis and treatment planning solutions. In addition, it offers medical systems comprising Diolase 10 Diode Laser for therapeutic applications consisting of temporary pain relief; topical heating for the purpose of temporarily relieving minor muscle and joint pain and stiffness, minor arthritis pain, muscle spasm, minor sprains and strains, and minor muscular back pain; temporarily increasing local blood circulation; and temporarily relaxing muscles. Further, the Company manufactures and sells disposable products and accessories for laser systems, as well as markets flexible fibers and hand pieces.

18.    The Company's core product offering is its two categories of laser technologies: WaterLase and its diode system. The WaterLase line of products has a large patent portfolio protecting the technology from competition, and is by far the Company's best-selling group of products (including four versions of the laser systems including WaterLase iPlus (the most advanced WaterLase technology), WaterLase MDX, WaterLase MD Turbo, and the introductory portable iLase).

19.     After its commercial launch in 2006, Biolase achieved sales growth in the WaterLase line of products despite an often contentious relationship with Henry Schein, Inc. ("Henry Schein"), the former exclusive distributor of the WaterLase system.  In the spring of 2012, Biolase settled the dispute with Henry Schein and began moving toward to a direct selling model for most of those systems, and repurchased the bulk of unsold units from Henry Schein.

20.     In order to fund this, on May 24, 2012 the Company entered into two revolving credit facility agreements with Comerica Bank ("Comerica") (the "Credit Agreements"), as amended on August 6, 2012 ("Amendment No. 1"), which provided for borrowings against certain domestic accounts receivable and inventory, as set forth in the $4.0 million revolving credit facility agreement (the "Domestic Revolver"), and borrowings against certain export related accounts receivable and inventory, as set forth in the $4.0 million revolving credit facility agreement (the "Ex-Im Revolver"), for a combined aggregate commitment of borrowings up to $8.0 million. The Credit Agreements mature on May 1, 2014 and are secured by substantially all assets now owned or hereinafter acquired by Biolase. The Credit Agreements require compliance with certain financial and non-financial covenants. If a default occurs, Comerica has the authority to declare the amounts outstanding under the Credit Agreements immediately due and payable.

21.     Lockbox arrangements under the revolving bank facilities provide that substantially all of the income generated by Biolase is deposited directly into lockbox accounts and then swept into cash management accounts for the benefit of Comerica. Cash is disbursed from Comerica to Biolase only after payment of the applicable debt service and principal.  Biolase's obligations are generally secured by substantially all of its assets.

22.     Despite that as fiscal 2013 got underway, the Company had experienced net losses of millions of dollars for each of the preceding three years and had an accumulated deficit of approximately $112.3 million, Biolase claimed to be finished

1  reorganizing itself into a direct seller and on track to achieving a turnaround of its
2  financial performance and achieving cash positive operations in fiscal 2013.

## DEFENDANTS' FALSE AND MISLEADING CLASS PERIOD STATEMENTS

23.    The Class Period starts on January 7, 2013.  On that day, before the opening of trading, Biolase issued a press release entitled "Revenue Expected to Exceed $18 Million for 2012 Fourth Quarter – Revenue Growth Driven by Direct Sales to End-Users in North America," which stated, in pertinent part, that "based on a preliminary review of its financial performance for the fourth quarter ended December 31, 2012, the Company expect[ed] to exceed its previous guidance and report net revenue in excess of $18 million." The press release also quoted Defendant Pignatelli lauding the strong growth in demand for Biolase's product offerings and the strong financial performance that foretold during fiscal 2013, with Defendant Pignatelli stating, in pertinent part, as follows:

We are very pleased with the strong growth in our core dental laser products and the trends that are accelerating with the adoption of our WaterLase® technology and diode laser systems.  Our strong revenue growth in the 2012 fourth quarter compared to the prior year period was primarily due to the increased demand for our flagship WaterLase iPlus™ and our new EPIC 10™ soft tissue diode laser.  Revenues were also bolstered by sales of our mid-priced WaterLase products and our digital imaging products, including the initial sales of our CAD/CAM systems.

After closing 2012 on a strong note, we are very excited to look ahead to 2013 and beyond as we expect a substantial acceleration in the adoption of lasers,  Specifically our core WaterLase technology, in dental practices around the world over the next three to five years. *We are very confident that all-tissue lasers will become the standard of care in*

- 6 -

*dental practices worldwide. Furthermore, as we move forward in 2013 we do not expect to be troubled with the multitude of extraneous issues that we faced throughout our challenging turnaround, including exiting our exclusive global distribution relationship with Henry Schein, Inc.* (NASDAQ: HSIC)*, and moving to a direct sales model in North America and multi-distributor model internationally.*[1]

24.  The price of the Company's common stock spiked on these statements, increasing nearly 20% to close at $2.35 per share on January 7, 2013, on unusually high trading volume of 784,400 shares traded.

25.  On January 22, 2013, the Company issued a press release entitled "BIOLASE Expects to Report Positive Cash Flow From Operations for Q4 2012 – BIOLASE Expects to Continue to Generate Positive Cash Flow From Operations for 2013 Overall."   The press release stated that "based on preliminary unaudited financial results, the Company expect[ed] to report that it generated positive cash flow from operations for Q4 2012," and quoted Defendant Pignatelli lauding those results, stating, in pertinent part, as follows:

*It is rewarding to see that our restructuring efforts over the past two years have enabled us to turn the Company around and that we are making significant progress toward achieving our financial goals. The trends we are seeing in the adoption of dental lasers also give us confidence in achieving continued double-digit growth of our core dental franchise. Based on our current plans, we expect the Company will continue to generate positive cash flow from operations for the overall year ending December 31, 2013.*

26.  On February 6, 2013, before the opening of trading, Biolase issued a press release entitled "BIOLASE Receives FDA Clearance for Its 940nm Diolase 10

---

[1]  All emphasis in bold and italics is added unless otherwise noted.

1  Diode Soft Tissue Laser for a Broad Spectrum of Medical Procedures – Clearance for

2  Over 80 Procedures in 19 Additional Medical Markets."   The press release quoted

3  Defendant Pignatelli stating, in pertinent part, that "[c]learance for our Diolase 10 is

4  the first step in enabling us to *leverage our recently released, next-generation 940nm*

5  *EPIC 10™ modular diode soft tissue dental laser platform and consumable*

6  *business across a wide range of multi-billion dollar medical markets with*

7  *appropriate strategic partners*," and quoted Defendant Furry stating "[t]his is an

8  exciting time at BIOLASE as we *continue to expand the capabilities, applications,*

9  *and indications for our core technologies* so that they can be leveraged within our

10 core dental market as well as into a number of other promising medical and veterinary

11 markets."

12        27.    The price of Biolase common stock again spiked on this news, increasing

13 another 20% to close at $3.35 per share that day on extremely high trading volume of

14 more than three million shares trading, or more than 51 times the average daily trading

15 volume over the preceding ten trading days.

16        28.    On February 28, 2013, Biolase declared a one-half percent stock dividend

17 payable on March 29, 2013 to stockholders of record as of March 15, 2013.

18        29.    On March 6, 2013, Biolase issued a press release entitled "BIOLASE

19 Reports 2012 Fourth Quarter, Year-End Results – Net Revenue Increases 45.0% to

20 $19.1 Million, Quarter Over Quarter; Core WaterLase Unit Sales Increase 42.0%,

21 Quarter Over Quarter; Net Income of $1.0 Million – $0.03 per share – in Q4 2012;

22 Non-GAAP Net Income of $1.7 Million – $0.05 per Share -- in Q4 2012; *2013 Q1*

23 *Revenue Guidance of $14 Million to $15 Million; 2013 Annual Revenue Guidance*

24 *of $68 Million to $72 Million*."   To buttress that strong first quarter and fiscal 2013

25 financial guidance, the press release quoted Defendant Pignatelli stating, in pertinent

26 part, as follows:

27        *For the past two years, BIOLASE has undergone a radical*

28        *restructuring, which was substantially completed at year-end 2012.*

Now we can concentrate on continued execution and the meaningful expansion of our business in 2013 and beyond.

Overall 2012 was a year of execution where we met or exceeded our guidance throughout the year and went on to generate cash from operations in the fourth quarter. We have expanded our offerings of internally developed lasers and in-licensed cone beam and CAD/CAM imaging products while significantly strengthening our intellectual property and patent portfolio. As a result of these efforts, our annual revenue for 2012 increased significantly over 2011 and more than doubled that of 2010. With a number of solid initiatives in place, including new product launches, the recent approval of over 80 new procedures in 19 additional medical markets, and the launch of EPIC V-Series in to the veterinary market, *we expect BIOLASE to continue to grow strongly in 2013*.

The press release also quoted Defendant Furry stating, in pertinent part, as follows:

The number of WaterLase systems sold increased by a larger percentage than WaterLase revenues quarter over quarter because of our strategy to offer systems of varying capabilities at multiple price points. The iPlus is our flagship product and our primary revenue driver, and *we expect this to continue in 2013.* By offering multiple product configurations across a range of price points, *we believe we can attract more customers, drive adoption, and generate more significant product and consumables revenue*.

                    *         *         *

As expected, sales of diode laser systems increased significantly in the fourth quarter, and *we anticipate that the EPIC 10 will continue to be a strong contributor to revenue in 2013 and beyond*. We also believe that the low price point of our EPIC diode soft-tissue laser system *will*

- 9 -

*continue to broaden the demand for lasers and create an up-sell*
*opportunity for our more expensive, all-tissue WaterLase systems.*

The press release also provided the following "Financial Outlook" for fiscal 2013:

For the 2013 first quarter, BIOLASE expects net revenue of approximately $14.0 million to $15.0 million. The midpoint of $14.5 million reflects expected growth of approximately 18% as compared to the 2012 first quarter. After the 2013 first quarter the Company does not plan to provide quarterly guidance for the rest of 2013.

*For the year ending December 31, 2013, the Company expects net revenue of approximately $68 million to $72 million. The midpoint of $70 million represents a 22% increase over 2012 net revenue and would also represent record revenue for the Company. The Company also expects to generate cash from operations for the year ending December 31, 2013.*

30.    During the conference call held with investors later on the evening of March 6, 2013, Biolase made more positive comments about the strength of its business and finances and demand for its product offerings.

31.    On this news, the Company's stock price again spiked when trading resumed on March 7, 2013, closing up that day at $4.42 per share, on unusually high trading volume of more than 1.4 million shares trading.

32.    On March 15, 2013, Biolase filed its annual financial report for its fiscal year ended December 31, 2012 on Form 10-K with the SEC. The Form 10-K stated, in pertinent part, that "*the cash generated from operations and the borrowings available under the lines of credit with Comerica Bank [would] be sufficient to fund [Biolase's] working capital requirements for 2013*" and that "[a]s of December 31, 2012, the Company was in compliance with [its debt] covenants" under the Comerica lines of credit. The Form 10-K was signed and certified as to veracity under §§302 and 906 of the Sarbanes Oxley Act of 2002 by the Individual Defendants.

33.     On April 30, 2013, Biolase issued its 2013 annual proxy statement to shareholders, setting a June 6, 2013 date for Biolase's annual meeting of shareholders ("2013 AGM").  Among other things, Defendants would seek shareholder approval at the 2013 AGM to amend Biolase's 2002 Stock Incentive Plan to increase the shares of common stock reserved for issuance thereunder by 800,000 shares.  As of March 28, 2013, options to acquire only 86,473 shares of common stock remained available for issuance of the 6,950,000 options previously authorized under the 2002 Stock Incentive Plan.  Option grants to Defendant Pignatelli during fiscal 2012 alone far exceeded the number of options remaining for issuance under the 2002 Stock Incentive Plan, with Defendant Pignatelli having been granted 100,000 options in November 2012.  As shareholders would be apprehensive about authorizing such a significant increase in options available for distribution under the 2002 Stock Incentive Plan if they knew the Company faced a liquidity crisis forcing it to further dilute the outstanding Biolase stock by issuing additional capital to raise funds, the pendency of the shareholder vote on increasing the number of shares outstanding under the 2002 Stock Incentive Plan provided Defendants with further incentive to conceal the Company's pending financial doom.

34.     On May 7, 2013, Biolase issued a press release entitled "Biolase Reports 2013 First Quarter Results – Net Revenue Increases 19% to $14.6 Million, Quarter over Quarter – Laser System Revenue Increases 9%, Quarter over Quarter – Imaging Revenue Increases 619%, Quarter over Quarter – *2013 Annual Revenue Guidance Reiterated at $68 Million to $72 Million – Expects to Generate Cash from Operations for 2013 Overall – Gross Profit of 40% in Q1; Projected to Return to Normalized Levels of 44% to 46%*."  The press release quoted Defendant Pignatelli emphasizing the Company's strong first quarter 2013 financial results, stating, in pertinent part, as follows:

> While our overall revenue growth was slightly above the midpoint of our
> guidance, it is to be noted that certain domestic product revenues

generated from our WCLI Super Symposium held March 21-24 were not recognized until after the close of the first quarter. The 2013 first quarter was also heavily geared toward international revenues as a result of the AEEDC Dubai held in February and the bi-annual International Dental Show held in early March. Our international revenues have grown as a result of these efforts and BIOLASE® now has distributors in 71 countries around the world. We are confident that these efforts will continue to increase our international business throughout 2013 and beyond.

Domestically we focused on expanding our efforts as the premier total technology provider in dentistry by intensifying our efforts in selling digital imaging and CAD/CAM intra oral scanners, which is evidenced by the 619% growth for our imaging revenues quarter over quarter. Our Total Technology Solution® is a key component in our strategy to push forward the adoption of lasers as high-tech dentistry and lasers become the standard of care in dentistry versus traditional conventional methods, along with leveraging our significant installed base of diode lasers. We believe that BIOLASE is the only company in North America that currently provides a full line of high-tech products, which includes a full range of all-tissue lasers and diode soft-tissue laser products; CBCT digital imaging products; and CAD/CAM intraoral scanners. *We are pleased with the level of laser sales so far this year and we expect the aggressive marketing efforts we undertook in the first quarter to begin to pay off further as we move forward in the second quarter and the rest of 2013.*

                    *       *       *

We added cone beam digital imaging to our product offerings in late 2011, and further expanded our imaging product offerings with the

addition of CAD/CAM intra-oral scanning in late 2012. *It is promising to see these product lines continue to grow and we expect this positive trend to continue throughout the year as we gain traction in the market and increase our imaging product offerings.* We believe that digital imaging is a tremendous market opportunity and is an excellent complement to our core internally developed laser products.

The press release also quoted Defendant Furry stating, in pertinent part, as follows:

We are very pleased that the Company obtained FDA clearance for the EPIC soft-tissue diode laser platform for over 80 indications in 19 additional medical markets in April 2013. *We expect that the EPIC 10 platform will continue to be a strong contributor to revenue in the second quarter and beyond.* It is gratifying to have obtained this clearance so quickly.

\*        \*        \*

*Based on our projected revenues and expenditures, we expect that our gross margin will return to historical levels in the range of 44% to 46% for the second quarter and 2013 overall.*

As to "Financial Outlook," the press release stated:

*For the year ending December 31, 2013, the Company is reiterating its revenue expectation of approximately $68 million to $72 million. The midpoint of $70 million represents a 22% increase over 2012 net revenue and would also represent record revenue for the Company. The Company also reiterates that it expects to generate cash from operations for the year ending December 31, 2013.*

35.     During the conference call held with investors later on the evening of May 7, 2013, Biolase made more positive comments about the strength of its business and finances and demand for its product offerings.

36.   On March 15, 2013, Biolase filed its quarterly financial report for the first quarter of 2013, the period ended March 31, 2012, on Form 10-Q with the SEC. The Form 10-Q stated, in pertinent part, that "$4.7 million of available borrowings [remained] under two revolving credit facility agreements" with Comerica; that "to improve liquidity, management amended the Company's lines of credit increasing the combined aggregate capacity of borrowings to $10.0 million" during the quarter; that "the working capital and borrowings available under the lines of credit should be sufficient to fund the requirements of the Company" during fiscal 2013; and that "[a]s of March 31, 2013, the Company was in compliance with [its debt] covenants" under the Comerica lines of credit.  The Form 10-Q was signed and certified as to veracity under §§302 and 906 of the Sarbanes Oxley Act of 2002 by the Individual Defendants.

37.   On May 13, 2013, Biolase filed a Current Report on Form 8-K with the SEC advising that obtaining the increase in the Comerica lines of credit to $10 million had cost the Company $30,000 and that "certain financial and non-financial covenants" had been "revised," while stating that the summary of the changes to the credit agreements was "not complete," and was "qualified in its entirety by reference to the full text of the agreements or forms of the agreements, which" would not be disclosed until the Company filed its quarterly financial report on Form 10-Q with the SEC for the second quarter 2013 ended June 30, 2013, stating "*[r]eaders should review those agreements or forms of agreements for a more complete understanding of the terms and conditions associated with this transaction*."

38.   On May 21, 2013, Biolase declared a one-half percent stock dividend payable on June 28, 2013 to stockholders of record as of June 14, 2013.

39.   On May 29, 2013, Defendant Furry presented at a Stifel, Nicolaus & Company investor conference in New York City, making positive statements about the strength of Biolase's business and finances and demand for its product offerings, including stating that the Company was still "[p]rojecting revenue of $68M to $72M

1    for 2013." Defendant Furry also presented a slide at the conference stating that

2    approximately 5% of dental practices in the U.S. had adopted laser dental technology

3    and 1.5% internationally, and that "[e]ach incremental 1% market penetration equals

4    over $600M revenue," creating a "[d]ental laser market opportunity [of] in excess of

5    $50B." Defendant Flurry also presented the following chart using the fiscal 2013

6    guidance provided to demonstrate the purported success of the Company's

7    "[t]turnaround through *the reestablishment of direct sales force and multi-distributor*

8    *model* in Aug. 2010. . . .":

9



20

21       40.    Defendant Furry also presented a chart at the conference titled

22   "Investment Considerations and Expectations" emphasizing that based on then-present

23   demand for the Company's product offerings being experienced in the market,

24   Defendants believed that there would "be a laser in every dental office in the next 3-5

25   years":

26

27

28



41.     On June 6, 2013, shareholders approved the increase in the 2002 Stock Incentive Plan at the 2013 AGM.  Following the AGM, in response to rumors in the market that Defendant Pignatelli was resigning from his positions as Chairman and CEO of Biolase, that same day, Biolase issued a press release stating that the Biolase Board "issued the following statement in response to inquiries from a significant number of shareholders," which provided that:

> There is absolutely no truth to rumors that Federico Pignatelli, Chairman and CEO, would resign from the Board or the Company.  Mr. Pignatelli is and will remain Chairman and CEO, as he was elected in August, 2010.  He is fully engaged in all aspects of the Company's business, as he will continue to be.
>
> Mr. Pignatelli stated, "I am fully committed to Biolase now and for the future."

42.     On June 10, 2013, Biolase filed a Current Report on Form 8-K with the SEC advising that on June 6, 2013, the Biolase Board had also entered into a new employment agreement with Defendant Pignatelli pursuant to which "the Board

agreed to re-nominate Mr. Pignatelli to serve on the Board at the next three annual meetings, and to maintain his election as Chairman of the Board until his earlier resignation or removal, or until he is not elected by the shareholders of the Company to be a director of the Company." The Form 8-K also advised that a new Chief Operating Officer ("COO") and President had been appointed.

43.   On June 17, 2013, Biolase issued a press release announcing that its common stock had been added to two major indices, the Russell 3000 and the Russell Global Indices,  significantly increasing demand for the Company's stock in the market as many investors purchase shares based on their inclusion in these indexes. The Company's press release issued that day stated that "Index-Following Funds Expected to Include Approximately 2.5-3.0 Million BIOL Shares via Market Purchase to Meet Their Rebalancing Requirements by the Actual Rebalancing Date of June 28, 2013" and quoted Defendant Pignatelli and the Company's incoming President/COO, stating:

> "The inclusion of our company in the widely-followed Russell 3000 and Russell Global Indices *is the result of the substantial growth in our business* since new Management and Board of Directors took over in August 2010," said Federico Pignatelli, Chairman and CEO of BIOLASE. "We know that a number of institutional funds use these indices for their buying guidelines. Indeed, a May 31, 2013 research report from Cantor Fitzgerald predicted that if we are included in this year's Russell indices, an additional 2.5 million to 3.0 million BIOL shares will be purchased to be included by June 28th 2013 for Index-based funds' compliance with their own guidelines."
>
> "We are honored to be included in the Russell 3000 because of *the statement this makes about investor recognition of the prosperity and growth of BIOLASE*. We also welcome the upcoming comparison that being in the index will bring us with last year's top-performing

1    component companies, such as Affymax, Inc., Vanda Pharmaceuticals,

2    and Mannkind Corp.," said Alexander Arrow, MD, President and COO

3    of BIOLASE. *"As our business progresses the way we strategically*

4    *plan over the next twelve months and beyond, and BIOLASE is*

5    *recognized by investors for the value we are creating, I anticipate that*

6    *we will be named one of the year's top-performers by the time of next*

7    *year's Russell Index rebalancing.*"

8        44.    On July 27, 2013, Biolase filed a registration statement on Form S-3 with

9    the SEC stating that Biolase sought to sell up to $30 million of additional Biolase

10   shares upon the SEC declaring the registration statement effective.

11       45.    The true facts, which were known by Defendants, but concealed from the

12   investing public during the Class Period, were as follows:

13           (a)    Contrary to Defendants' statements during the Class Period that

14   dental lasers were "becom[ing] the standard of care in dental practices worldwide"

15   and feeding demand for Biolase's product offerings, in reality, because there is little

16   evidence demonstrating the use of dental lasers (instead of drills) provides long-term

17   benefits to teeth, and because both children and adults can have cavities filled without

18   the numbing injections Biolase claims WaterLase products preclude, only 5% of

19   dental offices use dental lasers and dentists were hesitant to adopt dental lasers –

20   especially Biolase's – because of their high costs;

21           (b)    Due to the relatively high costs associated with its dental lasers

22   offerings, Biolase's efforts to switch to a direct sales model in the U.S. during the

23   Class Period were failing;

24           (c)    Contrary to Defendants' Class Period statements that they did "not

25   expect to be troubled with the multitude of extraneous issues that [Biolase] faced

26   throughout [its] challenging turnaround, including exiting [its] exclusive global

27   distribution relationship with Henry Schein," the high debt burden the Company

28

1  assumed to exit the Henry Schein arrangement, coupled with the onerous terms of the

2  Comerica lines of credit, were financially handicapping the Company; and

3          (d)     Contrary to Defendants' Class Period statements that "the cash

4  generated from operations and the borrowings available under the lines of credit with

5  Comerica Bank [would] be sufficient to fund [Biolase's] working capital requirements

6  for 2013," there was no cash being generated from operations and the Company was

7  in default of the Comerica lines of credit.

8          46.     On August 7, 2013, after the close of trading, Biolase issued a press

9  release announcing its second quarter 2013 financial results.  Rather than the $15.69

10  million in revenues Defendants had led the market to expect though their bullish Class

11  Period statements, Biolase reported revenues of just $14.2 million – *down 2.74%* from

12  the $14.6 million the Company had reported in the fourth quarter 2012.  Rather than

13  the $.04 per share loss Defendants had led the market to expect, and had reported in

14  the second quarter of 2012, Biolase reported a loss of $.06 per share.  Attempting to

15  explain the shortfall, Defendant Pignatelli was quoted in the press release issued that

16  day, stating:

17          While we experienced 17% net revenue growth for the second quarter of

18          2013 when compared to the prior year second quarter, *this result was*

19          *approximately 7% to 10% lower than our internal goal for the quarter*.

20          While we are experiencing growth in all areas of our business, we fell

21          short of our own internal expectations due to an unusually slow quarter

22          end for our domestic laser sales, Germany not performing as expected, a

23          delay in U.S. deliveries of the latest CAD/CAM system model from our

24          European vendor, and a pair of problems that hurt our sales in Canada.

25          Severe flooding in June in parts of Canada impeded sales and we did not

26          receive approval from Health Canada for our EPIC 10, which was

27          anticipated in the second quarter.  Compounding these head winds

28

domestically were the continued uncertainty and confusion over the recent implementation of Obamacare and a sharp rise in interest rates.

\* \* \*

***Concentrating on selling our EPIC 10 diode soft-tissue laser and our lines of licensed digital imaging and CAD/CAM equipment has caused a short term negative impact on our traditional margin***, but we expect this strategy to result in opportunities to leverage these relationships and sell those new customers our flagship WaterLase iPlus.

The press release also stated:

Gross profit as a percentage of net revenue was 39% as compared to 45% for the prior year quarter. For the six months ended June 30, 2013, gross profit as a percentage of net revenue was 39% as compared to 46% for the year period. ***The quarter-over-quarter and year-over-year decreases were primarily due to higher sales of licensed imaging equipment, which generally carry lower margins than our laser products, and increased international laser sales, which generally carry a lower margin than our domestic laser sales.***

The August 7, 2013 press release also quoted Defendant Furry stating that "based on . . . projected revenue mix and expenditures for the remainder of the year, [Biolase] expect[ed] that [its] gross margin [would only increase] to the low- to mid-forties for the second half of the year." The press release also reduced forward Biolase's "Financial Outlook," stating that "[f]or the year ending December 31, 2013, the Company [was now] expecting net revenue to be in the ***low end of its guidance range for the year*** of approximately $68 million to $72 million" and that "[t]he Company no longer expect[ed] to generate cash from operations overall for the year ending December 31, 2013."

47.     The August 7, 2013 press release also contained the following warning of an impending "Liquidity and Capital Resources" crisis at Biolase:

- 20 -

As of June 30, 2013, BIOLASE had approximately $3.8 million in working capital.  Cash and cash equivalents totaled approximately $2.1 million at June 30, 2013, compared to $2.5 million at December 31, 2012.

Accounts receivable totaled $11.5 million at June 30, 2013, compared to $11.7 million at December 31, 2012.  At June 30, 2013, the Company had two revolving credit facilities totaling $10.0 million, *with $1.5 million of available borrowings, in excess of the $6.0 million outstanding.*

*On July 26, 2013, the Company filed a registration statement on Form S-3 (the "2013 Registration Statement") with the Securities and Exchange Commission (the "SEC") to register an indeterminate number of shares of common stock, preferred stock, and warrants with a total offering price not to exceed $30 million.*

48.     During an earnings conference call held later that evening with investors, Biolase specifically highlighted the filing of the registration statement as its source of liquidity when discussing its low cash balance and the situation with its credit facility.

49.     When Biolase filed its quarterly financial report on Form 10-Q with the SEC on August 9, 2013, it disclosed for the first time that it had violated the covenants of its new May 24, 2013 Credit Agreements with Comerica and that Comerica had agreed to waive its non-compliance.  It also disclosed that total stockholder equity had fallen to just $8 million, while Biolase owed at least $6 million to Comerica.

50.     Then on August 13, 2013, before the opening of trading, Biolase issued a press release stating that the new May 24, 2013 Comerica "Loan Agreement required that, as of June 30, 2013, Biolase's earnings before interest, taxes, depreciation, and amortization could not be less than ($500,000)," that "Comerica agreed to waive th[at] requirement" conditioned upon "Biolase and Comerica [being able to] agree upon a further amendment to the Loan Agreement containing revised financial covenants by

September 13, 2013, and further agreed that until such time, the total amount borrowed under the Loan Agreement [could not] exceed $7.5 million."

51. As one stock blogger lamented on *Seeking Alpha.com* on August 13, 2013, "[a]s confirmed in the press release, Biolase is now in violation of its bank covenants. It has around 19 more trading days in which to rectify this situation before the Comerica deadline. Biolase has already given weak guidance for the remainder of the year such that any turnaround in financial performance will not be able to repair the situation with Comerica."

52. On the news of the revenue and earnings misses, the violation of the prior debt covenants, the current debt covenant default and the $2.5 million debt limit cut, the price of Biolase common stock, which had traded as high as $6.05 per share in intraday trading during the Class Period, plummeted ***more than 80%*** from that level to close at $1.19 per share on August 13, 2013, ***erasing more than $165 million in market capitalization***.

53. The market for Biolase common stock was open, well-developed and efficient at all relevant times. As a result of these materially false and misleading statements and omissions as set forth above, Biolase common stock traded at artificially inflated prices during the Class Period. Plaintiff and other members of the Class purchased or otherwise acquired Biolase common stock relying upon the integrity of the market price of Biolase common stock and market information relating to Biolase, and have been damaged thereby.

54. During the Class Period, Defendants materially misled the investing public, thereby inflating the price of Biolase common stock, by publicly issuing false and misleading statements and omitting to disclose material facts necessary to make Defendants' statements, as set forth herein, not false and misleading. Said statements and omissions were materially false and misleading in that they failed to disclose material adverse information and misrepresented the truth about the Company, its business and operations, as alleged herein.

55.     At all relevant times, the material misrepresentations and omissions particularized in this Complaint directly or proximately caused, or were a substantial contributing cause of, the damages sustained by Plaintiff and other members of the Class. As described herein, during the Class Period, Defendants made or caused to be made a series of materially false or misleading statements about Biolase's business, prospects, and operations. These material misstatements and omissions had the cause and effect of creating, in the market, an unrealistically positive assessment of Biolase and its business, prospects, and operations, thus causing the Company's securities to be overvalued and artificially inflated at all relevant times. Defendants' materially false and misleading statements during the Class Period resulted in Plaintiff and other members of the Class purchasing Biolase common stock at artificially inflated prices, thus causing the damages complained of herein. When the true facts about the Company were revealed to the market, the inflation in the price of Biolase common stock was removed and the price of Biolase common stock declined dramatically, causing losses to Plaintiff and the other members of the Class.

## ADDITIONAL SCIENTER ALLEGATIONS

56.     As alleged herein, Biolase and the Individual Defendants acted with scienter in that they knew that the public documents and statements issued or disseminated in the name of the Company were materially false and misleading; knew that such statements or documents would be issued or disseminated to the investing public; and knowingly and substantially participated or acquiesced in the issuance or dissemination of such statements or documents as primary violations of the federal securities laws. As set forth elsewhere herein in detail, these Defendants, by virtue of their receipt of information reflecting the true facts regarding Biolase, their control over, and/or receipt and/or modification of Biolase's allegedly materially misleading statements and/or their associations with the Company which made them privy to confidential proprietary information concerning Biolase, participated in the fraudulent scheme alleged herein.

57.    Defendants were motivated to assure the market that Biolase was achieving its financial goals and was financially sound enough to continue paying its outsized dividend of one-half percent per share each quarter. Maintenance of the outsized dividend was particularly important to Defendant Pignatelli who owned, as of December 31, 2012, approximately 4.8% of Biolase's common shares outstanding on a diluted basis, hundreds of thousands of which he had acquired by cashing in stock options which allowed him to acquire Biolase stock for pennies on the dollar. Because Defendant Pignatelli receives only a $1 annual salary, his annual compensation is highly dependent upon maintenance of the dividend. The need to issue more stock options to Defendant Pignatelli and others also motivated Defendants to overstate demand for the Company's products and to conceal the nefarious impact non-compliance with the Comerica debt covenants could have on Biolase, including forcing it to engage in dilutive stock sales, in order to obtain shareholder approval of the increase in the 2002 Stock Incentive Plan.

58.    Defendants were also motivated to conceal the Company's dramatically diminished financial performance to obtain inclusion of Biolase's common stock in two Russell indexes, significantly increasing demand for the Company's stock in the market and priming the market to facilitate a $30 million public stock offering. As one stock blogger on *Seeking Alpha.com* surmised on August 13, 2013, in reality the Company needed to begin raising capital during the first quarter of 2013 but held off as it primed the market for a huge stock offering:

In reality, management used incredibly poor judgment in waiting to issue equity. In Q1, the cash balance was already down to $1 million, such that the need for an offering should have been very clear. The share price had traded as high as $6.00, meaning that over $20 million could have been raised at a very attractive price. This would have given Biolase complete freedom to run its business for the next year or two without any cash constraints.

**NO SAFE HARBOR**

59.     Biolase's "Safe Harbor" warnings accompanying its reportedly forward-looking statements ("FLS") issued during the Class Period were ineffective to shield those statements from liability.  To the extent that projected revenues and earnings were included in the Company's financial reports prepared in accordance with GAAP, including those filed with the SEC on Form 8-K, they are excluded from the protection of the statutory Safe Harbor.  *See* 15 U.S.C. §78u-5(b)(2)(A).

60.     Defendants are also liable for any false or misleading FLS pleaded because, at the time each FLS was made, the speaker knew the FLS was false or misleading and the FLS was authorized and/or approved by an executive officer of Biolase who knew that the FLS was false.  None of the historic or present tense statements made by Defendants were assumptions underlying or relating to any plan, projection or statement of future economic performance, as they were not stated to be such assumptions underlying or relating to any projection or statement of future economic performance when made, nor were any of the projections or forecasts made by Defendants expressly related to or stated to be dependent on those historic or present tense statements when made.

**APPLICATION OF PRESUMPTION OF RELIANCE:**
**FRAUD ON THE MARKET**

61.     Plaintiff will rely upon the presumption of reliance established by the fraud on the market doctrine in that, among other things:

(a)     Defendants made public misrepresentations or failed to disclose material facts during the Class Period;

(b)     The omissions and misrepresentations were material;

(c)     The Company's securities traded in an efficient market;

(d)     The misrepresentations alleged would tend to induce a reasonable investor to misjudge the value of the Company's securities; and

(e)     Plaintiff and other members of the Class purchased Biolase securities between the time Defendants misrepresented or failed to disclose material facts and the time the true facts were disclosed, without knowledge of the misrepresented or omitted facts.

62.     At all relevant times, the market for Biolase securities was efficient for the following reasons, among others:

(a)     As a regulated issuer, Biolase filed periodic public reports with the SEC; and

(b)     Biolase regularly communicated with public investors via established market communication mechanisms, including through regular disseminations of press releases on the major news wire services and through other wide-ranging public disclosures, such as communications with the financial press, securities analysts, and other similar reporting services.

**LOSS CAUSATION/ECONOMIC LOSS**

63.     During the Class Period, as detailed herein, Defendants made false and misleading statements and engaged in a scheme to deceive the market and a course of conduct that artificially inflated the price of Biolase common stock and operated as a fraud or deceit on Class Period purchasers of Biolase common stock by misrepresenting the value of the Company's business and prospects by overstating its earnings and concealing the significant defects in its internal controls. As Defendants' misrepresentations and fraudulent conduct became apparent to the market, the price of Biolase common stock fell precipitously, as the prior artificial inflation came out of the price. As a result of their purchases of Biolase common stock during the Class Period, Plaintiff and other members of the Class suffered economic loss, *i.e.*, damages, under the federal securities laws.

## COUNT I

### For Violations of §10(b) of the Exchange Act and Rule 10b-5
### Against Defendant Biolase and the Individual Defendants

64.   Plaintiff incorporates ¶¶1-63 by reference.

65.   During the Class Period, Defendant Biolase and the Individual Defendants disseminated or approved the false statements specified above, which they knew or deliberately disregarded were misleading in that they contained misrepresentations and failed to disclose material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading.

66.   Defendant Biolase and the Individual Defendants violated §10(b) of the Exchange Act and Rule 10b-5 in that they: (a) employed devices, schemes and artifices to defraud; (b) made untrue statements of material facts or omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; or (c) engaged in acts, practices and a course of business that operated as a fraud or deceit upon Plaintiff and others similarly situated in connection with their purchases of Biolase securities during the Class Period.

67.   Plaintiff and the Class have suffered damages in that, in reliance on the integrity of the market, they paid artificially inflated prices for Biolase securities. Plaintiff and the Class would not have purchased Biolase securities at the prices they paid, or at all, if they had been aware that the market prices had been artificially and falsely inflated by Defendants' misleading statements.

## COUNT II

### For Violations of §20(a) of the Exchange Act
### Against Defendant Biolase and the Individual Defendants

68.   Plaintiff incorporates ¶¶1-67 by reference.

69.   The Individual Defendants acted as controlling persons of Biolase within the meaning of §20(a) of the Exchange Act.  By reason of their positions with the

Company, and their ownership of Biolase securities, the Individual Defendants had the power and authority to cause Biolase to engage in the wrongful conduct complained of herein. Biolase controlled the Individual Defendants and all of the Company's employees. By reason of such conduct, Defendants are liable pursuant to §20(a) of the Exchange Act.

### PRAYER FOR RELIEF

WHEREFORE, Plaintiff prays for relief and judgment, as follows:

A.     Determining that this action is a proper class action, designating Plaintiff as a Lead Plaintiff and certifying plaintiff as a Class representative under Rule 23 of the Federal Rules of Civil Procedure and Plaintiff's counsel as Lead Counsel;

B.     Awarding compensatory damages in favor of Plaintiff and the other Class members against all Defendants, jointly and severally, for all damages sustained as a result of Defendants' wrongdoing, in an amount to be proven at trial, including interest thereon;

C.     Awarding Plaintiff and the Class their reasonable costs and expenses incurred in this action, including counsel fees and expert fees; and

D.     Awarding such equitable/injunctive or other relief as deemed appropriate by the Court.

### JURY DEMAND

Plaintiff demands a trial by jury.

DATED: August 22, 2013                    ROBBINS GELLER RUDMAN
                                          & DOWD LLP
                                          DAVID C. WALTON

                                          _____
                                          DAVID C. WALTON

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

655 West Broadway, Suite 1900
San Diego, CA 92101
Telephone: 619/231-1058
619/231-7423 (fax)

ROBBINS GELLER RUDMAN
  & DOWD LLP
SAMUEL H. RUDMAN
MARY K. BLASY
58 South Service Road, Suite 200
Melville, NY 11747
Telephone: 631/367-7100
631/367-1173 (fax)

HOLZER HOLZER & FISTEL, LLC
MICHAEL I. FISTEL, JR.
MARSHALL P. DEES
200 Ashford Center North, Suite 300
Atlanta, GA 30338
Telephone: 770/392-0090
770/392-0029 (fax)

Attorneys for Plaintiff

S:\CptDraft\Securities\Cpt Biolase.docx

## CERTIFICATION OF NAMED PLAINTIFF
## PURSUANT TO FEDERAL SECURITIES LAWS

The undersigned declares, as to the claims asserted under the federal securities laws, that:

Plaintiff has reviewed the initial complaint filed in this action.

Plaintiff did not purchase and/or acquire the security that is the subject of this action at the direction of Plaintiff's counsel or in order to participate in any private action under the federal securities laws.

Plaintiff is willing to serve as a representative party on behalf of the class, including providing testimony at deposition and trial, if necessary. I understand that this is not a claim form, and that my ability to share in any recovery as a member of the class is not dependent upon execution of this Plaintiff Certification.

Plaintiff's transactions in the security that is the subject of this action during the Class Period are as follows:

Purchases:

| Name of Company | Date(s) Purchased | # Shares Purchased | Cost |
|---|---|---|---|
| BIOL | 6/21/13 | 85 | $316.20 |
| | 8/1/13 | 22 | $78.54 |

Sales:

| Name of Company | Date(s) Sold | # Shares Sold | Proceeds |
|---|---|---|---|
| BIOL | N/A - Still own above shares | | |

During the three (3) years prior to the date of this certification, Plaintiff has not sought to serve or served as a class representative in an action filed under the federal securities laws except for the following (if any):

1

Plaintiff will not accept any payment for serving as a representative party on behalf of the class beyond Plaintiff's pro rata share of any recovery, except such reasonable costs and expenses (including lost wages) directly relating to the representation of the class as ordered or approved by the court.

I declare under penalty of perjury that the foregoing is true and correct.

Executed this __21__ day of _August_, 2013 in ____Seabrook____, ____Texas____.
City           State

(Signature) X_____

(Print Name)____Brady Adams_____

2

# UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF CALIFORNIA

### NOTICE OF ASSIGNMENT TO UNITED STATES JUDGES

This case has been assigned to District Judge      Josephine Staton Tucker      and the assigned Magistrate Judge is      Frederick F. Mumm      .

The case number on all documents filed with the Court should read as follows:

## SACV 13-01300 JST (FFMx)

Pursuant to General Order 05-07 of the United States District Court for the Central District of California, the Magistrate Judge has been designated to hear discovery related motions.

All discovery related motions should be noticed on the calendar of the Magistrate Judge.

Clerk, U. S. District Court

| | |
|---|---|
| August 23, 2013 | By   D. Vo |
| Date | Deputy Clerk |

---

### NOTICE TO COUNSEL

*A copy of this notice must be served with the summons and complaint on all defendants (if a removal action is filed, a copy of this notice must be served on all plaintiffs).*

**Subsequent documents must be filed at the following location:**

☐ Western Division
312 N. Spring Street, G-8
Los Angeles, CA 90012

☒ Southern Division
411 West Fourth St., Ste 1053
Santa Ana, CA 92701

☐ Eastern Division
3470 Twelfth Street, Room 134
Riverside, CA 92501

**Failure to file at the proper location will result in your documents being returned to you.**

---

CV-18 (08/13)          NOTICE OF ASSIGNMENT TO UNITED STATES JUDGES

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA
CIVIL COVER SHEET

**I. (a) PLAINTIFFS** ( Check box if you are representing yourself ☐ )
BRADY ADAMS, Individually and on Behalf of All Others Similarly Situated

**DEFENDANTS** ( Check box if you are representing yourself ☐ )
BIOLASE, INC., FEDERICO PIGNATELLI and FREDERICK D. FURRY

**(b) Attorneys** (Firm Name, Address and Telephone Number. If you are representing yourself, provide same.)
David C. Walton
Robbins Geller Rudman & Dowd LLP
655 West Broadway, Suite 1900
San Diego, CA 92101    619/231-1058

**(b) Attorneys** (Firm Name, Address and Telephone Number. If you are representing yourself, provide same.)

**II. BASIS OF JURISDICTION** (Place an X in one box only.)

☐ 1. U.S. Government Plaintiff
☒ 3. Federal Question (U.S. Government Not a Party)
☐ 2. U.S. Government Defendant
☐ 4. Diversity (Indicate Citizenship of Parties in Item III)

**III. CITIZENSHIP OF PRINCIPAL PARTIES**-For Diversity Cases Only
(Place an X in one box for plaintiff and one for defendant)

| | PTF | DEF | | PTF | DEF |
|---|---|---|---|---|---|
| Citizen of This State | ☐ 1 | ☐ 1 | Incorporated or Principal Place of Business in this State | ☐ 4 | ☐ 4 |
| Citizen of Another State | ☐ 2 | ☐ 2 | Incorporated and Principal Place of Business in Another State | ☐ 5 | ☐ 5 |
| Citizen or Subject of a Foreign Country | ☐ 3 | ☐ 3 | Foreign Nation | ☐ 6 | ☐ 6 |

**IV. ORIGIN** (Place an X in one box only.)
☒ 1. Original Proceeding
☐ 2. Removed from State Court
☐ 3. Remanded from Appellate Court
☐ 4. Reinstated or Reopened
☐ 5. Transferred from Another District (Specify)
☐ 6. Multi-District Litigation

**V. REQUESTED IN COMPLAINT: JURY DEMAND:** ☒ Yes  ☐ No  (Check "Yes" only if demanded in complaint.)

**CLASS ACTION under F.R.Cv.P. 23:** ☒ Yes  ☐ No     ☐ MONEY DEMANDED IN COMPLAINT: $ _____

**VI. CAUSE OF ACTION** (Cite the U.S. Civil Statute under which you are filing and write a brief statement of cause. Do not cite jurisdictional statutes unless diversity.)
COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS    15 U.S.C. §§78j(b) and 78t(a)

**VII. NATURE OF SUIT** (Place an X in one box only).

| OTHER STATUTES | CONTRACT | REAL PROPERTY CONT. | IMMIGRATION | PRISONER PETITIONS | PROPERTY RIGHTS |
|---|---|---|---|---|---|
| ☐ 375 False Claims Act | ☐ 110 Insurance | ☐ 240 Torts to Land | ☐ 462 Naturalization Application | **Habeas Corpus:** | ☐ 820 Copyrights |
| ☐ 400 State Reapportionment | ☐ 120 Marine | ☐ 245 Tort Product Liability | ☐ 465 Other Immigration Actions | ☐ 463 Alien Detainee | ☐ 830 Patent |
| ☐ 410 Antitrust | ☐ 130 Miller Act | ☐ 290 All Other Real Property | | ☐ 510 Motions to Vacate Sentence | ☐ 840 Trademark |
| ☐ 430 Banks and Banking | ☐ 140 Negotiable Instrument | **TORTS** | **TORTS** | ☐ 530 General | **SOCIAL SECURITY** |
| ☐ 450 Commerce/ICC Rates/Etc. | ☐ 150 Recovery of Overpayment & Enforcement of Judgment | **PERSONAL INJURY** | **PERSONAL PROPERTY** | ☐ 535 Death Penalty | ☐ 861 HIA (1395ff) |
| ☐ 460 Deportation | | ☐ 310 Airplane | ☐ 370 Other Fraud | **Other:** | ☐ 862 Black Lung (923) |
| ☐ 470 Racketeer Influenced & Corrupt Org. | ☐ 151 Medicare Act | ☐ 315 Airplane Product Liability | ☐ 371 Truth in Lending | ☐ 540 Mandamus/Other | ☐ 863 DIWC/DIWW (405 (g)) |
| ☐ 480 Consumer Credit | ☐ 152 Recovery of Defaulted Student Loan (Excl. Vet.) | ☐ 320 Assault, Libel & Slander | ☐ 380 Other Personal Property Damage | ☐ 550 Civil Rights | ☐ 864 SSID Title XVI |
| ☐ 490 Cable/Sat TV | | ☐ 330 Fed. Employers' Liability | ☐ 385 Property Damage Product Liability | ☐ 555 Prison Condition | ☐ 865 RSI (405 (g)) |
| ☒ 850 Securities/Commodities/Exchange | ☐ 153 Recovery of Overpayment of Vet. Benefits | ☐ 340 Marine | **BANKRUPTCY** | ☐ 560 Civil Detainee Conditions of Confinement | **FEDERAL TAX SUITS** |
| ☐ 890 Other Statutory Actions | ☐ 160 Stockholders' Suits | ☐ 345 Marine Product Liability | ☐ 422 Appeal 28 USC 158 | **FORFEITURE/PENALTY** | ☐ 870 Taxes (U.S. Plaintiff or Defendant) |
| ☐ 891 Agricultural Acts | ☐ 190 Other Contract | ☐ 350 Motor Vehicle | ☐ 423 Withdrawal 28 USC 157 | ☐ 625 Drug Related Seizure of Property 21 USC 881 | ☐ 871 IRS-Third Party 26 USC 7609 |
| ☐ 893 Environmental Matters | ☐ 195 Contract Product Liability | ☐ 355 Motor Vehicle Product Liability | **CIVIL RIGHTS** | ☐ 690 Other | |
| ☐ 895 Freedom of Info. Act | ☐ 196 Franchise | ☐ 360 Other Personal Injury | ☐ 440 Other Civil Rights | **LABOR** | |
| ☐ 896 Arbitration | **REAL PROPERTY** | ☐ 362 Personal Injury-Med Malpractice | ☐ 441 Voting | ☐ 710 Fair Labor Standards Act | |
| ☐ 899 Admin. Procedures Act/Review of Appeal of Agency Decision | ☐ 210 Land Condemnation | ☐ 365 Personal Injury-Product Liability | ☐ 442 Employment | ☐ 720 Labor/Mgmt. Relations | |
| | ☐ 220 Foreclosure | ☐ 367 Health Care/ Pharmaceutical Personal Injury Product Liability | ☐ 443 Housing/ Accomodations | ☐ 740 Railway Labor Act | |
| ☐ 950 Constitutionality of State Statutes | ☐ 230 Rent Lease & Ejectment | ☐ 368 Asbestos Personal Injury Product Liability | ☐ 445 American with Disabilities-Employment | ☐ 751 Family and Medical Leave Act | |
| | | | ☐ 446 American with Disabilities-Other | ☐ 790 Other Labor Litigation | |
| | | | ☐ 448 Education | ☐ 791 Employee Ret. Inc. Security Act | |

**FOR OFFICE USE ONLY: Case Number:** SACV 13 - 01300 JST (FFMx)

AFTER COMPLETING PAGE 1 OF FORM CV-71, COMPLETE THE INFORMATION REQUESTED ON PAGE 2.

CV-71 (02/13)                    CIVIL COVER SHEET                    Page 1 of 2

## UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA
### CIVIL COVER SHEET

**VIII(a). IDENTICAL CASES:** Has this action been previously filed in this court and dismissed, remanded or closed?  ☒ NO   ☐ YES

    If yes, list case number(s):

**VIII(b). RELATED CASES:** Have any cases been previously filed in this court that are related to the present case?  ☒ NO   ☐ YES

    If yes, list case number(s):

Civil cases are deemed related if a previously filed case and the present case:

(Check all boxes that apply)   ☐ A. Arise from the same or closely related transactions, happenings, or events; or

    ☐ B. Call for determination of the same or substantially related or similar questions of law and fact; or

    ☐ C. For other reasons would entail substantial duplication of labor if heard by different judges; or

    ☐ D. Involve the same patent, trademark or copyright, and one of the factors identified above in a, b or c also is present.

**IX. VENUE:** (When completing the following information, use an additional sheet if necessary.)

(a) List the County in this District; California County outside of this District; State if other than California; or Foreign Country, in which **EACH** named plaintiff resides.

☐ Check here if the government, its agencies or employees is a named plaintiff. If this box is checked, go to item (b).

| County in this District:* | California County outside of this District; State, if other than California; or Foreign Country |
|---|---|
|  | Seabrook, Texas |

(b) List the County in this District; California County outside of this District; State if other than California; or Foreign Country, in which **EACH** named defendant resides.

☐ Check here if the government, its agencies or employees is a named defendant. If this box is checked, go to item (c).

| County in this District:* | California County outside of this District; State, if other than California; or Foreign Country |
|---|---|
| Orange County |  |

(c) List the County in this District; California County outside of this District; State if other than California; or Foreign Country, in which **EACH** claim arose.
**NOTE: In land condemnation cases, use the location of the tract of land involved.**

| County in this District:* | California County outside of this District; State, if other than California; or Foreign Country |
|---|---|
| Orange County |  |

**\*Los Angeles, Orange, San Bernardino, Riverside, Ventura, Santa Barbara, or San Luis Obispo Counties**
Note: In land condemnation cases, use the location of the tract of land involved

**X. SIGNATURE OF ATTORNEY (OR SELF-REPRESENTED LITIGANT):** _(signature)_   DATE: August 22, 2013

Notice to Counsel/Parties: The CV-71 (JS-44) Civil Cover Sheet and the information contained herein neither replace nor supplement the filing and service of pleadings or other papers as required by law. This form, approved by the Judicial Conference of the United States in September 1974, is required pursuant to Local Rule 3-1 is not filed but is used by the Clerk of the Court for the purpose of statistics, venue and initiating the civil docket sheet. (For more detailed instructions, see separate instructions sheet).

Key to Statistical codes relating to Social Security Cases:

| Nature of Suit Code | Abbreviation | Substantive Statement of Cause of Action |
|---|---|---|
| 861 | HIA | All claims for health insurance benefits (Medicare) under Title 18, Part A, of the Social Security Act, as amended. Also, include claims by hospitals, skilled nursing facilities, etc., for certification as providers of services under the program. (42 U.S.C. 1935FF(b)) |
| 862 | BL | All claims for "Black Lung" benefits under Title 4, Part B, of the Federal Coal Mine Health and Safety Act of 1969. (30 U.S.C. 923) |
| 863 | DIWC | All claims filed by insured workers for disability insurance benefits under Title 2 of the Social Security Act, as amended; plus all claims filed for child's insurance benefits based on disability.  (42 U.S.C. 405 (g)) |
| 863 | DIWW | All claims filed for widows or widowers insurance benefits based on disability under Title 2 of the Social Security Act, as amended. (42 U.S.C. 405 (g)) |
| 864 | SSID | All claims for supplemental security income payments based upon disability filed under Title 16 of the Social Security Act, as amended. |
| 865 | RSI | All claims for retirement (old age) and survivors benefits under Title 2 of the Social Security Act, as amended. (42 U.S.C. 405 (g)) |