1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

**THE WAGNER FIRM**
AVI WAGNER (SBN 226688)
1925 Century Park East, Suite 2100
Los Angeles, California 90067
Telephone:   (310) 491-7949
Facsimile:    (310) 694-3967
Email:  avi@thewagnerfirm.com

**BERNSTEIN LIEBHARD LLP**
SANDY A. LIEBHARD
JEFFREY M. HABER
JOSEPH R. SEIDMAN, JR.
10 East 40th Street
New York, New York 10016
Telephone:   (212) 779-1414
Facsimile:    (212) 779-3218

## UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| IN RE BIOLASE, INC. SECURITIES LITIGATION | Case No. 8:13-cv-01300-JLS-(FFMx) **CONSOLIDATED CLASS ACTION COMPLAINT** **DEMAND FOR JURY TRIAL** |

Lead Plaintiff Pradeep Khurana ("Lead Plaintiff" or "Khurana"), individually and on behalf of all other persons similarly situated, by his undersigned attorneys, for his consolidated class action complaint against the Defendants named herein (defined below), alleges the following based upon personal knowledge as to himself and his own acts, and information and belief as to all other matters, based upon, *inter alia*, the investigation conducted by and through his attorneys, which included, among other things, a review of the public documents, transcripts of conference calls, and announcements made or issued by Defendants; United States Securities and Exchange Commission ("SEC") filings; wire and press releases published by and regarding BIOLASE, Inc. ("BIOLASE" or the "Company"); analysts' reports about the Company; information readily obtainable on the Internet; and information provided by former employees of the Company. Lead Plaintiff believes that substantial evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## NATURE OF THE ACTION

1.     Lead Plaintiff brings this securities class action on behalf of himself and all persons who purchased BIOLASE common stock during the period November 5, 2012 through August 13, 2013, inclusive (the "Class Period"), and who sustained damages as a result of the corrective disclosures alleged herein (the "Class"). Lead Plaintiff seeks to recover damages as a result of Defendants' violations of the Securities Exchange Act of 1934 (the "Exchange Act").

2.     BIOLASE is a biomedical company that develops, manufactures, and markets lasers in dentistry and medicine and also markets and distributes high-end 2D and 3D digital imaging equipment and CAD/CAM intraoral scanners. The Company offers two categories of its core laser products: the WaterLase systems (which include the "flagship" WaterLase iPlus (referred to herein as the "iPlus"), WaterLase MDX, WaterLase MD Turbo, and the iLase) for cutting soft and hard tissue; and the Diode

laser systems for use in soft tissue, pain therapy, and cosmetic procedures, such as teeth whitening.

3.     During the Class Period, Defendants made materially false and misleading statements and omissions about the growth of, and demand for, the Company's WaterLase systems, as well as the acceptance and adoption of dental lasers.  Defendants also made materially false and misleading statements about the Company's liquidity, and, in particular, the near-term liquidity/cash crisis BIOLASE was experiencing.

4.     Since 1998, BIOLASE has sold its lasers to the dental community.  Over the next 8 years, BIOLASE was able to increase sales of its laser systems, reaching a peak of about $70 million in 2006.  The vast majority of the sales occurred in North America where the Company used a direct sales force.

5.     In August 2006, however, former management changed the sales model for North America from reliance on a direct sales force to reliance on a distributor.  This distribution model did not work as intended, and sales in North America began to decline, slowly at first, and then more significantly by the end of the decade.

6.     In 2010, two events occurred that altered the direction of the Company. First, as a result of a successful proxy fight, Defendant Pignatelli was reinstated as Chairman of the Board and appointed Chief Executive Officer ("CEO"), and a new Board (which included Defendant Arrow) was constituted.   Second, the Company terminated its distribution agreement with its distributor and began the transition back to a direct sales force in North America.

7.     To help fund the new business model (that is, the direct sales force), on May 24, 2012, the Company entered into two revolving credit facility agreements with Comerica Bank ("Comerica") for a combined aggregate commitment of borrowings of up to $8 million.  The revolving credit facilities subjected the Company to various reporting and financial covenants that required it to maintain certain levels of debt ratios and minimum earnings before income taxes, depreciation, and amortization ("EBITDA").  Comerica secured the credit facilities with substantially all of the assets

then owned or thereafter acquired by BIOLASE, and placed all of the Company's receivables in a "lock box".  In a lockbox arrangement, substantially all of the income generated by the borrower is deposited directly into lockbox accounts and then moved into cash management accounts for the benefit of the lender.  Cash is disbursed to the borrower only after payment of the applicable debt service and principal.  In addition, Comerica received a five-year warrant to purchase an aggregate of 80,000 shares of BIOLASE stock at $2.36 per share (lowered less than three months later to $2.00 per share), the closing price per share of BIOLASE's stock on May 24, 2012.  Comerica could exercise the warrant (which it later did during the first quarter of 2013) for cash or on a net exercise basis.  In case of a default, Comerica could declare the amounts outstanding under the credit facilities immediately due and payable.

8.     With its direct sales force and credit facilities in place, BIOLASE began to sell its core dental lasers, and in particular the iPlus.  It did so by offering these products primarily to its existing customers and early adopters of laser dentistry at significant discounts and promotional prices.

9.     By the fourth quarter of 2012, after years of consistent reported losses, BIOLASE reported an increase in revenues and a net profit.  The Company falsely attributed the increase in revenues primarily to sales of the iPlus and other WaterLase systems.  In reality, however, the primary drivers of the reported increases were sales of digital imaging equipment and CAD/CAM intraoral scanners.   The price of the Company's stock rose following these reported results, and continued to do so into the second quarter of 2013, reaching a multi-year high of just over $6.00 per share in late April 2013, up from $1.50 per share in 2012.[1]

10.     The first quarter of 2013, however, brought mixed results – a reported increase in net revenues, which Defendants this time attributed to the increase of sales of digital imaging equipment and CAD/CAM intraoral scanners, and a reported net loss,

---

[1] All BIOLASE stock prices are in actual, not adjusted, closing prices.

which was greater than analysts' consensus estimates.  The Company also reported an increase in operating expense, compared to analysts' expectations.  Sales and marketing expense were reported to be impacted by the costs associated with BIOLASE's sponsorship of the WCLI (World Clinical Laser Institute) Super Symposium in March 2013, and its attendance at other dental conferences during the quarter.  The Company ended the quarter with only $1.2 million in cash on hand, compared to $2.5 million at the end of 2012.  The Company increased its draw-down on its lines of credit to $3.3 million.

11.    As a near-term liquidity/cash crunch took hold of the Company during the first quarter, Comerica fully exercised the warrant it received under the May 24, 2012 credit agreements on a cashless basis resulting in a net issuance of 40,465 shares of common stock.  The timing of the exercise indicates that, due to the liquidity/cash crunch BIOLASE was experiencing, Comerica did so as protection in the event the Company became insolvent – there were no additional assets to attach because, under the credit agreements, as noted, all of the Company's assets were pledged to the bank.

12.    Defendants obtained an increase in the Company's maximum aggregate borrowing under the revolving credit facilities to $10 million from $8 million, on May 7, 2013, to obtain mid-quarter borrowing flexibility.  This explanation hinted at the near-term liquidity/cash crunch, but did not disclose fully the extent of the crisis.

13.    Less than two months later, the Company increased its aggregate outstanding borrowings under the credit facilities to more than $6 million.  By comparison, the Company had aggregate outstanding borrowings totaling approximately $1.6 million as of December 31, 2012.

14.    As BIOLASE's liquidity/cash situation worsened, so did the Company's ability to satisfy the financial covenants on the loan agreements.  By the end of June 2013, and unbeknown to the market, the Company was no longer in compliance with the EBITDA covenant in the credit agreements with the bank and owed Comerica more than $6 million.  The bank gave BIOLASE until September 13, 2013, to negotiate

acceptable terms of an amended credit agreement, and it reduced the Company's aggregate borrowing capacity to a maximum of $7.5 million.   At June 30, 2013, BIOLASE had approximately $2.1 million in cash and cash equivalents and $11.47 million in accounts receivable, and used approximately $5 million for operating activities.

15.   On August 7, 2013, in the first of a series of August 2013 disclosures, BIOLASE reported second quarter net revenues and a net loss below expectations, which Defendants attributed to poor sales of the iPlus and the WaterLase systems and marketing execution.   Defendants disclosed that, contrary to their Class Period statements about the mainstream dental community's acceptance and adoption of laser dentistry, and demand for the iPlus and WaterLase systems in particular, BIOLASE had not penetrated that market and, as a result, WaterLase revenues for the first half of 2013 did not grow.  As Defendant Arrow explained, the absence of these sales was the "main reason that the Company is not already cash flow-positive."   Defendants also announced a net loss 50% higher than expected.

16.   As alleged below, Defendants knew or, with deliberate recklessness, disregarded that the primary users of dental lasers were the innovators – tech-savvy dentists who wanted the latest available dental tool – and the early adopters of laser technology.  Dental lasers were not widely accepted and adopted as the standard of care within the larger, mainstream dental community.   Indeed, this larger community of dentists was content to use the drill and scalpel and had no intention to convert to laser dentistry.  Defendants knew that existing customers, early adopters and innovators were too small a market to fuel and sustain the Company's revenues and earnings growth.

17.   Additionally, because the acceptance and adoption of laser dentistry was limited to a very small group of professionals, Defendants also knew or, with deliberate recklessness, disregarded that any demand for BIOLASE's dental lasers would come primarily from this very limited group of dentists.  Even as to this group, despite being the primary market for the Company's lasers, dentists were not knocking down

BIOLASE's door for an iPlus or WaterLase system.  Any "demand" for these lasers had to be manufactured by the Company and its sales/field representatives.  BIOLASE created such "demand" primarily by offering significant discounts and promotional pricing to its limited market of dental professionals.

18.    However, BIOLASE's primary market could not sustain the Company's sales and revenues beyond the third and fourth quarters of 2012.  Consequently, Defendants looked to the Company's less expensive laser offerings (*e.g.*, the Diode lasers), digital imaging equipment and CAD/CAM intraoral scanners, as well as international sales, to pick up the slack.  Defendants told investors that BIOLASE's emphasis on these product offerings was part of an effort to be a total technology solution for dental professionals and a gateway to the sale of the WaterLase systems.  In reality, Defendants knew that the increased sales of digital imaging equipment and CAD/CAM intraoral scanners had been necessary to report top-line growth and conceal the near-term liquidity/cash crisis that the Company was experiencing.

19.    The Company also disclosed on August 7, 2013, that as of June 30, 2013, it had approximately $3.8 million in working capital, approximately $2.1 million in cash, compared to $2.5 million at December 31, 2012, and $11.5 million in accounts receivable, compared to $11.7 million at December 31, 2012.  At June 30, 2013, the Company reported $1.5 million of available borrowings, in excess of the $6 million outstanding.

20.    On this news, BIOLASE stock declined from an August 7, 2013 closing price of $3.42 per share to close at $2.51 per share on August 8, 2013, on heavy volume of 1,935,300 shares, a decline of 26%.

21.    On August 9, 2013, in its quarterly report, BIOLASE disclosed for the first time that it had violated the EBITDA covenant of its credit agreements with Comerica and that Comerica had agreed to waive the Company's non-compliance.  It also disclosed that Comerica gave the Company until September 13, 2013, to negotiate an acceptable amendment to the credit agreements, and reduced the Company's aggregate

borrowing capacity from $10 million to $7.5 million, an attempt by the bank to limit its exposure.

22.   The Company also disclosed in the quarterly report that total stockholder equity had fallen to just $8 million, while BIOLASE owed at least $6 million to Comerica.

23.   On August 13, 2013, BIOLASE made two disclosures, the first of which, released before the market opened, involved a discussion of the Company's non-compliance with the EBITDA covenant in the Credit Agreements and the bank's agreement to waive that violation.   BIOLASE stock opened at $1.96 per share on August 13, 2013, and closed at $1.81 per share on that day.   The second disclosure, made after the close of the market, came in a filing with the SEC.   In that filing, an amended registration statement on Form S-3, the Company reduced the planned stock offering from $30 million to $5 million.   With this filing, the Company disclosed that as a consequence of its cashflow/liquidity crisis, it desperately needed cash such that it would accept proceeds from the offering below the $30 million originally planned. BIOLASE stock fell further on the following day, August 14, 2013, closing at $1.20 per share from $1.81 per share on August 13, 2013.   As investors and the market became aware of the full extent to which BIOLASE's statements concerning the financial and liquidity position of the Company had been false and misleading, the remaining artificial inflation came out of BIOLASE's stock price, thereby damaging investors.

24.   As a result of Defendants' misstatements and omissions, the disclosure of the true facts, and the precipitous declines in the market price of the Company's stock, Lead Plaintiff and other Class members have suffered significant losses and damages.

## JURISDICTION AND VENUE

25.   This Court has jurisdiction over the subject matter of this action pursuant to § 27 of the Exchange Act (15 U.S.C. § 78aa) and 28 U.S.C. § 1331.

26.     The claims asserted herein arise under and pursuant to Sections 10(b) and 20(a) of the Exchange Act (15 U.S.C. §§ 78j(b), 78n(a) and 78t(a)) and Rule 10b-5 promulgated under Section 10(b) (17 C.F.R. § 240.10b-5).

27.     Venue is proper in this District pursuant to § 27 of the Exchange Act, 15 U.S.C. § 78aa and 28 U.S.C. § 1391(b), as BIOLASE's headquarters are located within this District, and the alleged misconduct was transacted in, and emanated from, this District.

28.     In connection with the acts, conduct and other wrongs alleged in this Complaint, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including, but not limited to, the United States mail, interstate telephone communications and the facilities of the national securities exchange.

## PARTIES

29.     Lead Plaintiff Pradeep Khurana, as set forth in the certification accompanying his motion for appointment as Lead Plaintiff incorporated by reference herein, purchased BIOLASE stock at artificially inflated prices during the Class Period and has been damaged by the corrective disclosures identified herein.

30.     Defendant BIOLASE, headquartered in Irvine, California, develops, manufactures, and markets lasers in dentistry and medicine and also markets and distributes digital imaging equipment and intraoral scanners.  It is a small company that employs about 200 people worldwide, with approximately 110 people working in the Company's headquarters, according to phone extension lists circulated to employees during the Class Period.  The Company was originally formed as Societe Endo Technic, SA ("SET") in 1984 in Marseilles, France, to develop and market various endodontic and laser products.  In 1987, SET merged into Pamplona Capital Corp., a public holding company incorporated in Delaware.  In 1994, the Company changed its name to BIOLASE Technology, Inc.  Since 1998, the Company's stated primary objective has been to design, manufacture, and market laser systems for the dental industry.  In 2012, the Company changed its name to BIOLASE, Inc.  The Company's common stock is

listed on the NASDAQ, an open and efficient market, under the ticker symbol "BIOL". During the Class Period, the Company had in excess of 31 million shares of its common stock outstanding.

31.     Defendant Federico Pignatelli ("Pignatelli") has served as the Company's CEO and Chairman of the Board of Directors (the "Board") since September 30, 2010. He served as Chairman of the Board from 1994 until March 2006, at which point he resigned as Chairman of the Board and became Chairman Emeritus.   Pignatelli previously served as interim CEO from November 2007 to January 2008, and served as President from January 2008 until June 2010.  He has served as a director since 1991.

32.     Pignatelli is, and was during the Class Period, a hands-on manager, which the Company conceded in a June 6, 2013 press release, stating that Pignatelli "is fully engaged in all aspects of the Company's business, as he will continue to be."  More specifically, according to a confidential source (CS 5, discussed below), Pignatelli was involved in the sale and marketing of the Company's products.  Pignatelli receives a symbolic annual salary of $1.00, but is compensated through stock options.

33.     During the Class Period, Pignatelli's nephew Adriano worked at BIOLASE as a U.S.-based sales representative.

34.     As alleged below, throughout the Class Period, Pignatelli made materially false and misleading statements in BIOLASE quarterly conference calls, SEC filings, Company-issued press releases and statements, events for analysts, investors and the media, and industry events.

35.     Defendant Frederick D. Furry ("Furry") has served as the Company's Chief Financial Officer ("CFO") since November 2010, and as Chief Operating Officer ("COO") from October 2011 through June 2013.  Defendant Furry is a certified public accountant and has experience working with manufacturing and high technology companies during more than 18 years at public accounting firms, including PricewaterhouseCoopers.   According to the Company's website, "Furry has been instrumental in restructuring operations and raising debt and equity financing enabling

BIOLASE to broaden its reach of core dental products and to diversify into new markets." During the Class Period, as more fully alleged below, Furry made materially false and misleading statements in BIOLASE quarterly conference calls, Company-issued press releases and statements, SEC filings, events for analysts, investors and the media, and industry events.

36. Defendant Alexander K. Arrow ("Arrow") has served as the Company's President and Chief Operating Officer since June 6, 2013, and as a member of the Board since July 2010. Arrow served as Chairman of the Audit Committee from August 2010 through 2013. Since becoming a senior executive officer of the Company, Arrow became more involved in the Company's operations. As Arrow admitted during a conference call with analysts and investors on August 7, 2013, "I've got a lot to say about how to execute on the operational side of" the Company. In this regard, Arrow identified the following areas under his supervision, direction and control: "planning, product development, execution [of] new ideas, and, . . . sales and marketing." During the Class Period, as more fully alleged below, Arrow made materially false and misleading statements in BIOLASE quarterly conference calls, Company-issued press releases and statements, SEC filings, events for analysts, investors and the media, and industry events.

37. The defendants referenced above in paragraphs 31-36 are referred to herein as the "Individual Defendants." BIOLASE and the Individual Defendants are referred to herein, collectively, as "Defendants."

38. Each of the Individual Defendants, by virtue of his high-level positions with BIOLASE, directly participated in the management of the Company, was directly involved in the day-to-day operations of the Company at the highest levels and was privy to confidential, proprietary information concerning the Company and its business, operations, financial statements, and financial condition during their tenure with the Company, as alleged herein.

39.     As senior executive officers and/or directors of a publicly-held company whose common stock was, and is, registered with the SEC pursuant to the Exchange Act, and whose common stock was, and is, traded on the NASDAQ, and governed by the federal securities laws, the Individual Defendants each had a duty to disseminate prompt, accurate, and truthful information with respect to the Company's business, operations, financial statements and financial condition, and to correct any previously issued statements that had become materially misleading or untrue, so that the market prices of the Company's publicly-traded common stock would be based on accurate information.    The Individual Defendants each violated these requirements and obligations during the Class Period.

40.     The Individual Defendants, because of their positions of control and authority as senior executive officers and/or directors of BIOLASE, were able to and did control the content of the SEC filings, press releases and other public statements issued by BIOLASE during the Class Period to securities analysts, money and portfolio managers, and institutional investors, *i.e.*, the market.   Because of their positions of control and authority as senior executive officers and/or directors of BIOLASE, the Individual Defendants had access to the adverse, undisclosed information about BIOLASE's business, operations, and financial statements through access to internal corporate documents, conversations with other corporate officers and employees, attendance at management and Board of Directors meetings and committees thereof and through reports and other information provided to them in connection therewith, and knew or, with deliberate recklessness, disregarded that these adverse undisclosed facts rendered their positive representations about BIOLASE, its products, operations, and financial condition materially false and misleading.

41.     The Individual Defendants are liable as direct participants in the wrongs complained of herein.  In addition, the Individual Defendants, by reason of their status as senior executive officers and/or directors, were "controlling persons" within the meaning of Section 20(a) of the Exchange Act, and had the power and influence to

cause, and did cause, directly or indirectly, the Company to engage in the unlawful conduct complained of herein.

## CLASS ACTION ALLEGATIONS

42.     Lead Plaintiff brings this action as a class action pursuant to Federal Rule of Civil Procedure 23(a) and (b)(3) on behalf of the Class during the Class Period. Excluded from the Class are Defendants, the officers and directors of the Company, at all relevant times, members of their immediate families and their legal representatives, heirs, successors or assigns and any entity in which Defendants have or had a controlling interest.

43.     The members of the Class are so numerous that joinder of all members is impracticable. Throughout the Class Period, BIOLASE common stock was actively traded on the NASDAQ.  In excess of 31 million shares of BIOLASE common stock were outstanding during the Class Period.  While the exact number of Class members is unknown to Lead Plaintiff at this time and can only be ascertained through appropriate discovery, Lead Plaintiff believes that there are hundreds, if not thousands, of members in the proposed Class.  Record owners and other members of the Class may be identified from records maintained by BIOLASE or its transfer agent and may be notified of the pendency of this action by mail, using the form of notice similar to that customarily used in securities class actions.

44.     Lead Plaintiff's claims are typical of the claims of the members of the Class as all members of the Class are similarly affected by Defendants' wrongful conduct in violation of federal law that is complained of herein.

45.     Lead Plaintiff will fairly and adequately protect the interests of the members of the Class and has retained counsel competent and experienced in class and securities litigation.

46.     Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class. Among the questions of law and fact common to the Class are:

a)   whether the Exchange Act was violated by Defendants as alleged herein;

b)   whether the statements made by Defendants misrepresented and/or omitted material facts about the business, operations, and financial condition of BIOLASE; and

c)   to what extent the members of the Class have sustained damages and the proper measure of damages.

47.   A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable. Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it impossible for members of the Class to individually redress the wrongs done to them.  There will be no difficulty in the management of this action as a class action.

## SOURCES OF INFORMATION

48.   Lead Plaintiff's allegations, based upon information and belief, are supported by information former BIOLASE employees (referred to as a confidential source or "CS __") provided to Lead Plaintiff as discussed below.

49.   CS 1 was employed by the Company from January 2012 through April 2013, as a field representative responsible for the southeast region.  CS 1 was responsible for selling the Company's lasers and digital imaging equipment and CAD/CAM intraoral scanners to existing BIOLASE customers and non-customers within the region.  CS 1's direct manager was Daniel Merkin ("Merkin"), National Sales Manager, and William E. Brown ("Brown"), Vice President of Sales and Marketing.  According to a Company press release dated March 8, 2012, announcing Brown's promotion to the position, Brown reported directly to Defendant Pignatelli.

50.   CS 2 was employed by the Company from February 2011 through May 2013, and was responsible for customer care.  CS 2 worked in the Company's Irvine, California headquarters.  CS 2 managed a customer care team, which supported over

8,000 dentists in North America and 70+ International Distributors. CS 2's responsibilities included all post-sale service and support, service sales, technical training for all direct field service engineers and international distributors, and developing service strategies for new product lines. CS 2 reported directly to Richard R. Whipp ("Whipp"), Vice President of Operations. Whipp reported directly to Defendants Pignatelli and Furry. Whipp was responsible for directing the daily operations of the Company, including product manufacturing, manufacturing engineering, field service, purchasing, logistics, and maintenance.

51. CS 3 was employed by BIOLASE from December 2012 through July 2013. CS 3 worked in the Company's Irvine, California headquarters. CS 3 was responsible for quality assurance and regulatory compliance throughout the product-realization cycle, including post-market quality assurance. During CS 3's tenure at BIOLASE, CS 3 initiated actions to fix product deficiencies and address the backlog of customer complaints about the Company and its product offerings. CS 3 reported directed to Defendant Furry.

52. CS 4 was employed by BIOLASE from August 2012 through September 2013, as a field representative responsible for the southeast region. CS 4 was responsible for selling the Company's laser and digital imaging equipment and CAD/CAM intraoral scanners to existing BIOLASE customers and non-customers within the region. CS 4's direct managers were Merkin and Brown.

53. CS 5 was employed by the Company from December 2012 through July 2013. CS 5 worked in the Company's Irvine, California headquarters. CS 5 was a manager and then an executive involved with development, engineering and regulatory compliance. CS 5 also provided consulting services to the Company from September 2012 through December 2012. During CS 5's tenure, CS 5 analyzed business processes across all divisions, including management, organization/personnel, sales and marketing, regulatory, quality, product development, clinical research, production, supply, service and product management, and implemented strategic initiatives

targeting key business goals including customer satisfaction and improved efficiency. CS 5 reported to Defendant Pignatelli.

54.   CS 6 was employed by the Company from September 2011 through September 2013, as a field representative responsible for the northeast region.  CS 6 was responsible for selling the Company's lasers and digital imaging equipment and CAD/CAM intraoral scanners.  CS 6's direct managers were Merkin and Brown.

55.   CS 7 was employed by the Company from February 2011 through October 2012.  CS 7 handled direct and distribution sales of the Company's line of all-tissue lasers, 3-dimensional diagnostic imaging devices (Cone Beam CT), associated surgical instrumentation, and disposables.  CS 7 also provided hands-on surgical training and certification.  CS 7's direct manager was Merkin.

56.   CS 8 was employed by the Company from July 2012 through September 2013.  CS 8 worked in BIOLASE's corporate office in Irvine, California, as a buyer who oversaw vendor relationships.  CS 8 was responsible for planning against monthly build plan and managing and procuring machined parts, print and packaging and laser consumables, such as tips, hand pieces and trunk fibers.  In this role, CS 8 handled vendor negotiations, pricing, contracts and agreements, and assisted in resolving vendor payables, terms and credit issues.  CS 8 reported directly to Whipp.

57.   The information provided by each CS is reliable and credible because s/he: (a) worked at BIOLASE prior to and/or during the Class Period; (b) possessed a job title and responsibilities demonstrating that s/he was in a position to know the information provided; and (c) provided an account that corroborates, and is corroborated by, internal documents and Lead Plaintiff's allegations.

## **BACKGROUND**

58.   Since 1998, BIOLASE has developed, manufactured and marketed its lasers to the dental community.  Its core technology is based on the ablation (*i.e.*, the removal) of soft and hard dental tissues through the absorption of laser light by water in

those tissues.  The Company offers two categories of laser system products:  Waterlase systems and Diode systems.

59.    The WaterLase system, which cuts both soft and hard tissue, represents BIOLASE's core product line.  The WaterLase systems consist of the flagship iPlus (introduced in January 2011), the WaterLase MD Turbo (introduced in the first quarter of 2009), the WaterLase MDX 300 and MDX 450 (introduced in February 2012), and the WaterLase C100 all-tissue dental laser systems.  Each system can be moved from operatory to operatory within a practice office.   The Company claims that the WaterLase systems provide cutting speeds comparable to those of high speed drills.

60.    The vast majority of dentists and other specialists (*e.g.*, oral surgeons, endodontists, and periodontists) use hand instruments, as opposed to lasers, for the procedures that they perform.  These instruments fall into two categories:

- <u>High Speed Drills</u>.  Most dentists in the dental community use high speed drills for hard tissue procedures, such as preparing cavities for filling and gaining access for performing root canals or shaving and contouring oral bone tissue.

- <u>Cutting Instruments</u>.  Soft tissue procedures, such as reshaping gum lines and grafting on new gum tissue, are typically performed by the majority of oral surgeons or periodontists using scalpels, scissors and other cutting tools.

61.    The Diode systems can perform soft tissue and cosmetic procedures, including tooth whitening.  The Diode systems consist of the ezLase and the iLase.

62.    From 1998 through the summer of 2006, BIOLASE primarily sold its laser systems in North America where the Company used a direct sales force.

63.    In August 2006, however, former management decided to change to a sales model for North America that would rely on a distributor, Henry Schein, Inc. ("Schein").  Management believed that BIOLASE could achieve greater leverage of its sales and marketing expenditures with this hybrid distribution model.  Thus, as of September 1, 2006, BIOLASE commenced selling its products into the U.S. and Canadian markets exclusively through Schein.

64.     As part of the agreement between Schein and BIOLASE, Schein purchased products from the Company at negotiated distributor pricing, and invoiced the customer directly at the customer's purchase order price.  As Defendant Pignatelli observed in an interview posted on the website of *The Wall Street Reporter* on March 1, 2011, this distribution model did not work as intended.  Sales in North America began to decline, slowly at first, and then more significantly as capital equipment sales were also negatively affected by the economic slowdown at the end of the decade and the temporary decrease in credit available to purchasers.   The decline in sales was associated with a weaker balance sheet and dwindling cash balance, a depressed stock price, and a revolving door of senior executives.

65.     In 2010, two events occurred that changed the direction of the Company. First, Defendant Pignatelli initiated a proxy fight and was able to reconstitute the Board and management.  Defendant Pignatelli was reinstated as Chairman of the Board and appointed CEO.  Defendant Arrow was appointed to the Board.  Defendant Furry was appointed CFO.

66.     Second, the Company, led by Defendant Pignatelli and the new Board, implemented policies that were designed to guide BIOLASE to profitability and regain a strong market valuation.   For example, BIOLASE reduced operating costs, and restructured the balance sheet during 2011 by eliminating debt through capital raises and efforts to generate working capital.  (*See* discussion, *infra*.)

67.     BIOLASE also returned to a direct sales force model in North America by terminating the agreement with Schein and adding international distribution partners. The Company effected these changes on September 23, 2010, with the execution of the Distribution and Supply Agreement with Schein (the "D&S Agreement").

68.     Under the D&S Agreement, which was deemed effective as of August 30, 2010, BIOLASE (i) terminated all prior agreements with Schein, (ii) granted Schein certain non-exclusive distribution rights in North America and several international markets with respect to its dental laser systems, accessories, and related support and

services in certain circumstances, (iii) granted Schein exclusivity in selected international markets subject to review of certain performance criteria, and (iv) granted Schein a security interest in the Company's inventory and assets, including its intellectual property.  For its part, Schein placed two irrevocable purchase orders totaling $9 million for the Company's products.

69.    On April 12, 2012, BIOLASE purchased Schein's inventory of WaterLase MD Turbo laser systems for approximately $1.1 million and Schein released its liens on the Company's assets, including its inventory and intellectual property (the "2012 Termination Agreement").

70.    In order to fund the new business model (*i.e.*, the direct sales model), on May 24, 2012, the Company entered into two revolving credit facility agreements (the "Credit Agreements") with Comerica, which provided for borrowings against certain domestic accounts receivable and inventory, as set forth in the $4 million revolving credit-facility agreement (the "Domestic Revolver"), and borrowings against certain export-related accounts receivable and inventory, as set forth in the $4 million revolving credit-facility agreement (the "Ex-Im Revolver"), for a combined aggregate commitment of borrowings up to $8 million.  The Credit Agreements mature on May 1, 2014, and were secured by substantially all assets then owned or thereafter acquired by BIOLASE.  As of June 30, 2012, the Company had outstanding borrowings totaling approximately $1.9 million under the Domestic Revolver and no borrowings under the Ex-Im Revolver.

71.    The Credit Agreements require compliance with certain financial and non-financial covenants.  In this regard, the Company agreed to maintain the following financial ratios and covenants:

(a) Liquidity Ratio. As of the end of each month, commencing with May 31, 2012, a ratio of (i) cash plus Eligible Accounts plus Eligible Ex-Im Accounts plus Eligible Inventory to (ii) the outstanding principal amount of the Obligations, at not less than 1.25:1.00.

(b) EBITDA. As of the end of each fiscal quarter, commencing with the fiscal quarter ending March 31, 2012, an EBITDA [earnings before income

CONSOLIDATED CLASS ACTION COMPLAINT

tax, depreciation and amortization] of not less than the amount set forth below for the applicable measurement date, measured in each case for the three (3) months then-ending:

| Measurement Date | Minimum EBITDA |
| --- | --- |
| March 31, 2012 | –$1,000,000.00 |
| June 30, 2012 | -$650,000.00 |
| September 30, 2012 | $- 0 - |
| December 31, 2012 and thereafter | + $300,000.00 |

72.    The Company also covenanted to deliver to the bank, among other things:

(a) as soon as available, but in any event within 30 days after the end of each calendar month, a company prepared consolidated and consolidating balance sheet and income statement covering Borrower's operations during such period, in a form reasonably acceptable to Bank and certified by a Responsible Officer [defined to mean "each of the Chief Executive Officer, the Chief Financial Officer and the Controller of Borrower"];

(b) as soon as available, but in any event within 120 days after the end of Borrower's fiscal year, audited consolidated and consolidating financial statements of Borrower prepared in accordance with GAAP, consistently applied, together with an opinion which is unqualified (including no going concern comment or qualification) or otherwise consented to in writing by Bank on such financial statements of an independent certified public accounting firm reasonably acceptable to Bank;

(c) if applicable, copies of all statements, reports and notices sent or made available generally by Borrower to its security holders or to any holders of Subordinated Debt, if any, and all reports on Forms 10-K and 10-Q filed with the Securities and Exchange Commission (the "SEC") (the filing of such documents on the SEC's EDGAR system shall be deemed delivery by Borrower of such information to Bank);

*        *        *

(f) as soon as available, but in any event not later than 60 days after the commencement of each fiscal year, Borrower's board of directors-approved financial and business projections and budget, sales projections, and operating plans for that year;

*        *        *

(h) within 30 days after the last day of each month, a Borrowing Base Certificate signed by a Responsible Officer in substantially the form of Exhibit D, together with aged listings by invoice date of accounts receivable and accounts payable; provided, however, during any Weekly Reporting Period, Borrower shall submit Borrowing Base Certificates as of the last Business Day of each week within 2 Business Days thereafter;

(i) within 30 days after the last day of each month, with the monthly financial statements a Compliance Certificate certified as of the last day of the applicable month and signed by a Responsible Officer in substantially the form of Exhibit E.

(j) immediately upon becoming aware of the occurrence or existence of an Event of Default hereunder, a written statement of a Responsible Officer setting forth details of the Event of Default, and the action which Borrower has taken or proposes to take with respect thereto.

73.    If the Company violates any of the financial ratios and/or covenants, and a default occurs, Comerica can declare the amounts outstanding under the Credit Agreements immediately due and payable.

74.    In addition to the payment of fees to the bank, the Company issued to Comerica a warrant to purchase up to 80,000 shares of the Company's common stock at an exercise price of $2.83 per share.

75.    Defendant Furry signed the warrant, the Domestic Revolver, and the Ex-Im Revolver.

76.    Comerica secured the revolving credit facilities with substantially all of the assets then owned or thereafter acquired by BIOLASE, and placed all of the Company's receivables in a "lock box".   Lockbox arrangements provide that substantially all of the income generated by the borrower is deposited directly into lockbox accounts and then moved into cash management accounts for the benefit of the lender.  Cash is disbursed from the lender to the borrower only after payment of the applicable debt service and principal.

77.    Within about one month (as of June 30, 2012), the Company violated the EBITDA covenant.   On August 6, 2012, the Company obtained a waiver from Comerica for noncompliance of the minimum EBITDA covenant.  The Company also amended the EBITDA financial covenant and modified certain future financial covenants ("Amendment No. 1").   Under Amendment No. 1, BIOLASE agreed to the following modification of the EBITDA covenant:

(b) EBITDA. As of the end of each fiscal quarter, commencing with the fiscal quarter ending September 30, 2012, an EBITDA of not less than the

amount set forth below for the applicable measurement date, measured in each case for the three (3) months then-ending:

| Measurement Date | Minimum EBITDA |
|---|---|
| September 30, 2012 | -$750,000.00 |
| December 31, 2012 | -$250,000.00 |
| March 31, 2013 and thereafter | [to be determined as follows] |

78.    With regard to the minimum EBITDA as of the March 31, 2013 measurement date, it was agreed that "[f]or each fiscal quarter ending on or after March 31, 2013, [Comerica] Bank shall establish an EBITDA measurement based upon Borrower's Board of Directors-approved financial and business projections and budget, sales projections, and operating plans for the fiscal year ending December 31, 2013 ("2013 Plan"), which 2013 Plan shall be delivered to Bank no later than November 15, 2012, and shall be reasonably satisfactory to Bank."

79.    Defendant Furry signed Amendment No. 1.

80.    With its financial house claimed to be in order, and having regained full rights to both sell and distribute its products in international territories, which were previously Schein's exclusive markets, BIOLASE conditioned the market to believe that it was poised to turn itself around.

81.    In that connection, according to BIOLASE in a July 25, 2012 press release, the Company established an inside sales organization to work with its direct sales force to "maximize sales, leverage the existing installed customer base, and drive smaller deals to closure." The inside sales group was created to not only work with the field representatives, but to call dentists to create awareness of BIOLASE's products and build new leads. The inside sales group was also supposed to, among other things, ensure higher customer satisfaction.

82.    In addition to the sales organization, BIOLASE added an internal telemarketing team to fill regional and local seminars and courses with prospective dentists.

A.   **The Sales Team Did Not Expand The Market For BIOLASE's Products**

83.   During the Class Period, the Company estimated that approximately only 5% of dental practices in the U.S. and only 1.5% worldwide own a laser product.  With an estimated 1.2 million dentists worldwide, analysts estimated that the dental laser market would exceed $50 billion.  The worldwide dental market is dominated by the U.S., Europe and Japan, which collectively account for more than 80% of the global revenue.

84.   In order to tap into this lucrative market, BIOLASE needed to sell its WaterLase systems, and in particular, the high margin iPlus, to the larger, mainstream dental community, rather than the smaller group of existing customers, early adopters of laser technology, and innovators that made up its primary customer base.

85.   At the start of the Class Period, BIOLASE was able to sell its core lasers to its smaller customer base.   But, as this primary market started to contract, BIOLASE found it more and more difficult to sell its expensive WaterLase systems, in particular the iPlus, to these professionals, let alone the larger, mainstream dental community.  To remedy the situation, the sales force had to manufacture demand for BIOLASE's WaterLase systems.

86.   Manufacturing demand was not easy, and came at the expense of the Company's financial health.  (*See* discussion, *infra*.)

87.   First, BIOLASE had to overcome the mainstream dental community's aversion to the adoption of laser dentistry.  As noted above, approximately only 5% of dental practices in the U.S. have accepted and adopted dental lasers.  Confidential sources, internal documents, and postings on DentalTown.com by actual dentists reveal that, among other reasons, the mainstream dental community was comfortable with traditional hand tools (such as the drill and scapel) and saw no reason to switch to an expensive laser system when the former could perform every procedure the latter could do.

88.     DentalTown.com is an interactive healthcare community that connects dentists to their peers, dental service providers, and manufacturers.   It is a well-respected resource within the dental community.  CS 2 referred to the DentalTown.com message boards as a key source for researching product recommendations within the dental community.  "That's your referrals right there."  In a May 24, 2011 post, James C. King, DDS, a dentist who posts on the website, lauded DentalTown.com as a valuable resource for dentists:

> I spend a lot of time sitting on the sidelines of DT shaking my head at some of the statements that are posted here on the DT laser forum.  That being said it is a fantastic source of information.
>
> Here are some things you should look for when doing your research for the possible purchase of any dental laser.
>
> First of all, start right here on DT.  If a company has a vast amount of negative issues posted you should probably take note of it...reguardless [sic] of how fast some rep or company spokesman attempts to put the fire out.    If an issue reaches DT, I think it is fair to assume that that posting isn't the only issue of its kind out there.  if it looks like a duck, walks like a duck and quacks like a duck...it's probably a duck.

89.     Internal documents show that BIOLASE senior management reviewed the DentalTown.com message boards to learn what the dental community was saying about the Company and its products.  First, on December 11, 2012, Christopher Walinski, Director of Clinical Research and Education, sent an email to the sales team in which he sought their help to bring "some balance" to the DentalTown.com message boards:

> BIOLASE could really use your help on the Dentaltown message boards.  Please reach out to your local KOLs to help us out in the Laser Dentistry forum.   There is quite a bit of misinformation being disseminated.   The threads need some balance.

90.     In addition to reviewing the DentalTown.com message boards, BIOLASE also scheduled meetings with DentalTown members to promote the Company's dental lasers.  According to a "Q2 Event Planner" circulated by Sarah Lessley to the sales team on February 22, 2013, BIOLASE had scheduled such a meeting, known as a "Townie Meeting", in Las Vegas, Nevada, for April 17-20, 2013.

91.     Second, BIOLASE had to overcome its reputation for poor customer service and poor quality parts.   Confidential sources, internal documents, and postings on DentalTown.com by actual practitioners reveal that poor customer service and broken component parts (namely, the trunk fiber, which was the laser energy delivery system from the WaterLase unit to the hand piece) were materially impacting demand for the iPlus and the other WaterLase systems.

92.     Third, to induce existing customers, early adopters, innovators, and those in the mainstream dental community who expressed an interest in laser dentistry to upgrade to, or buy, an iPlus and the other WaterLase systems, BIOLASE offered substantial discounts and promotional pricing on these products.   Because Defendants were so focused on top-line reporting, getting a sale, at almost any price, was often the norm (and, as discussed below, important to the Company's ability to manage cash). As discussed below, senior management often approved of sales that fell below the already discounted price.

93.     Fourth, BIOLASE had to overcome concerns over the cost of the WaterLase systems and the return on investment ("ROI") a clinician could expect to have with a purchase.   With the Waterlase system, the Company employed a tiered product strategy offering different models of the product line at different price points. Confidential sources, internal documents, and postings on DentalTown.com by actual dentists reveal that, notwithstanding the tiered pricing, promotions and discounts, the cost and return on investment arguments did not persuade the market to buy, or upgrade to, an iPlus or other WaterLase system.   As discussed below, Defendants conceded this fact at the end of the Class Period.

1.     **The Mainstream Dental Community Has Not Accepted and Adopted Laser Dentistry As The Standard Of Care**

94.     Lasers have been used in dentistry since 1994 to treat a number of dental problems.   Yet, despite FDA approval, no laser system has received the American

Dental Association's ("ADA") Seal of Acceptance.  That seal assures dentists that, among other things, the product or device meets ADA standards of safety and efficacy.

95.    Even though some dentists have been using lasers in their practice for many years (*e.g.*, the early adopters and innovators), most dentists in the mainstream dental community have not.  A number of reasons explain why laser dentistry has not been accepted and adopted by vast majority of dental practitioners.

96.    Cost and return on investment are major obstacles to the adoption of laser dentistry.  (*See* discussion, *infra*.)  Adopting new technology requires a higher capital investment, especially at the "innovator" or "early adopter" stage.  Laser dentistry has not moved beyond this stage.  As discussed below, these obstacles were significant and negatively affected demand and sales of WaterLase systems, and in particular the iPlus.

97.    Although dental lasers can be used in a number of procedures, their use is nevertheless limited.  A dental laser is unable to remove gold and vitreous (gel-like) porcelain. Lasers cannot be used on teeth with silver (amalgam) fillings.  They cannot be used to work on cavities between teeth, requiring the dentist to use a drill during the filling process.  Lasers are not as effective in preparing a tooth for a crown or prepping the teeth for a bridge as traditional drills.  Lasers cannot help a dentist in shaping a filling, adjusting the bite, or polishing a filling.  Lasers minimize, but do not eliminate, the need for anesthesia.  Many laser-assisted dental procedures still need a drill.  Since the equipment to perform laser procedures is much more expensive than traditional dental drills, treatments performed using lasers tend to be costly.  Finally, both the dentist and patients can injure their eyes from the light of the laser.

98.    David Palmer, a dentist from Texas, summed up the limitations in a DentalTown.com posting on October 23, 2013:

> Hard for me to understand using something that is slower than a $200 HS, can't be used to remove amalgam (since that is so rare?), and is pain free on only 70% of the adult patients if you want to risk no anesthesia (30% get hurt in the chair?) and requires a huge learning curve.. Where's the real benefit? How does it make your life easier and less stressful? ....

That means it's [sic] use is so limited that it is relegated to an extremely expensive toy.

99.   Given the limitations on the use of dental lasers, the majority of dentists within the mainstream dental community would not see a return on investment to justify the time and expense to convert to laser dentistry.  According to CS 4, most in the mainstream dental community were "drill, fill and bill dentists" – dental professionals who primarily filled cavities.  Thus, "[i]f you're going to sell a doctor the laser based totally on cavity-preps, there is no [insurance] reimbursement benefit."

100.   Mitchell Hill, DDS, from Lauderhill, Florida, posted a message on October 23, 2013, on DentalTown.com in which he concurred with CS 4's experience, despite owning an iPlus.  In pertinent part, Dr. Hill stated: "I wouldn't purchase [a laser] based alone on the ideal of doing fillings with it."

101.   A lack of commitment and time for training are also common reasons to explain why the mainstream dental community has not adopted the use of dental lasers. Indeed, dental educators, who have posted on DentalTown.com, warn clinicians that buying a dental laser is not, according to Charles D. Payet, DDS (posting on October 24, 2013), "something you do for kicks and giggles."

102.   Glenn A. van As, a lecturer who receives honorariums from various laser companies, echoed this sentiment in a DentalTown.com posting on October 25, 2011:

> The real issue with any hard tissue laser is
>
> WHAT ARE YOU LOOKING FOR IT TO DO FOR YOUR PRACTICE
>
> (ie Restorative, endo, bone,, cosmetic crown lengthening)
>
> and once you purchase the laser are you prepared to really invest in training.......and not just one weekend course.
>
> You will need it no matter what laser system you buy.
>
> I just did a lecture/training session in Calgary last weekend for the simpler diode lasers.  Great group, great facility.  There was an original Waterlase MD sitting in a corner...with boxes on it....not being used.  Its [sic] not the lasers fault but the dentists need training and realistic expecations.
>
> I asked an assistant what the office was using it for now (other than a plant stand) and she mentioned not much.  I then asked about training and not a

lot was taken so again - the purchase is the starting point.  You WILL need training and practice to make any hard tissue laser work in your office.  Its [sic] simply a given.......

103.  Finally, there is a psychological impediment to the adoption of new technology.  Indeed, most dentists in the mainstream dental community see no reason to change their traditional practice methods.  "It's hard to change somebody's idea[,]" said CS 6.  "If I told you you could practice more on the moon … would you believe me? Not only did I have to convince them that lasers were the way to go, I had to convince them to buy my laser and get over the fact that my company was the devil."  It was a real hurdle "that we had to get over."    CS 5 also noted that "you have to convince dentists – from doing drilling as they they've learned in dental school – to change their way of practice.   That's an educational process.  From what I hear, dentists are more ingrained in what they've done in the past and what they've learned versus being [open] to change."  CS 7 noted that dentists "can do the same [thing] with a scalpel, and that's what you run into a lot." "They're making a lot of money from the dental hygienists; teeth cleaning is a big thing."

104.  CS 4 heard similar reasons from dentists in the mainstream dental community:  "It's a $65,000 tool [that is, a discounted iPlus] that does the same thing as a $500 hand piece."  So, in the words of those potential customers who declined to buy an iPlus, "'Why do I want to buy a $65,000 hand piece?'  There [are] reasons why, but the change that you're trying to make in the doctor is a philosophical change.  It's a different way of thinking."

105.  As a consequence of the philosophical hurdles encountered, field representatives saw little to no demand for the iPlus or other WaterLase systems.

## 2.    **BIOLASE's Reputation For Poor Customer Service**

106.  BIOLASE has a reputation for poor customer service, which preceded and post-dated the Class Period.  The July 25, 2012 press release announcing the creation of the internal sales organization confirms Defendants' acknowledgement of the problem: "The inside sales group will build a rapport with customers to . . . ensure higher

customer satisfaction . . . ."  In that same release, Defendant Pignatelli addressed one of the known reasons for customer dissatisfaction – post-sale abandonment:  "We want to ensure that the sales cycle doesn't stop after the initial sale is made and that clients remain happy and loyal customers."

107.  CS 3 said that at the start of CS 3's employment (in December 2012), "I found a major mess.  There were a lot of open corrective actions that had been stagnating for many, many months.  There were complaints – 5,000 – that had not even been reviewed."  To address this massive backlog of customer complaints, CS 3 asked Defendant Furry for additional resources, which the latter approved.  Two temporary staff members were hired to assist CS 3 review and address the complaints. These new hires were let go when Defendant Arrow became COO. According to CS 3, "[t]he Company was in major financial difficulties, and they had to make some adjustments, and they let all the new hires go."

108.  In addition to processing thirty to forty new complaints per day, CS 3 processed the logjam of complaints that had not been reviewed prior to CS 3's hiring.  "For six months, I was cleaning up the mess that was left behind by my predecessors."

109.  CS 3 found that "[t]he way the complaint process was documented and managed was not a good way of doing it.  There were a lot of changes that needed to happen."  CS 3 pinpointed the changes in a report that CS 3 presented to Defendant Furry and Brown in March/April 2013.  Among the findings in the report was the absence of an automated system to deal with customer complaints.  "We were doing a lot of paper reviews.  We should have had automated paper reviews."  Without such automation, it made the process for addressing customer complaints, claims of defective parts, and the like more difficult to process and correct.  In that regard, CS 3, stated that BIOLASE did not have a process for "identifying part numbers properly, identifying what was defective when a part was rejected in the field, what was the issue.  When you find those things in a database, you can start to make sense out of this information."

110.   Despite CS 3's efforts, and Defendant Pignatelli's acknowledgements in the July 25, 2013 press release, the Company did not alter the dental market's perception of poor customer service during the Class Period, and, therefore, the adverse impact the Company's reputation for poor customer service had on demand.

111.   According to CS 2:  "They never really focused on the back end – the customer.   At the end of the day, a happy customer is what leads you to further referrals."   Referrals are the primary means by which BIOLASE sold its products.  Indeed, as CS 2 noted: "Dentists are referral based."  "[W]ord gets out in the industry.  Dentists talk a lot; they're very communicative."  "I knew exactly what the general perception was.  The general perception was that BIOLASE was not taking care of the customer."

112.   Charles D. Payet, DDS, summed up the problem in an October 24, 2013 post on the DentalTown.com message board as follows:

> Brad, that's one of the reasons I went with the Lightwalker.  Biolase's long history of bad customer service just doesn't have enough good history to overcome it.  I would never use a Biolase product until they've done some serious work to repair their customer service reputation.

Dr. Payet was responding to an earlier October 24, 2013 post by Brad Blair, DDS, of Columbus, Ohio, who wrote the following:

> Ok guys, bottom line: what does one of these cost? I figure I only have 10 yrs of drilling left in me, so I want to recap my money.
>
> As an aside, earlier this year our study club had an implant lecture (Biolase maybe?) and it was so bad that most of the people left at lunch. The speaker was bragging on how he used it on the sore knees of his kid's soccer team. And the sales reps wouldn't give a straight answer on the cost. This much...but if you buy it today....or if you want support.....jeez guys, just answer the damn question!
>
> Oh, and the "expert" confided that he still uses local lots of the time...and a high speed.

113.   The Company's reputation for poor customer service was so bad that it negatively affected the demand for the iPlus and the other WaterLase systems.  As CS 2

noted, this perception "bled into prospective purchasers" of the iPlus and other WaterLase systems. "At the end of the day, dental is sold via referral. If you don't have a solid, happy customer base, then you're going to have difficult time with referrals. That's just the bottom line. Customers would tell me, 'I was leery about buying the laser, but I did because it's great technology, but I feel like I've been abandoned.' I talked to quite a few customers on a weekly basis who were unhappy with BIOLASE for any number of reasons. Customers would tell me, '*Listen, I'm going to tell my other friends not to buy.*" Emphasis added. CS 1 heard similar complaints from iPlus customers who felt that they had been abandoned by the Company after the sale closed. In this regard, customers would say to CS 1: "'I would never buy it from Biolase. 'Hey, I bought his laser. You guys were here when I bought it. I called and had a problem, and nobody ever got back to me.'"

114. During CS 2's tenure, CS 2 relayed the industry's perception of the Company's customer service to Defendant Furry, but, according to CS 2, Furry was dismissive of CS 2's concerns:  "[W]e did have conversations about customers' satisfaction, but they were fleeting. I was more concerned about customer satisfaction than anybody else in the Company was."

115. Internal documents confirm CS 1 and CS 2's experience. Although sent later in the Class Period, a May 7, 2013 email from Merkin to the sales team, Brown and Shea Cotner, who, according to CS 1, was Defendant Pignatelli's eyes and ears within the Company (describing her as Defendant Pignatelli's "right hand person") demonstrates that senior management (including Defendants Pignatelli and Furry) were well aware of the market's perception of the Company's customer service and the adverse impact it was having on demand for the iPlus and other WaterLase systems. In the email, Merkin asked the field representatives to update their WaterLase owner listing for the purpose of highlighting satisfied owners who could be featured on the "Find a Dentist" link on BIOLASE's website. Merkin said that the request was meant to address the "feedback from the field" that many of the dentists who had purchased a

WaterLase system and were "featured" on the website were not "the best advocates for the technology" and Company.  Merkin specifically tied customer satisfaction with demand stating that having poor advocates for the technology not only "hurts patient interest in the technology but also . . . sales opportunities" when prospective purchasers call upon the existing user for his/her "feedback".

116.  CS 3 also said that BIOLASE's poor response in addressing customer complaints affected sales of the Waterlase system, including the iPlus: "The dentist community is a pretty tight community.  They know when a new technology comes out, and they always talk to their colleagues.  If a machine they worked on turned out to be a lemon or there turned out to be some issues in getting it up and running, that dentist talks to other dentists.  It spreads like a virus, and it does affect sales."

117.  Confidential sources and dentists posting on the DentalTown.com message boards also attributed much of the Company's reputation for poor customer service to deceptive sale pitches (*e.g.*, concerning the cost of ownership) and broken component parts – namely the trunk fiber on the WaterLase system.

118.  According to CS 2, "[t]here were a lot of sales people who would not explain the cost of ownership for the lasers."  "The total cost of ownership wasn't discussed.  What the sales people told me over and over again was that if they explained the full cost of ownership to a customer, they would never buy the laser.  If the customer knew they would have follow-on payments, they wouldn't go for the laser itself."  Dentists posting on the DentalTown.com message board addressed this problem.

119.  Brian Schaefer, DDS, of Suamico, Wisconsin, an owner of a WaterLase Turbo MD, had the following to say in a post dated September 30, 2011:

> Once you get past the past marketing hype of Biolase, they have a very, very solid product. The MD with the turbo handpiece is everything I could ask for in a laser. Not a big fan of the expensive annual warranty, but you take the good with the bad.
>
> The warranty is not only expensive, but now Biolase charges you for parts even if you have a warranty. You pay less if you have the warranty, but

> IMHO, when you spend as much for this laser and the warranty as we do, you kind of expect parts to be included. I have to assume that this is being done to prop up the Biolase bottom line, but it is definitely not a major selling point for them, and I can guarantee that it will take some sales away.

120.   William E. Wyatt Jr., D.D.S., F.A.G.D., of Flower Mound, Texas, had the following, less charitable things to say in an August 13, 2013 post:

> Never chime in much but the worst purchase I ever made was a hard and soft tissue laser made by Biolase. Bought it at Townie mtg over 6 years ago. I think it was a waterlase. It occupies space in a storage room in my office. The maintence [sic] costs are unbelievable.

> Totally agree. The worst purchase, (and a LOT of money for it) I've EVER made. Unbelievably bad purchase.

121.   In explaining to another poster why he purchased a competing Lightwalker instead of a WaterLase system, Jimmy James, a frequent poster on the DentalTown.com message board, posted the following on October 28, 2013:

> Perhaps I had a greedy Biolase rep. But the push to buy new laser, and inability or lack of desire to maintain the Bioloase [sic] MD was painfully evident.  (they called obsolete, 5 years old laser)   And the catastrophic value loss is what put the final nail in the coffin.

122.   CS 2 noted that the trunk fiber (the laser energy delivery system from the main unit to the hand piece) would frequently break.  Because of the frequency of breakdown, replacements "were in rare supply." "There were times that we couldn't get a customer up and running because we didn't have the parts."

123.   CS 3 observed that most customer complaints centered on component part problems, mainly failure in the trunk fiber and issues with the water bottle.  As CS 3 noted, the complaint rate was "high" for the iPlus, on which the trunk fiber could be found.

124.   CS 4 stated that the Company had "horrible, horrible customer service," particularly relating to the iPlus trunk fiber replacement.  Breakage of the trunk fiber and its replacement were the most common complaints about the iPlus that CS 4 knew of.

125.   CS 3 addressed the manufacturing process, defective parts, and complaints related thereto in CS 3's report to Defendant Furry and Brown in March/April 2013. "The real robustness in their design and the quality processes were not there.  They were shoving product out the door without any quality controls and quality measures. There was no prior process for verifying and validating design before transferring to manufacturing, and then monitoring the field for the next nine months for your post-market issues to see what types of issues are currently coming out, and then going and making improvements." According to CS 3, these steps are part of any manufacturer's production and quality control system.  BIOLASE did not have such processes in place. Instead, BIOLASE was more interested in the top-line: "There's [a] lot of politics within the Company which evolved into not having a focus on quality.  If you look at the history of the Company, the quality managers and directors had a major turnover. They really didn't care.  They really did not pay attention to [the fact] that quality needs to be the number one thing.  Their focus was more on pushing product out."

126.   Daniel T. Quevedo, DDS, of Longwood, Florida, summed it up in a November 5, 2011 post as follows:

> After having the the [sic] original Waterlase AND the Waterlase MD.....and after dealing with the NUMEROUS blown trunk fibers I've been through......all I can say is:
>
> 1.   I would never have a Waterlase laser without the service contract. Those fiber trunks are too expensive.
>
> 2.   I would never again own a laser that uses a fiber trunk.

### 3.   Using Price Promotions and Substantial Discounts to Manufacture Demand

127.   Defendants' focus on top-line reporting, getting a sale, at almost any price, was often the norm (and necessary to manage cash) during the Class Period.  Indicative of this focus is an email from Defendant Pignatelli that was circulated by Brown to, among others, Merkin, on March 7, 2013, in which Pignatelli urged his sales executives to stay focused on selling lasers so that BIOLASE could meet its net revenues guidance and they could benefit under the Company's stock option plan:

I spoke to two different Wall Street analysts today that follow our Company, and both of them concurred that if we perform somewhat better than our $70 million [net revenues] guidance, we are going to end the year with a $10 stock!!!

Now, please reflect on what that can mean to your ownership in the Company via your stock options, and realize that it will be a very nice amount of extra money!!!

While I am thanking you for a superb performance in 2012, I also ask you to remain focused on success and your selling performance, so we can achieve another outstanding year, quarter after quarter, and get to that great goal of having BIOLASE worth $10 a share!

128. But, as confidential sources noted, this emphasis on the top line was not sustainable because the primary market for the iPlus and other WaterLase systems was limited primarily to existing customers, early adopters and innovators. As CS 6 noted, selling to existing BIOLASE customers, early adopters, and innovators was the BIOLASE business model. Field representatives "basically just keep going to the same people." "We used to kind of laugh about it and say that the only people who would buy it [*i.e.*, the iPlus] were people who had already drank the BIOLASE Kool-Aid," said CS 4. There was little to no demand for the Company's WaterLase systems within the larger, mainstream dental community. Consequently, as CS 6 aptly observed, BIOLASE "could not sell the [all-tissue] laser to new people, they just kept selling it to the same client. That's why they couldn't expand because it's the same people buying the laser year after year."

129. Throughout the Class Period, BIOLASE had to face the harsh reality that, as CS 6 noted, "[p]eople were never calling you to buy a laser. You had to really work to find people who were interested." CS 4 referred to it as creating demand: "There's no demand. [T]o a certain extent, you have to create demand too though."

130. Because, as CS 4 noted, BIOLASE "would continue to market to the same customers who had already bought a laser," and demand had to be manufactured, BIOLASE ran numerous price promotions and offered substantial discounts throughout the Class Period to induce existing customers, early adopters, innovators, and those in

the minority of the mainstream dental community who expressed an interest in laser dentistry to upgrade to, or buy, an iPlus or one of the other WaterLase systems. Although BIOLASE was able to sell the iPlus and the other WaterLase systems in North America during the beginning of the Class Period, BIOLASE was not able to sustain that momentum thereafter. As CS 4 noted, the iPlus "did horribly in the market. They weren't selling very well at all." Defendants did not disclose these known facts until the end of the Class Period.

a)   **Third Quarter 2012:**

1.   **Promotions:**

131.   One program that was offered to existing customers throughout the Class Period was the "White Shell Program." According to CS 4, BIOLASE "would continue to market to the same customers who had already bought a laser. We used to call them the 'MD customers' or the 'White Shell customers.' Those are the only people who would even consider" the iPlus.

132.   According to CS 4, the White Shell Program was a trade-in program directed to existing customers to replace a predecessor to the WaterLase MD (known internally as the White Shell) with a newer WaterLase system, and in particular the iPlus. Field representatives sent existing customers a letter, at the direction of Merkin, before the end of the quarter advising that it was "time for you to upgrade" because the Company was no longer honoring warranties and because parts were no longer available to repair any broken machine. The letter advised these customers that as a consequence of numerous manufacturing and technology issues (such as obsolete components and a supply chain that no longer manufactured some older, out-of-date parts), the Company could not guarantee that it would be able to obtain the parts required to service their pre-October 2004 WaterLase machine. Consequently, the Company would be discontinuing service agreement extensions for the pre-October 2004 WaterLase machines beginning January 1, 2013. Customers were encouraged to upgrade to the newer WaterLase technology.

133.   Though some dentists did upgrade, the program engendered dissatisfaction among those buyers.  Posts on DentalTown.com show that existing customers were put off by the program.   For example, Flyfishindoc, a dentist from Turnersville, N.J., lamented in a post on December 14, 2012: "I was also infomed [sic] of this phase out. It is BS, they want you to buy the new laser 59K. Guess what if this works and lots of guys buy new lasers, they will do it agin [sic] in 5 years."  Michael I. Barr, DDS, said the following in a November 25, 2012 post:  "I would not be happy if I had bought an $80,000 waterlase and then have the company dump it and me.  I looked 'hard' into hard tissue lasers several years ago.  I almost pulled the trigger a couple of times.  I'm still glad I didn't."

134.   In addition to the White Shell Program, senior management implemented a number of price promotions during the third quarter of 2012 to manufacture demand among existing customers, early adopters and innovators to purchase a WaterLase system, and, in particular, the iPlus.  As Merkin told the sales representatives in an email dated September 13, 2012, "[y]ou need to let [the doctors] know that it is the end of the quarter and we have awesome pricing promotions in place."  In addition to the sales team, the email was sent to Brown and Cotner.  As noted, Cotner was Defendant Pignatelli's "right hand person" within the Company and Cotner sent and received most of Pignatelli's official BIOLASE communications.

135.   BIOLASE ran a payoff program (known as the Mercedes Program) directed to existing customers who had less than $10,000 remaining on the loans they had taken to finance their BIOLASE laser system.   Under the payoff program, an existing customer could have the balance remaining on the loan added to a new iPlus selling at a discounted rate of $64,995.  The manufacturer's retail price for an iPlus was $79,995.  The program included training and deferral of payment for six months with no interest.

136.   BIOLASE sent an email to 58,000 opt-in email addresses on September 11, 2012, to promote the sale of a pre-owned WaterLase system, at prices starting at

$19,995.  The sales team was advised of the email blast on September 11, 2012, in an email sent by John Bernhard ("Bernhard"), Director of Marketing, with a carbon copy to, among others, Brendan O'Connell (Corporate Controller).   The program also included three "Kick Start" packages that were intended to further induce the purchase of the system.  The offer remained opened until September 28, 2012.

137.   BIOLASE also sent an email blast to promote the sale of pre-owned WaterLase MD CPO systems for $19,995, plus the choice of three different packages, the cost of which ($4,995) would be added to the contract.  The undiscounted price of the MD CPO system was $39,995.  Bernhard concluded his email by focusing on the short-term goal of the program – quarterly sales:  "We anticipate that this promotion will create quite a stir in the marketplace and help us fill the funnels with some good *short-term leads*." Emphasis added.  The following day, Merkin emailed the sales team, Brown and Cotner, to advise them that the email blast was generating leads.  Merkin emphasized that BIOLASE did "not want to lose any deals here", "especially where we are dealing with price sensitive customers.  Price is very important out there as can be seen by the interest generated by the $20K lead in.  We are at a very critical part of the quarter. *Every box counts and we do not walk away from any deal!!!*" Emphasis added.

138.   In yet another email blast, BIOLASE sent a "perio mailer" or email to periodontists to promote the sale of the iPlus.  Bernhard advised the sales team of the promotion in an email dated September 14, 2012.  Under the program, BIOLASE was offering a $5,000 rebate, 4 "full days of training", other incentives, and an iLase.  Recipients were urged to act before September 28, 2012.

139.   BIOLASE also ran two programs at quarter's end to induce primarily price-sensitive doctors to purchase WaterLase systems, in particular the iPlus.  These programs (the Demo and Ambassador) were discussed in an email dated September 26, 2012, that Merkin sent to the sales team, including Brown and Cotner.  Both programs offered iPlus systems at deeply discounted prices.

### b)   Fourth Quarter 2012
#### 1.   Promotions

140.   As noted above, BIOLASE continued offering the iPlus through the White Shell Program during the fourth quarter of the year.  As they did during the third quarter 2012, field representatives sent existing customers a letter advising them that it was time to upgrade their old laser system to a new WaterLase system because the Company was no longer honoring warranties and because parts were no longer available to repair any broken machine.  The letter, which was sent on October 31, 2012 at Merkin's direction, gave the same explanation for the Company's action (*e.g.*, numerous manufacturing and technology issues (such as obsolete components), and a supply chain that no longer manufactured some older, out-of-date parts), and a warning that the Company would be discontinuing service agreement extensions for the pre-October 2004 WaterLase machines beginning January 1, 2013.  Customers were encouraged to upgrade to the newer WaterLase technology.  BIOLASE followed up this letter with a similar one dated December 21, 2012.  In that letter, there was a call to action in which existing customers were required to call the field representative to discuss trade-in options or sign an acknowledgment that he/she was forfeiting the trade-in opportunity and the $30,000 in credits available to upgrade to an iPlus.  Such action had to be taken before December 31, 2012.

141.   In addition to the White Shell Program, BIOLASE had other promotions in place that were designed to manufacture demand and induce the purchase of a WaterLase system.  By email dated November 5, 2012, from Merkin to the sales team, Brown and Cotner, Merkin provided the sales team with BIOLASE's fourth quarter promotions.  Although these programs applied to all laser systems, Merkin focused on the iPlus Q4/ADA Special Package, which included an iPlus, a 42' flat screen TV, training credit, tuition to the WCLI Super Symposium, either an EPIC diode laser or the iPlus Marketing Package and one of two financing options.   The WCLI was formed by BIOLASE for the purpose of, *inter alia*, promoting the use of the WaterLase systems in dentistry.  The WCLI symposiums (which are conducted regionally once a quarter and

nationally two times a year) offer ongoing education and after-sale support for BIOLASE owners, provide a forum for prospective buyers to investigate laser technology, in particular BIOLASE lasers, and discuss laser technology with laser dentists.  In addition to hyping the Q4 promotions, Merkin also highlighted the use of an upcoming change in the Section 179 tax limit as a powerful tool to motivate fence-sitting dentists.  In two emails sent to the sales team, Brown and Cotner, on November 8 and 13, 2012, respectively, Merkin stressed the need to "hammer the Section 179 like never before" to induce the purchase of the Company's WaterLase systems and in particular, the iPlus.

142.   As it did in the prior quarter, BIOLASE also ran a payoff program, called the "we will pay off your laser program," directed to existing customers who were close to the end of their financing term.  Under the program, an existing customer could have the balance remaining on the loan added to a new iPlus, which was discounted from the manufacturer's retail price.  According to CS 4, field representatives were instructed to tell existing and potential customers that the price of the iPlus would be increased by 5% beginning January 1, 2013, as further inducement to upgrade/purchase an iPlus.

143.   BIOLASE also made available demo and trade show iPlus systems, or "P units", as it did in the prior quarter, to potential new customers at a price below $51,000 as a way to get price sensitive, fence-sitting dentists to buy the iPlus.  This program was discussed in emails dated December 7, 17, and 26, 2012, that Merkin sent to the sales team, Brown and Cotner.

### c)   First Quarter 2013
#### 1.   Promotions

144.   In an email sent by Merkin to the sales team, Brown and Cotner, dated January 28, 2013, the sales team was given the first quarter promotions, which were geared towards the March WCLI Super Symposium to be held in California.  As noted, the super symposium was one of the primary events used by BIOLASE to stir up demand for the WaterLase system among existing customers, as well as potential new

customers who had already expressed an interest in laser dentistry.  In the packages, BIOLASE offered to pay for travel and tuition expenses up to a certain amount, and offered a low interest rate for financing the iPlus.  The sales team was reminded of the packages created for the Company's entire product line of both lasers and imaging and how "crucial" it was for them to sell "the entire product mix now more than ever."  Merkin further encouraged the sales team to use the Company's impending price change for the iPlus as "a closing tool" to induce price sensitive, fence-sitting dentists to buy an iPlus.  The impending price change was due to the medical equipment excise tax that was assessed beginning January 1, 2013 – BIOLASE intended to pass the cost of the tax to its customers.

145.   Merkin reiterated the impending price increase, in addition to a six month deferral payment option, in a February 12, 2013 email that he sent to the sales team, Brown and Cotner.  Merkin said that combined, they "should help move those [fence-sitting] Doctors across the line NOW!!"

146.   Just nine days later, BIOLASE advised the sales team (through an email from Merkin to the sales team), of another promotion that they could use for the remainder of the quarter.   Under this promotion, among other things, the iPlus was substantially discounted, an Epic TDS was offered, a low interest for financing was offered, and no first or last month payment was required.

147.   On February 25, 2013, yet another financing promotion for the iPlus was sent to the sales team by Merkin in an email of the same date.  Under this program, the customer could finance an iPlus for just under $100 through the end of the year, then pay equal monthly amounts at a low interest rate (though higher than the rate included in the promotion discussed in the January 28 and February 21 emails).   Not surprisingly, feedback communicated to Merkin showed that this promotion was not moving fence sitters who were concerned about cost.  By this time, the primary market for the iPlus and other WaterLase systems was contracting and those remaining within that market who had not already upgraded, and those in the mainstream dental

community expressing an interest in laser dentistry, were sitting on the fence due to cost.  As Merkin noted in an email dated March 6, 2013, to the sales team, including Brown and Cotner, with a carbon copy to O'Connell, "[I] [t]hought that this [promotion] would help move fence sitters."   The sales team was also reminded of the White Shell Program in an email dated February 26, 2013 from Merkin.  Finally, by the end of the quarter, in an email dated March 25, 2013, from Merkin to the sales team, Brown and Cotner, with a carbon copy to O'Connell, Merkin urged the sales team to offer the demo iPlus units (at discounted prices) to doctors who did not want to pay the full cost of a new one laser.

### 4.   Management Approved of Sales Below Promotional Discounts

148.  As noted in the September 12, 2012 email discussed above, Merkin emphasized the importance of every sale to the Company: "*[e]very box counts and we do not walk away from any deal!!!*"  Emphasis added.  Because top-line results were so important to Defendants, as CS 1 noted, "sales reps were allowed to offer the [iPlus] for as low as approximately $52,000" to close a deal.  By comparison, under many of the price promotions, the iPlus was discounted to $64,995.

149. CS 6 noted that management often approved requests from sales representatives to sell an iPlus, below promotional prices in order to close a sale: "There was always a way to lower it; there was always a way.  You could get approval from Bill Brown or Dan [Merkin], or sometimes Mike Stevens.  Somebody would say, 'Okay, go ahead and push it through.'"   Management did so even though, CS 6 believed, such rock-bottom pricing was not "necessarily encouraged".

150.  Internal documents confirm that whatever the perception of management encouragement by some within the field, management did approve of, and, encourage making a sale at almost any price.  For example, in urging the sales team to offer units of the iPlus under the Ambassador Program, Merkin told the sales team that they could offer the unit even lower than the price covered by the promotion: "Ambassador

Program. $46,500 for a new unit only, iPlus only not System. We will accept trade in on this program, but do not drop below $40,000 ASP [asking sales price]."

151.   In addition, in urging the sales team to offer units of the iPlus under iPlus Q4/ADA Special Package discussed in the November 5, 2012 email that Merkin sent to the sales team, Brown and Cotner, the sales team was told that they could modify the package at the customer's request and maintain the substantial discount for the iPlus system.

### 5.   High Cost/Poor Return on Investment Impaired Demand

152.   As noted in the internal documents discussed above, BIOLASE was very cognizant of the high cost of the iPlus and the other WaterLase systems.  CS 5 summed up the price/cost concerns as follows:  "I definitely saw some dental practices where cost wasn't a factor.  If you could cut the price in half, then obviously you are going to get a lot more people to buy.  There were customers, who said, 'We can't buy because we don't have the money.'  That was pretty clear."  CS 1 concurred:  "What it comes down to is this.  It's a great product.  Every dentist needs it . . . at $25,000."  But, of course, BIOLASE was not selling the iPlus for $25,000; rather, the Company was selling it at a steep price, even at the discounted price of $64,995.   Even when BIOLASE reduced that price, the ROI was negligible.  As a result, very few found the decision to purchase an iPlus or other WaterLase system an economically rational one.

153.   In sales materials and field presentations, BIOLASE sought to mitigate the cost impediment by emphasizing the ROI a dental professional would receive with the purchase of an iPlus or the other WaterLase systems.  It did so by requiring the sales team to use a WaterLase interactive ROI calculator that was updated throughout the Class Period.  Indeed, Merkin said as much in an email dated September 12, 2012 to the sales team, Brown and Cotner, with a carbon copy to Bernhard and Shannon Dannettelle: "[The 179 Calculator] and the attached ROI calculator needs to be part of every single presentation."

154. The ROI calculator was an Excel spreadsheet that was designed to demonstrate the return on investment a WaterLase system would bring to the dental professional. In this regard, the ROI calculator identified: the diagnostic, restorative, endodontics, periodontics, oral and maxillofacial surgery procedures that could be reimbursed by insurance; the CDT Code for the procedures; the fees charged at the 50th percentile; the estimated number of the foregoing procedures performed per month; and the additional monthly revenue. The spreadsheet also included other ways in which additional revenue could be earned through increased efficiency, such as treating multiple quadrants during the same visit and new patient referrals. The ROI calculator would take the estimated gross monthly income, subtract the monthly cost of financing the iPlus or other WaterLase system, to determine the estimated gross increased monthly income.

155. Internal documents demonstrate and confidential sources confirm that the larger, mainstream dental community was not persuaded by the ROI sales pitch. This was especially true once the dentist's accountant reviewed the numbers. As Merkin noted later in the Class Period, in an email dated March 15, 2013, to the sales team, Brown and Cotner, the subject line of which was titled "Accountant Road Block": "I have heard from quite a few of you that Accountants have road blocked your deals this quarter. *As we all know, this is nothing new*." Emphasis added. Accountant Road Block was such a problem, that in the same email, Merkin asked the sales team to find their "best owners" who had seen a return on investment to "see if they can get a quote from their accountant about the value that the Waterlase iPlus has brought to the practice." CS 4 confirmed the Accountant Road Block problem: "Once an accountant got involved (and ran the numbers) they killed it; it was done."

156. In addition to Accountant Road Block, as shown in the ROI interactive calculator, insurance reimbursement played a role in determining return on investment. Insurance did not reimburse all procedures or provide sufficient reimbursement to provide most dentists within the mainstream dental community a return on investment.

According to CS 4, "If you're going to sell a doctor the laser based totally on cavity-preps, there is no [insurance] reimbursement benefit."  As noted, according to CS 4, most dentists in the mainstream dental community were "drill, fill and bill dentists" – dental professionals who primarily filled cavities.  The same reimbursement problem was true with regard to cutting teeth.  According to CS 4, "[t]o buy it and cut teeth with it, you are not going to make any money.  You are never going to pay for the laser by cutting teeth."

157.   One of the factors a dentist considered with reimbursement was the out-of-pocket outlay required by his/her patient.  CS 4 explained the issue as follows: "The return on investment is going to be based on your ability to convince the patient to pay out of pocket, and I think that's where the biggest issue is.  Either the doctor is not comfortable asking for the fees to cover it, or he doesn't think he can get the fee to cover it.  Because any of those treatments are going to be an out-of-pocket expense.  Dental insurance doesn't pay anything" – that is, it reimburses minimally.  CS 4 summed up the problem this way:  "There's no benefit from an ROI perspective; there's no insurance reimbursement that you can sell."

158.   Economic and geographic considerations also affected the return on investment.  CS 4 observed that "[t]here's more acceptance of laser dentistry in more affluent, as well as technically-savvy communities."   "That's where you see the majority of laser users – big cities, dense populations; Baltimore, Maryland, Washington D.C., New York City – lots of places like that, you'll see the highest density of laser users."  Patients in the more affluent communities have the disposable income to pay the out-of-pocket-costs associated with a dental procedure.  CS 4 said that ROI does not "make sense" in the less affluent communities, especially when the insurance reimbursement issues are factored into the analysis.  "If you have a doctor who is in a low socio-economic demographic, you can't make the numbers make sense.  He's not getting reimbursed anyway … or the insurance reimbursement is so low, it doesn't make sense."

159.   In sum, cost was an important factor inhibiting demand.   Despite Defendants' Class Period statements to the contrary, Defendants knew that price-sensitive dentists were difficult to convert into buyers.   Feedback from potential new customers summed it up, according to CS 4, as follows: "'If it was $30,000, I'd probably consider it.  But, $65,000 doesn't make sense.'  The ROI is not as great as you think it is." Stated differently, as CS 1 did:  "Let's say, it generates 5% increase in business; it doesn't pay for itself.  Your return on investment won't happen for 10 to twelve years."   This made no economic sense especially since BIOLASE advised customers that, according to CS 1 and CS 4, the iPlus should be replaced every 5 to 6 years.

**B.    BIOLASE's Near-Term Liquidity/Cash Crisis**

    **1.    BIOLASE's History of Cash Flow and Liquidity Problems**

160.   Over the past several years, BIOLASE has been plagued by liquidity and cash flow problems that have necessitated equity raises and the entry into revolving credit facilities.   As discussed below, these liquidity/cash flow problems, and the attempted fixes by the Company, provide the backdrop against which the Class Period problems occurred.

161.   Under prior management, BIOLASE entered into a Loan and Security Agreement (the "Loan Agreement"), dated as of September 28, 2006, with Comerica. Under the Loan Agreement, Comerica agreed to extend a revolving loan (the "2006 Revolving Line") to the Company in the maximum principal amount of $10 million.  As security for the payment and performance of the Company's obligations under the Loan Agreement, BIOLASE granted Comerica a first priority security interest in existing and later-acquired collateral (as defined in the Loan Agreement, and which excludes intellectual property).

162.   Similar to the events at the end of the Class Period, BIOLASE defaulted on the Loan Agreement by failing to comply with certain covenants therein.    In that regard, on January 30, 2009, BIOLASE delivered a compliance certificate to Comerica

which set forth non-compliance with certain covenants under the Loan Agreement as of December 31, 2008.  The parties agreed to terminate the Loan Agreement on February 5, 2009, and all outstanding balances were repaid in full with cash available on hand, and all obligations under the terms of the Loan Agreement and related note were satisfied.

163.  With no credit facility or other external means for obtaining cash, during the remainder of 2009, BIOLASE relied upon its cash on hand and Schein to help it meet the cash requirements of its operations.  As of December 31, 2009, BIOLASE had $3 million in cash and cash equivalents to finance operations and satisfy its obligations.  BIOLASE defines cash and cash equivalents as highly liquid deposits with original maturities of 90 days or less when purchased.

164.  On February 16, 2010, BIOLASE entered into a letter agreement amending the License and Distribution Agreement with Schein.   Pursuant to the letter agreement, the majority of Schein's required minimum laser orders for the first quarter were replaced by prepayments for future deliveries of the Company's products.   According to the March 10, 2010, press release announcing the agreement, the "new arrangement [would] delay the recognition of approximately $4 million in revenue from the first quarter to future quarters, while maintaining the expected level of cash flow in the period."   The Company said that it planned "to begin shipping against these prepayments in the second quarter of 2010."   The Company estimated that the prepayments would total $18 million over a twelve-month period.

165.  The agreement with Schein was significant and provided BIOLASE with much needed liquidity.  At March 31, 2010, BIOLASE had negative net working capital, a decrease of $5 million from $4.8 million in net working capital at December 31, 2009. The Company's principal sources of liquidity at March 31, 2010, consisted of $3.4 million in cash and cash equivalents.

166.  About one month later, on April 16, 2010, BIOLASE filed with the SEC a shelf registration statement (the "2010 Shelf Registration Statement") in order to offer

for sale, from time to time, in one or more offerings, an unspecified amount of common stock, preferred stock or warrants up to an aggregate public offering of $9.5 million. The 2010 Shelf Registration Statement was declared effective by the SEC on April 29, 2010.

167.   On May 27, 2010, BIOLASE entered into a Loan and Security Agreement (the "Loan and Security Agreement") with MidCap Financial, LLC (whose interests were later assigned to its affiliate MidCap Funding III, LLC) and Silicon Valley Bank in respect of a $5 million term loan, of which $3 million was borrowed on such date.

168.   On July 17, 2010, Defendant Arrow was elected to the Board.

169.   In a pattern that kept repeating itself, BIOLASE would soon default on the Loan and Security Agreement.   On August 16, 2010, BIOLASE entered into a Forbearance Agreement with MidCap Funding III, LLC and Silicon Valley Bank, pursuant to which MidCap Funding III, LLC and Silicon Valley Bank agreed not to exercise their rights and remedies for a certain period of time with respect to the Company's non-compliance with a financial covenant contained in the Loan and Security Agreement.

170.   With Defendant Pignatelli  and Arrow (Chairman of the Audit Committee as of August 22, 2010) in their new positions, BIOLASE negotiated a waiver of the Company's non-compliance of the Loan and Security Agreement.  In that regard, on September 23, 2010, BIOLASE entered into Waiver and Amendment No. 1 to the Loan and Security Agreement which, among other things, waived the Company's non-compliance at certain testing dates, with a financial covenant contained in the Loan and Security Agreement.

171.   On November 30, 2010, the Board appointed Defendant Furry as CFO of the Company.

172.   As the new Board and management (led by Defendants Pignatelli and Furry) settled into their positions in 2010, BIOLASE tried to address the Company's financial condition by restructuring the balance sheet and eliminating debt through

additional capital raises and efforts to generate working capital.  As discussed below, during the year ended December 31, 2011, the Company raised approximately $17.2 million in net proceeds through public and private equity financings, which it used for working capital purposes.

173.  On February 8, 2011, BIOLASE repaid all outstanding balances under a Loan and Security Agreement with MidCap Funding III, LLC and Silicon Valley Bank, which included $2.6 million in principal, $30,000 of accrued interest and $169,000 of loan related expenses.  In connection with the repayment, MidCap Funding III, LLC and Silicon Valley Bank released their security interest in the Company's assets.

174.  Also during the quarter ended March 31, 2011, pursuant to the 2010 Shelf Registration Statement, BIOLASE sold approximately 2.2 million shares of common stock with gross proceeds of approximately $7.5 million and net proceeds of approximately $7.1 million, net of commission and direct costs, through an agreement with Ascendiant Securities, LLC ("Ascendiant"), entered on December 23, 2010.

175.  On April 7, 2011, BIOLASE entered into an agreement with Rodman & Renshaw, LLC ("Rodman & Renshaw"), pursuant to which Rodman & Renshaw agreed to arrange for the sale of BIOLASE common stock in a registered direct public offering (the "April 2011 Registered Direct Placement") pursuant to the 2010 Shelf Registration Statement.  In addition, on April 7, 2011, BIOLASE and certain institutional investors entered into a securities purchase agreement arranged by Rodman & Renshaw, pursuant to which BIOLASE agreed to sell in the April 2011 Registered Direct Placement an aggregate of 320,000 shares of BIOLASE common stock with a purchase price of $5.60 per share for gross proceeds of approximately $1.8 million. The net proceeds to the Company from the April 2011 Registered Direct Placement totaled approximately $1.7 million.

176.  On June 24, 2011, the Company entered into a securities purchase agreement with certain institutional investors whereby BIOLASE agreed to sell, and on June 29, 2011 sold, an aggregate 1,625,947 shares of its common stock at a price of

$5.55 per share, together with five-year warrants to purchase 812,974 shares of BIOLASE common stock having an exercise price of $6.50 per share, first exercisable six months after issuance.  Net proceeds of the offering totaled approximately $8.4 million.

177.  By the end of 2011, with all the equity raises, the Company netted only $1.6 million in cash – reporting approximately $3.3 million in cash and cash equivalents at December 31, 2011.  According to the Company, at year end, BIOLASE's principal sources of liquidity consisted of $3.3 million in cash and $8.9 million of net accounts receivable.  The Company had approximately $9 million in working capital.  Given the precarious financial position of the Company, BIOLASE's independent auditor gave a qualified opinion, stating that, at December 31, 2011, there was substantial doubt regarding the Company's ability to continue as a going concern.

178.  The first quarter of 2012 did not see much improvement in the BIOLASE's financial condition.  At March 31, 2012, the Company had approximately $8 million in working capital.  The Company's principal sources of liquidity consisted of $2.8 million in cash and cash equivalents, compared to $3.3 million at December 31, 2011, and $9 million of net accounts receivable.  As the table below shows, BIOLASE had a negative cash flow for the quarter (on a year over year basis):

|  | Three Months Ended March 31, | |
| --- | --- | --- |
|  | 2012 | 2011 |
| Net cash flow provided by (used in): |  |  |
| Operating activities | $  (593) | $(5,064) |
| Investing activities | (266) | (18) |
| Financing activities | 277 | 4,943 |
| Effect of exchange rate changes | 47 | 77 |
| Net change in cash and cash equivalents | $  (535) | $  (62) |

179.  The second quarter of 2012 continued where the first quarter left off.  At June 30, 2012, BIOLASE had approximately $6.6 million in working capital.  The Company's principal sources of liquidity at June 30, 2012, consisted of approximately $1.6 million in cash and cash equivalents, $0.1 million in restricted cash, $9.6 million of net accounts receivable, and $5.6 million of available borrowings under the two

revolving Credit Agreements with Comerica.  As the table below shows, BIOLASE again had a negative cash flow for the quarter (on a year over year basis):

| | Six Months Ended June 30, | |
| | 2012 | 2011 |
|---|---|---|
| Net cash flow provided by (used in): | | |
| Operating activities | $ (3,274) | $ (7,103) |
| Investing activities | (457) | (157) |
| Financing activities | 2,068 | 15,589 |
| Effect of exchange rate changes | (37) | 111 |
| Net change in cash and cash equivalents | $ (1,700) | $ 8,440 |

180.   By the end of the third quarter (and start of the Class Period), BIOLASE stated that it had implemented the restructuring of its sales and marketing department and claimed that the Company's house was now in order.

181.   At September 30, 2012, the Company reported approximately $6.2 million in working capital.  The Company's principal sources of liquidity at September 30, 2012, consisted of approximately $1.3 million in cash and cash equivalents, $10.3 million of net accounts receivable, and $5.1 million of available borrowings under the two revolving Credit Agreements with Comerica.  As the table below shows, BIOLASE again had a negative cash flow for the quarter (on a year over year basis):

| | Nine Months Ended September 30, | |
| | 2012 | 2011 |
|---|---|---|
| Net cash flow provided by (used in): | | |
| Operating activities | $ (3,527) | $ (11,302) |
| Investing activities | (591) | (294) |
| Financing activities | 2,111 | 15,633 |
| Effect of exchange rate changes | (5) | 26 |
| Net change in cash and cash equivalents | $ (2,012) | $ 4,063 |

## 2.   BIOLASE's Cash Flow and Liquidity Problems Continue During the Class Period

182.   Unbeknown to the market, as 2012 came to a close, the Company started to experience another liquidity/cash flow crisis.

183.   By December 2012, as alleged herein, BIOLASE was having difficulty selling its high-margin iPlus and other WaterLase systems to its small customer base, let alone to the larger, mainstream dental community.   To compensate, senior

1   management directed the sales force to focus on selling all products within the

2   Company's laser, digital imaging and intraoral scanner product lines.  As Merkin noted,

3   the focus on the sale of the Company's entire product lines at substantial discounts

4   made a difference in reported net revenues for the fourth quarter of 2012.  This focus on

5   selling the entire product line, at discounted prices, continued into 2013.

6       184.   At December 31, 2012, BIOLASE had approximately $2.5 million in cash

7   and cash equivalents, compared to approximately $3.3 million at December 31, 2011.

8   For the first and second quarters of 2013, the Company reported $1.2 million in cash

9   and cash equivalents, which included funds from the draw-down of $3.3 million under

10  the credit facilities ($4.7 million remained available at March 31, 2013), and

11  approximately $2.1 million in cash and cash equivalents, which included funds from the

12  draw-down of approximately $6 million under the credit facilities (approximately $1.5

13  million available at June 30, 2013), respectively.

14      185.   Additionally, at March 31, 2013, BIOLASE had approximately $5.2

15  million in working capital.  As the table below shows, BIOLASE again had a negative

16  cash flow for the quarter (on a year over year basis):

| | Three Months Ended March 31, | |
|---|---|---|
| | 2013 | 2012 |
| Net cash flow provided by (used in): | | |
| Operating activities | $(2,822) | $(593) |
| Investing activities | (149) | (266) |
| Financing activities | 1,700 | 277 |
| Effect of exchange rate changes | (43) | 47 |
| Net change in cash and cash equivalents | $(1,314) | $(535) |

21      186.   Likewise, at June 30, 2013, BIOLASE had approximately $3.8 million in

22  working capital.  As the table below shows, BIOLASE again had a negative cash flow

23  for the quarter (on a year over year basis):

24

25

26

27

28

|  | Six Months Ended June 30, | |
| --- | --- | --- |
|  | 2013 | 2012 |
| Net cash flow provided by (used in): | | |
| Operating activities | $ (5,095) | $ (3,274) |
| Investing activities | (341) | (457) |
| Financing activities | 5,052 | 2,068 |
| Effect of exchange rate changes | (58) | (37) |
| Net change in cash and cash equivalents | $ (442) | $ (1,700) |

187.  The decrease in working capital during the Class Period further demonstrates that the Company was in a near-term liquidity/cash flow crisis.  Indeed, a decline in working capital indicates that the entity (here, BIOLASE) has less money to settle its short-term debts.  A company with this problem often pays its creditors late or even skip payments to its creditors, as CS 8 explained (*see* discussion below).  It may borrow money or offer debt or equity in an attempt to manage cash.  As alleged, this is exactly what BIOLASE did.  Simply put, a company with low or declining working capital may be at risk of running out of money.

188.  To address the Class Period near-term cash flow/liquidity crisis, Defendants implemented a number of actions to manage BIOLASE's cash and liquidity.

### 3.    BIOLASE Manages Cash Through the Increase of Sales at Substantially Discounted Prices

189.  One way to manage cash is through the increase in the sale of goods.  As alleged, beginning in December 2012, Defendants began to focus on increasing revenues through the sale of all the Company's products at substantial discounts.  That focus intensified during the remainder of the Class Period.

190.  In addition to selling all of the Company's products at substantially discounted prices, senior management (including Defendants Pignatelli and Furry, and later Arrow) required some form of payment upfront.  Internal documents show that senior management required the dentist purchasing a BIOLASE product to execute a purchase order and provide a financing form showing an upfront payment.  As Cotner told one of the sales representatives in a series of emails in September 2012, "Need a

signed contract and financing or form of payment in place."  "Will need at least 10% deposit and run credit if not paid in full prior."

191.    Requiring a payment upfront was especially important since the Company's net accounts receivable rose during the Class Period.  Because good cash flow is reflected in the turnover of receivables, the faster accounts receivable turn over, the more cash a company has to spend on its business.    An increase in accounts receivable, therefore, can indicate a cash flow problem.    That was the case at BIOLASE.  For example, for the first and second quarters of 2013, the Company reported net accounts receivable of $9 million and $10.3 million, respectively.

192.    It is reasonable to conclude that the increase in net accounts receivable was a concern to Comerica as the Company's receivables had been placed in a "lock box" under the Credit Agreements, such that BIOLASE could not touch any of the proceeds from sales of its products until Comerica first received the money and serviced the debt. It is also reasonable to conclude that the increase in net receivables and low cash on hand, among other things, caused Comerica to exercise the warrants it received in connection with the Credit Agreements towards the end of the first quarter 2013.

193.    Under the Warrant to Purchase Common Stock, executed by Defendant Furry on May 24, 2012, the warrant issued to Comerica vested and became exercisable in accordance with the following schedule:

| Vesting Date | Incremental Vested Shares | Total Vested Shares |
| --- | --- | --- |
| May 24, 2012 | 20,000 | 20,000 |
| August 24, 2012 | 20,000 | 40,000 |
| November 24, 2012 | 20,000 | 60,000 |
| February 24, 2013 | 20,000 | 80,000 |

194.    In February 2013, Comerica Bank exercised 60,000 of the 80,000 warrants resulting in a net issuance of 30,515 shares of BIOLASE common stock.  Comerica exercised the remaining 20,000 warrants on a cashless basis prior to the end of the first quarter.  As provided in the 2013 First Quarter 10-Q, "[d]uring the three months ended March 31, 2013, Comerica Bank exercised 80,000 warrants on a cashless basis pursuant to the Notice of Exercise resulting in a net issuance of 40,465 shares of common stock."

### 4.   **BIOLASE's Borrowing Capabilities Were Extremely Limited**

195.   Another way to manage a cash flow/liquidity crisis is to draw-down available funds under a credit facility and/or raise money through the offer of debt or equity.   As alleged, BIOLASE's draw-downs on the credit facilities with Comerica increased during the Class Period, and the filing of a shelf registration statement was filed during the second quarter of 2013.

196.   First, as the crisis grew worse during 2013, BIOLASE turned to Comerica to increase the funds available under the credit facilities.   Consequently, during the second quarter of 2013, BIOLASE went to Comerica for an increase in the lines of credit to provide for increased mid-quarter borrowing capacity.   However, BIOLASE could only obtain from Comerica a modest increase in the maximum available line of credit from $8 million to $10 million – it amended the Domestic Revolver with Comerica on May 7, 2013, to increase the borrowing capacity thereunder from $4 million to $6 million.   It is reasonable to conclude that Comerica was concerned that BIOLASE would burn through a higher amount.   At the end of the Class Period, as BIOLASE had drawn-down more than $6 million at June 30, 2013, and had defaulted on the EBITDA covenants of the Credit Agreements, Comerica lowered the available cash to $7.5 million – a sign that Comerica was trying to lower its exposure in the event the Company's liquidity/cash flow crisis escalated to insolvency.   In addition, Comerica gave BIOLASE time, albeit limited, to negotiate new terms in the Credit Agreements. It is reasonable to infer that Comerica gave BIOLASE the time because the Company had insufficient cash to pay the bank were it to call due the entire amounts owed because of the default, and the bank did not want to be responsible for selling the Company's products when the Company itself was having difficulty selling the products at discounted prices.

### 5. Defendants Waited Too Long To Raise Desperately Needed Cash Through A Stock Offering

197. Second, a debt or equity offering was not easy solution either. As a blogger on the Seeking Alpha.com website observed in an article posted on August 14, 2013: "Biolase knew that this situation [*i.e.*, the cash flow crisis] was coming, so they filed a $30 million S-3 registration statement just a few days before [the] earnings [announcement on August 7, 2013]. Had the S-3 been effective, Biolase would presumably have already issued stock immediately." BIOLASE filed the S-3 registration statement on July 26, 2013, for the maximum offering of $30 million. The problem for BIOLASE is Defendants tried to manage cash flow through other means, as discussed herein, and waited too long to file the S-3 registration statement. By waiting too long, they saw the price of the stock decline, after reaching a high of $6.05 per share on April 29, 2013.

### 6. BIOLASE Manages Cash by Paying Its Vendors as Late as Possible and Only When Pushed

198. Still another way to manage existing cash is to delay payments to vendors and suppliers and make employees obtain approval for payments. According to CS 8, beginning in or about December 2012-January 2013, Biolase started missing payments to vendors, and vendors moved immediately to stop shipment. "As soon as we would miss a payment, they would hold parts because they had lost so much before." CS 8 felt discouraged "because I had been told that they had gotten this good loan [*i.e.*, the credit facilities with Comerica] and were going to be doing well[;]" instead, "it went backwards".

199. CS 8 was frustrated at the hoops CS 8 had to go through to purchase parts in order to make internal production deadlines. "I would have to fight [for money to pay vendors] literally at the top of my lungs." Whipp would have to go "upstairs and fight for what we needed." By upstairs, CS 8 was referring to the senior executive offices in the Irvine headquarters where Defendant Furry and O'Connell, and later Defendant Arrow sat.

200.   CS 8 also said that beginning in December 2012, and continuing past the end of the Class Period, BIOLASE delayed paying suppliers unless the part was needed:   Vendors "just weren't getting paid unless I needed parts. . .   They were basically not paying anybody for a month or two.  And then, when we needed parts to do a shipment, they would pay them."

201.   Significantly, according to CS 8, based upon discussions with Whipp, Defendants delayed payment to vendors to manage cash:   "They wouldn't make payments for two to three weeks towards quarter end because they wanted to keep money in the bank."  According to CS 8, "[i]f I needed it [*i.e.*, the part from a vendor whose invoice was not paid for 30 to 60 days] again, we would pay it all up." "We paid the suppliers that we needed at the moment to make shipments."

202.   Finally, according to CS 8, because BIOLASE was managing its cash, most suppliers required pre-payment in advance of shipping the parts.   For example, one the Company's largest-volume vendors, Akela Laser Corporation, required an advance payment.  According to CS 8, "they didn't want to give me anything, unless I paid 50 percent in advance."

## SUBSTANTIVE ALLEGATIONS

203.   On November 5, 2012, the Company issued a press release in which it reported net revenues of $13.8 million, and a net loss of $548,000, or $0.02 per share, for the third quarter ended September 30, 2012.  Revenues from the sale of WaterLase systems reportedly increased $1.1 million, or 12.7%, as compared to the same quarter in 2011. Year-to-date revenues from the sale of WaterLase systems reportedly increased $4.1 million, or 20.3%, as compared to the prior year period.  Excluding the effects of the $1.1 million inventory repurchase in the second quarter of 2012, and the one time prepaid purchase orders from Schein for WaterLase systems in 2011 totaling $2.3 million, revenues for the nine month period reportedly increased $7.5 million, or 42.0%, over the prior year period.

204.   In commenting on the Company's reported results, Defendant Pignatelli spoke about the Company's purported "strong growth" of its "core WaterLase line of products" and its purported "successful execution" of its "sales and marketing strategies."  In this regard, Pignatelli stated:

> *Sales of our core WaterLase line of products increased by nearly 13% quarter over quarter and 20% year over year. This strong growth testifies to the successful execution of our sales and marketing strategies.* While we met our revenue guidance for the third quarter, we are cautiously reducing our range of annual revenue guidance to adjust for the timing delay in obtaining regulatory clearance for our new EPIC 10 soft tissue diode laser. We received CE Mark clearance for the EPIC 10 with only 2 days remaining in the quarter and FDA approval in the fourth quarter, which limited the number of units that we could ship in the quarter.  [Emphasis added].

> In addition to our top line growth, we are very pleased that the combination of improved margins and lower general and administrative expenses enabled us to generate non-GAAP net income during the quarter.

205.   The Company also provided guidance for the fourth quarter of 2012:

> BIOLASE expects net revenue for the fourth quarter of 2012 of approximately $16.5 million to $17.5 million, which reflects expected growth of 26% to 34% as compared to the same period last year. The Company also expects to generate non-GAAP net income and be cash flow positive in the fourth quarter of 2012.

> Due to the timing in obtaining regulatory clearance for our new EPIC 10 soft tissue diode laser, BIOLASE expects non-GAAP adjusted gross revenue of $55 million to $58 million for 2012, which excludes the $1.1 million reduction in net revenue from the inventory repurchase from Schein during the 2012 second quarter. Therefore, the Company's GAAP revenue guidance, which includes the $1.1 million reduction in net revenue from the inventory re-purchase from Schein during the 2012 second quarter, is effectively $53.9 million to $56.9 million for fiscal 2012.

206.   Also on November 5, 2012, Defendants Pignatelli and Furry participated in a conference call with investment analysts and market participants to discuss the Company's financial results for the third quarter of 2012.   During the call, both

Pignatelli and Furry spoke about the reported contribution of the WaterLase systems, including the Company's flagship system, the WaterLase iPlus, to top-line results:

[Defendant] Furry:

For the quarter ended September 30 2012, we reported net revenue of $13.8 million versus $13.1 million for the third quarter of 2011. *The 5.5% increase in net revenue was primarily driven by higher sales of our core all-tissue WaterLase systems.* Note however that the 2011 third quarter revenue includes $900,000 sales to Schein to satisfy one-time prepaid purchase orders. Excluding this amount, net revenue for the 2012 third quarter represents a 13.4% increase over non-GAAP adjusted net revenue of $12.2 million for the prior year quarter.

Looking specifically at our core WaterLase product line, unit sales increased by 29.9% in the third quarter of 2012, as compared to the prior year quarter, *primarily due to increased sales of iPlus systems, as well as pre-owned MD Turbo systems.* Revenues from the sale of WaterLase systems during the 2012 third quarter totaled $9.3 million. This is an increase of $1.1 million or 12.7% as compared to $8.2 million in the third quarter ended September 30, 2011. The 2011 third quarter revenue from the sale of WaterLase system includes approximately $200,000 in sales to Schein to satisfy one-time prepaid purchase orders.

Excluding this amount, revenue from the sale of WaterLase systems for the third quarter of 2012 increased by $1.2 million or 15.2% over non-GAAP adjusted net revenue for the prior year quarter. WaterLase systems sales comprised approximately 67.2% of net revenues for the third quarter of 2012, compared to 62.9% for the prior year quarter. *The majority of these WaterLase revenues in both quarters were from the sales of the company's flagship WaterLase iPlus all-tissue laser system.*

Emphasis added.

207.   During the Q&A portion of the call, Wyatt Carr, an analyst with Monarch Bay, asked for clarification regarding the contribution of the iPlus to the Company's top-line reported results.  Both Pignatelli and Furry refused to answer the question, thereby failing to provide the market with the sought-after clarification:

Wyatt Carr – Monarch Bay – Analyst:

And your units were up, but the profits were not up as much and some of that was because some of these were MDs that you were selling and then iPlus, but could you kind of walk me through, you've got a lot of different

WaterLase products now and I mean you've got the 300, 400 iPlus, MD Turbo, MD can you kind of breakout where the sales of WaterLase were in the quarter?

[Defendant] Pignatelli:

Well, let me answer [sic] to these questions, *we don't want to go too much into details of how much we sold this product, that product.*  What I can tell you is very simple, we bought back $1.1 million of a product that we have discontinued that is the MD Turbo.  *So we obviously concentrated in selling that product that sells basically around $20,000 and plus.*  And so you see the number of WaterLase going up, but the price is being lower [sic] and that's the difference that you see there. [Emphasis added.]

[Defendant] Furry:

I'd like to add a little bit there and the other part of your question, so at the top level, thinking in terms we have – in our WaterLase line we have a wide range now.  The top level is the revolutionary iPlus.  In the middle, you have the MDX 450 and then below that you have the MDX 300, which is very similar to the MD Turbo in output and what it can do.  And then like Federico mentioned we have the certified pre-owned or used MD Turbos that we repurchased from Henry Schein that have been a big hit in the marketplace.  In addition to MD Turbos that we've taken in trade much likes [sic] a car dealership would when returning customers buy a higher level iPlus.

So we've seen a lot of good reactions from the market where we offer the iPlus, the highest level, the fastest speed, the most presets, the most stability.  And then also we have the certified pre-owned model for those people that can't quite afford it or don't necessarily need all that speed or all those presets, but they love the entry point and we really like having all those new users joining us that at a low cost and - we look at everybody that buys an MD or used MD Turbos going to be looking for a future BIOLASE product and - as well as consumables and service contracts and warranties and everything else. We're very happy with that.

208.   Although BIOLASE stock declined modestly after the November 5, 2013 disclosures, from a November 5, 2013 closing price of $2.01 per share to a November 6, 2013 closing price of $1.92 per share, BIOLASE stock was nonetheless artificially inflated by Defendants' misstatements and omissions, which remained throughout the Class Period.

209.   On November 9, 2012, after the markets closed, the Company filed with the SEC on Form 10-Q its quarterly report for the period ended September 30, 2012 ("Third Quarter 10-Q").  Defendants Pignatelli and Furry signed the Third Quarter 10-Q and the Sarbanes-Oxley certifications appended as exhibits thereto.  The Third Quarter 10-Q reiterated the financial results and financial position reported by the Company in the November 5th press release.

210.   The Third Quarter 10-Q also repeated the statements made by Defendants Pignatelli and Furry relating to the reported contribution of the WaterLase system, and in particular the iPlus, to top-line revenues.  In this regard, Defendants (other than Arrow) attributed the reported revenue growth to "the iPlus, MDX systems, and the MD Turbo":

> *Revenue from Waterlase systems, the Company's principal product, which includes the iPlus, MDX systems, and the MD Turbo*, comprised 67% and 64% of total net revenue for the three and nine months ended September 30, 2012, respectively, and 63% and 57%, respectively, for the same periods in 2011.
>
> \*      \*      \*
>
> Net Revenue. Net revenue for the three months ended September 30, 2012 was $13.8 million, an increase of $720,000, or 6%, as compared to net revenue of $13.1 million for the three months ended September 30, 2011. *The increase in net revenue was primarily attributed to continued demand for our all-tissue Waterlase systems* and increased sales of imaging systems, consumables and service and warranty and training, and royalty revenues. These increases, fueled by increased sales and marketing efforts, were offset by decreased sales of diode laser systems.
>
> Laser system net revenue decreased by approximately $232,000, or 2%, for the three months ended September 30, 2012 compared to the three months ended September 30, 2011.  Revenues from Waterlase systems increased $1.0 million, or 13%, in the three months ended September 30, 2012 compared to the three months ended September 30, 2011.  *The increase was primarily due to increased sales and marketing efforts.*  Revenues from our diode systems decreased $1.3 million, or 59%, during the three months ended September 30, 2012 compared to the three months ended September 30, 2011.  The decrease was primarily attributed to lower sales of the ezlase laser due to market anticipation of the new Epic laser which

was launched at the end of September 2012, after unexpected delays in obtaining regulatory clearances.

Emphasis added.

211. The price of the Company's common stock rose on the statements italicized above, closing at $1.88 per share on November 12, 2012 (the next trading day), up from $1.84 per share on November 9, 2012.

212. The statements in paragraphs 203-207 concerning Biolase's purported "strong growth", increased sales of WaterLase systems, and in particular the iPlus, and "continued demand for [the Company's] all-tissue WaterLase systems" were materially false and misleading because Defendants BIOLASE, Pignatelli, and Furry knew or, with deliberate recklessness, disregarded the following:

a)     BIOLASE's reported "growth" did not mean growth in terms of an expanding customer base.  As alleged in paragraphs 83-126, "growth" in the sale of laser systems was primarily the result of the sale of WaterLase systems to existing BIOLASE customers, early adopters, innovators and the small minority of clinicians within the larger, mainstream dental community who had expressed an interest in laser dentistry.  BIOLASE was not penetrating the larger, mainstream dental market, which was comprised of clinicians who were not tech savvy, were comfortable using the traditional tools of dentistry (*e.g.*, the drill and scapel), and who saw no return on investment for the cost of the system, as alleged in paragraphs 152-159, above.

b)     There was little to no demand for the Company's WaterLase systems, including the iPlus, by either the smaller customer base or the larger, mainstream dental market.  As alleged in paragraphs 106-151 above, to the extent there was a "demand" for the WaterLase system, and in particular the iPlus, that "demand" had to be created by the Company and field representatives.  And, in that case, such "demand" was created through the offer of significant discounts and promotions.

c)     The "increase" in sales of WaterLase systems, and in particular the iPlus, reported by the Company was the result of (i) numerous promotions run during

the quarter in which the iPlus and other WaterLase systems were substantially discounted, and (ii) management approval of sales below promotional discounts, as set forth in paragraphs 127-151.

213.   On December 3, 2012, BIOLASE announced that the Board had declared a one-half percent stock dividend payable on December 28, 2012, to stockholders of record as of December 14, 2012.

214.   On January 7, 2013, before the opening of trading, BIOLASE issued a press release, entitled "Revenue Expected to Exceed $18 Million for 2012 Fourth Quarter — Revenue Growth Driven by Direct Sales to End-Users in North America," which stated, in pertinent part, that "based on a preliminary review of its financial performance for the fourth quarter ended December 31, 2012, the Company expect[ed] to exceed its previous guidance and report net revenue in excess of $18 million." Defendant Pignatelli was quoted in the press release lauding the "strong growth" in BIOLASE's core laser products, the accelerating trends "with the adoption" of the Company's WaterLase systems, and the "increased demand for [BIOLASE's] flagship WaterLase iPlus . . . ."  In this regard, Defendant Pignatelli stated, in pertinent part, as follows:

> We are very pleased with *the strong growth in our core dental laser products and the trends that are accelerating with the adoption of our WaterLase® technology and diode laser systems*.  Our strong revenue growth in the 2012 fourth quarter compared to the prior year period was *primarily due to the increased demand for our flagship WaterLase iPlus*$^{TM}$ and our new EPIC 10$^{TM}$ soft tissue diode laser.  Revenues were also bolstered by sales of our mid-priced WaterLase products and our digital imaging products, including the initial sales of our CAD/CAM systems.
>
> After closing 2012 on a strong note, we are very excited to look ahead to 2013 and beyond *as we expect a substantial acceleration in the adoption of lasers, specifically our core WaterLase technology, in dental practices around the world over the next three to five years.  We are very confident that all-tissue lasers will become the standard of care in dental practices worldwide*.  Furthermore, as we move forward in 2013 we do not expect to be troubled with the multitude of extraneous issues that we faced throughout our challenging turnaround, including exiting our exclusive

1
2
global distribution relationship with Henry Schein, Inc. (NASDAQ: HSIC), and moving to a direct sales model in North America and multi-distributor model internationally.

3
Emphasis added.

4   215.   The price of the Company's common stock rose on these statements,
5   increasing nearly 20% to close at $2.37 per share on January 7, 2013, up from a closing
6   of $2.00 per share on January 4, 2013, on unusually high trading volume of 790,700
7   shares traded.

8   216.   Over the following days, the price of the Company's stock continued to
9   climb, reaching a trading high of $2.95 per share on January 18, 2013, reflecting the
10  market's favorable reaction to BIOLASE's pre-announcement of fourth quarter
11  revenues and Pignatelli's commentary regarding product-line acceptance and demand.
12  On January 15, 2013, for example, Gregory Garner, an analyst with Singular Research,
13  issued a research report in which he reiterated the themes expressed by Defendant
14  Pignatelli in the January 7, 2012 press release.  In pertinent part, Garner wrote:

15
16
17
Strong revenues in Q4:12 are attributed to demand across the major product lines: the flagship Waterlase iPlus, the Waterlase MD Turbo and the digital imaging products.

*       *       *

18
19
20
We believe the [sic] Biolase has the potential for positive surprises due to the unique product offerings, the expanding product line and the improved productivity of the direct sales force.

21  217.   Unbeknown to the market, however, demand for the WaterLase system,
22  and the iPlus in particular, was not accelerating and the direct sales force was not
23  penetrating the larger, mainstream dental community.   Indeed, the statements in
24  paragraph 213 concerning the acceptance and growth in the Company's core laser
25  products, and increased demand for the iPlus, in particular, were materially false and
26  misleading.   Defendants knew or, with deliberate recklessness, disregarded the
27  following:

28

a)     As alleged in paragraphs 83-126 above, BIOLASE's reported "growth" did not mean growth in terms of an expanding customer base. "Growth" in the sale of laser systems was primarily the result of the sale of WaterLase systems to existing BIOLASE customers, early adopters, and innovators.   "Growth" was not due to an increase in sales of WaterLase systems, such as the iPlus, to the mainstream dental community.

b)     There was little to no demand for the Company's WaterLase systems, including the iPlus, by either the smaller customer base or the larger mainstream dental market. As alleged in paragraphs 106-151 above, to the extent there was a "demand" for the WaterLase system, and in particular the iPlus, that "demand" had to be created by the Company and field representatives. And, in that case, such "demand" was created through the offer of significant discounts and promotions.

c)     The contribution of the iPlus to sales and the Company's reported net revenues was not based on demand from an expanded base of potential customers, but, rather, as discussed in paragraphs 127-151 above, on significant discounts and promotions to primarily existing customers, early adopters, and innovators.

d)     The "increase" in sales of WaterLase systems, and in particular the iPlus, reported by the Company was the result of (i) numerous promotions run during the quarter in which the iPlus and other WaterLase systems were substantially discounted, and (ii) management approval of sales below promotional discounts, as alleged in paragraphs 127-151, above.

218.  On January 22, 2013, the Company issued a press release entitled "BIOLASE Expects to Report Positive Cash Flow From Operations for Q4 2012 — BIOLASE Expects to Continue to Generate Positive Cash Flow From Operations for 2013 Overall."  In the press release, the Company stated that "based on preliminary unaudited financial results, [BIOLASE] expect[ed] to report that it generated positive cash flow from operations for Q4 2012." Commenting on the preliminary financial

results, Defendant Pignatelli was quoted, again lauding those results, stating, in pertinent part, as follows:

> It is rewarding to see that our restructuring efforts over the past two years have enabled us to turn the Company around and that we are making significant progress toward achieving our financial goals. *The trends we are seeing in the adoption of dental lasers also give us confidence in achieving continued double-digit growth of our core dental franchise. Based on our current plans, we expect the Company will continue to generate positive cash flow from operations for the overall year ending December 31, 2013.* [Emphasis added.]

219.   The statements in paragraph 218 concerning the purported "trend[] . . . in the adoption of dental lasers" and the Company's "confidence" that such trends would enable BIOLASE to "achiev[e] continued double-digit growth . . ." were materially false and misleading and made without a basis in fact.  Defendants BIOLASE and Pignatelli knew or, with deliberate recklessness, disregarded the following:

   a)   The "continued double-digit growth" of the Company's core laser systems was not achievable.  These defendants knew that the start of 2013 was "slow" and did not carry the initial momentum from the sale of WaterLase systems, including the iPlus, to existing customers, early adopters, and innovators during the third and fourth quarters of 2012.  Indeed, in an email dated January 28, 2013, from Merkin to the sales team, Brown and Cotner, with a carbon copy to, among others, Brendan O'Connell (Corporate Controller), Merkin specifically noted that the first couple of weeks of January were "slow". As discussed below, this slow start would continue throughout the remainder of the Class Period.

   b)   BIOLASE was not penetrating the mainstream dental community, as alleged in paragraphs 83-126.  Rather, BIOLASE's primary market was the existing customer, early adopter, and innovator.  And, as alleged in paragraphs 106-151, any "growth" was due to the multiple promotions and discounts that BIOLASE offered to induce existing customers, early adopters, and innovators to purchase the WaterLase

systems, as well as the minority of dentists within the larger, mainstream dental community who had expressed an interest in laser dentistry.

c)     The adoption of lasers in dental practices was limited primarily to the existing customers, early adopters, and innovators.  As alleged in paragraphs 83-126, and for the reasons set forth therein, the vast majority of dentists in the larger, mainstream dental community was content to remain with the drill and scalpel and had no intention to convert to laser dentistry.

220.   On February 6, 2013, before the opening of trading, BIOLASE issued a press release entitled "BIOLASE Receives FDA Clearance for Its 940nm Diolase 10$^{TM}$ Diode Soft Tissue Laser for a Broad Spectrum of Medical Procedures — Clearance for Over 80 Procedures in 19 Additional Medical Markets."   The press release quoted Defendant Pignatelli as stating, in pertinent part, that "[c]learance for our Diolase 10 is the first step in enabling us to leverage our recently released, next-generation 940nm EPIC 10$^{TM}$ modular diode soli tissue dental laser platform and consumable business across a wide range of multi-billion dollar medical markets with appropriate strategic partners," and quoted Defendant Furry as stating that "[t]his is an exciting time at BIOLASE as we continue to expand the capabilities, applications, and indications for our core technologies so that they can be leveraged within our core dental market as well as into a number of other promising medical and veterinary markets."

221.   The price of BIOLASE common stock again spiked on this news, increasing from a closing price of $2.83 on February 5, 2013 to close at $3.38 per share on February 6, 2013 on extremely high trading volume of more than three million shares trading, or more than 51 times the average daily trading volume over the preceding ten trading days.

222.   On February 28, 2013, BIOLASE announced that the Board had declared a one-half percent stock dividend payable on March 29, 2013, to stockholders of record as of March 15, 2013.  In addition, the Company said that the Board "adopted a two percent annual stock dividend policy for 2013."

223.   On March 6, 2013, BIOLASE issued a press release after the close of the trading, entitled "BIOLASE Reports 2012 Fourth Quarter, Year-End Results — Net Revenue Increases 45.0% to $19.1 Million, Quarter Over Quarter; Core WaterLase Unit Sales Increase 42.0%, Quarter Over Quarter; Net Income of $1.0 Million — $0.03 per share — in Q4 2012; Non-GAAP Net Income of $1.7 Million —$0.05 per Share — in Q4 2012; 2013 Q1 Revenue Guidance of $14 Million to $15 Million; 2013 Annual Revenue Guidance of $68 Million to $72 Million." To buttress that purportedly strong fourth quarter and 2013 financial guidance, the press release quoted Defendant Pignatelli, in pertinent part, as follows:

> For the past two years, BIOLASE has undergone a radical restructuring, which was substantially completed at year-end 2012.   Now we can concentrate on continued execution and the meaningful expansion of our business in 2013 and beyond.
>
> *Overall 2012 was a year of execution where we met or exceeded our guidance throughout the year and went on to generate cash from operations in the fourth quarter.* We have expanded our offerings of internally developed lasers and in-licensed cone beam and CAD/CAM imaging products while significantly strengthening our intellectual property and patent portfolio.  *As a result of these efforts, our annual revenue for 2012 increased significantly over 2011 and more than doubled that of 2010.  With a number of solid initiatives in place*, including new product launches, the recent approval of over 80 new procedures in 19 additional medical markets, and the launch of EPIC VSeries in to the veterinary market, *we expect BIOLASE to continue to grow strongly in 2013.* [Emphasis added.]

224.   In discussing the reported increase in revenues for the fourth fiscal quarter of 2012, BIOLASE attributed the results, in part, to the WaterLase systems, and in particular to the iPlus:

> Net revenue for the 2012 fourth quarter totaled $19.1 million, compared with $13.2 million in the 2011 fourth quarter.   The increase of $5.9 million, or 45.0%, *was primarily driven by increased sales of the Company's all-tissue WaterLase systems, diode soft-tissue laser systems, and imaging systems.*
>
> *The number of WaterLase systems sold increased by 42.0% in the 2012 fourth quarter as compared to the prior year quarter.*  Such growth was

the result of successful efforts of our direct sales force in North America. Revenues from the sale of WaterLase systems increased $2.6 million, or 29.2%, to $11.7 million in the 2012 fourth quarter as compared to $9.1 million in the prior year quarter.   WaterLase system sales comprised approximately 61.5% of net revenues for the 2012 fourth quarter compared to 69.0% for the prior year quarter.   *The majority of these WaterLase revenues in both quarters were from sales of the Company's flagship WaterLase iPlus all-tissue laser system.* [Emphasis added.]

225.   The press release also quoted Defendant Furry as identifying the WaterLase iPlus as the Company's "primary revenue driver" for the fourth quarter, stating, in pertinent part, as follows:

*The number of WaterLase systems sold increased by a larger percentage than WaterLase revenues quarter over quarter because of our strategy to offer systems of varying capabilities at multiple price points. The iPlus is our flagship product and our primary revenue driver, and we expect this to continue in 2013.*   By offering multiple product configurations across a range of price points, we believe we can attract more customers, drive adoption, and generate more significant product and consumables revenue. [Emphasis added.]

226.   Defendant Furry also explained the Company's sales and marketing strategy of using lower cost products, such as the newly FDA-approved EPIC 10 soft tissue laser, as a gateway to the sale of WaterLase systems, such as the iPlus.   In pertinent part, Furry stated:

As expected, sales of diode laser systems increased significantly in the fourth quarter, and we anticipate that the EPIC 10 will continue to be a strong contributor to revenue in 2013 and beyond. *We also believe that the low price point of our EPIC diode soft-tissue laser system will continue to broaden the demand for lasers and create an up-sell opportunity for our more expensive, all-tissue WaterLase systems.*   [Emphasis added.]

227.   As with the reported fourth quarter results, BIOLASE attributed the positive year-end reported results, in part, to the WaterLase systems, and in particular the iPlus:

GAAP net revenue for the year ended December 31, 2012, totaled $57.4 million, compared with net revenue of $48.9 million in the prior year. Domestic revenues were $40.6 million, or 70.7% of net revenue, for 2012

compared to $32.8 million, or 67.1 % of net revenue, for 2011. International revenues for 2012 were $16.8 million, or 29.3% of net revenue compared to $16.1 million, or 32.9% of net revenue for 2011.

\*     \*     \*

*The number of WaterLase systems sold during 2012 increased by 37.1% as compared to the prior year, primarily due to increased sales of WaterLase iPlus systems* and sales of MD Turbo[TM] systems, including 100% of the equipment that the Company repurchased in connection with the Schein termination agreement. [Emphasis added.]

\*     \*     \*

WaterLase system sales comprised approximately 62.8% of gross revenues for 2012 compared to 59.9% for the prior year. *The majority of these WaterLase revenues were from sales of the Company's flagship WaterLase iPlus all-tissue laser system.* [Emphasis added.]

228. Defendant Pignatelli explained the Company's sales and marketing strategy of using the Company's imaging product offerings as a gateway to the sale of WaterLase systems, such as the iPlus. In pertinent part, Pignatelli stated:

We added cone beam digital imaging to our product offerings in late 2011, and further enhanced our imaging products with the addition of CAD/CAM intra-oral scanning in late 2012. These in-licensed imaging systems are expected to generate greater revenue growth *while increasing awareness in our core internally developed laser products*. [Emphasis added].

229. The press release also provided the following "Financial Outlook" for fiscal 2013:

*For the 2013 first quarter, BIOLASE expects net revenue of approximately $14.0 million to $15.0 million.* The midpoint of $14.5 million reflects expected growth of approximately 18% as compared to the 2012 first quarter. After the 2013 first quarter the Company does not plan to provide quarterly guidance for the rest of 2013. For the year ending December 31, 2013, the Company expects net revenue of approximately $68 million to $72 million. The midpoint of $70 million represents a 22% increase over 2012 net revenue and would also represent record revenue for the Company. *The Company also expects to generate cash from operations for the year ending December 31, 2013.* [Emphasis added.]

230.   During the conference call held with investors later in the evening of March 6, 2013, Defendants Pignatelli and Furry made more materially false and misleading statements about the Company's purported "increased growth in [it's] core dental business" and demand for the iPlus, in particular:

[Defendant] Pignatelli:

The fourth quarter of 2012 reflected a favorable and positive result of the significant restructuring that BIOLASE is undergoing during its turnaround over the past three years, where *we have improved our financial condition and increased the growth in our core dental business*. It gives me great pleasure to report that we exceeded our stated high range of revenues guidance for the 2012 fourth quarter by approximately 9%, with revenues of $19.1 million. This is the highest quarterly revenue for the Company since 2007. *This growth was driven by the continued demand of our core line WaterLase all-tissue laser* and our newly released EPIC soft-tissue diode laser.  [Emphasis added.]

*          *          *

2012 fourth quarter was another productive and active quarter for BIOLASE with 35% growth quarter-over-quarter. *This growth was driven by  continuous growing demand for our flagship WaterLase iPlus* and EPIC diode soft-tissue laser, for which we received FDA clearance in early October. [Emphasis added.]

[Defendant] Furry:

For the quarter ended December 31, 2012, we reported net revenue of $19.1 million versus $13.2 million for the fourth quarter of 2011, representing quarter-over-quarter growth of 45%. The 45% increase in net revenue was due to the increased sales across all of our revenue streams, including our line of all-tissue WaterLase lasers, diode soft-tissue lasers, imaging systems and consumables, *with the primary driver being higher sales of our all-tissue WaterLase system*. [Emphasis added.]

*          *          *

*The number of WaterLase systems sold increased by a larger percentage than WaterLase revenues quarter-over quarter as a result of our strategy to offer systems of varying capabilities at multiple price points.  The iPlus is still our flagship product and our primary revenue driver, and we expect this to continue in 2013.  By offering multiple product configurations across a range of price points, we believe that we can attract more*

*customers, drive adoption, and generate more significant product and consumables revenue*. [Emphasis added.]

WaterLase system sales comprised approximately 61.5% of net sales for the 2012 fourth quarter compared to 69.0% for the prior year quarter. *The majority of these WaterLase revenues in both quarters were from the sales of the Company's flagship, WaterLase iPlus all-tissue laser system.* [Emphasis added.]

\* \* \*

We also expect that by leveraging our growing direct sales force, which has already affected in [sic] selling high-tech equipment and improving quarterly, to sell our high-tech in-licensed cone beam and CAD/CAM imaging products, we will create more BIOLASE customers who will ultimately have interest in our core laser product.

Gross profit as a percentage of net revenue was 46.6% as compared to 42.2% for the prior year period. *This year-over-year increase for the fourth quarter was primarily due to higher unit sales of our core product*, combined with decreased costs of revenues as we continue to improve our manufacturing processes and quality and our service and warranty expenses continue to decline. [Emphasis added.]

\* \* \*

*The number of WaterLase systems sold during 2012 increased by 37.1%, primarily due to increased sales of our flagship, WaterLase iPlus systems*, and sales of our MD Turbo laser systems, including 100% of the laser systems that the Company re-purchased in connection with the Schein termination agreement during the 2012 second quarter. . . . [Emphasis added.]

\* \* \*

WaterLase system sales comprised approximately 62.8% of gross revenues for 2012 compared to 59.9% for the prior year period. *The majority of these WaterLase revenues were from the sales of the Company's flagship WaterLase iPlus all-tissue laser system.* [Emphasis added.]

231. On March 7, 2013, the next trading day after the press release and conference call, the Company's stock price again rose, closing at $4.46 per share, up from $4.39 per share on from the prior day's close, on unusually high trading volume of more than 1.46 million shares trading.

232.   The italicized statements in paragraphs 223-230 concerning the Company's increase in sales of WaterLase systems, the increase in sales of the iPlus, sales of the iPlus accounting for the majority of the increase in net revenues, the iPlus as the primary driver of revenues, and the Company's growth being driven by the demand for the iPlus were materially false and misleading.  Defendants BIOLASE, Pignatelli, and Furry knew or, with deliberate recklessness, disregarded the following:

a)   BIOLASE was not penetrating the mainstream dental community, as alleged in paragraphs 83-126.  Rather, BIOLASE's primary market was the existing customer, early adopter, and innovator.  And, as alleged in paragraphs 127-151, any "growth" was due to the multiple price promotions and significant discounts that BIOLASE offered to induce primarily existing customers, early adopters, and innovators to purchase the WaterLase systems.

b)   There was little to no demand for the Company's WaterLase systems, including the iPlus, by either the smaller customer base or the larger, mainstream dental market.  As alleged in paragraphs 106-151 above, to the extent there was a "demand" for the WaterLase system, and in particular the iPlus, that "demand" had to be created by the Company and field representatives.  And, in that case, such "demand" was created through the offer of significant discounts and promotions that materially compromised earnings.

c)   The contribution of the iPlus to sales and the Company's reported net revenues was not based on actual demand by the larger, mainstream dental community and the payment of the manufacturer's suggested retail price, but, rather, as discussed in paragraphs 127-151 above, on significant discounts and promotions.

233.   The statement in the March 6, 2013, press release about the Company's expectation that it would "generate cash from operations" for 2013 was materially false and misleading and made without a basis in fact.  As alleged in paragraphs 182-202, Defendants knew that the Company was experiencing a near-term liquidity/cash crisis. Defendants knew that BIOLASE had limited cash and cash equivalents, was increasing

its draw-down on its line of credit, was not generating sufficient cash from sales of the WaterLase systems, and in particular the iPlus, had declining working capital and increasing accounts receivable, and was managing cash – all to address the Company's near-term liquidity/cash flow crisis.

234.   The guidance provided in the March 6, 2013 press release was materially false and misleading and made without a basis in fact.  As alleged in paragraphs 83-126, BIOLASE knew that the guidance was based in large part on an emphasis to sell non-core dental products, such as the CAD/CAM imaging products.

235.   Internal documents show that senior management recognized that at the end of 2012, the primary market for the iPlus and the other WaterLase systems was contracting.  As a consequence, in order to show the market continued revenue "growth", Defendants continued to focus the Company's marketing and sales strategy on the sale of the digital imaging products and intraoral scanners.  In an email dated January 28, 2013, from Merkin to the sales team, Brown, Cotner, and O'Connell, Merkin implored the sales team to sell the Company's "entire product mix more than ever", noting that "[i]maging impacted the Q4 contest in all three tiers and really made a difference in the top spots." The contest Merkin referred to was a fourth quarter sales contest, the purpose of which was to generate sales of the Company's entire product line.

236.   To further emphasize the need to sell the Company's entire product line, senior management implemented another sales contest for that purpose during the first quarter of 2013.  Presented to the sales team by Bernhard in email dated February 15, 2013, the new contest, called the "Mix it Up" sales contest, would reward those field representatives who sold a "combination of 'the mix' of products" offered by the Company, and "achieve the highest sales totals overall for the quarter." To win, the field representative was required to meet his/her quota in two of three categories of products – the Waterlase system (iPlus, MDX, MD Turbo CPO); diodes (Epic and iLase); and imaging (NewTom and 3Shape).

237.    Internal documents also show that North American sales of the Company's core dental products, including the iPlus, were slow.  For example, in an email dated January 28, 2013, from Merkin to the sales team, Brown and Cotner, with a carbon copy to, among others, O'Connell, Merkin specifically noted that the first couple of weeks of January were "slow".  Approximately two weeks later, on February 12, 2013, Merkin sent another email to the sales team, Brown and Cotner, requesting the sales team to send updated forecasts for the remainder of the quarter so that management could "get an idea of where we are tracking." Throughout the Class Period, Merkin sent such emails (with Brown and Cotner on the distribution list) requesting updated forecasts from the sales team.  In the February 12, 2013 email, Merkin acknowledged that "we have started somewhat slower than usual this quarter."  Internal documents sent after the March 6, 2013 press release further confirm that the quarter for North American sales of core dental systems did not improve.  On March 25, 2013, Merkin sent an email to the U.S. sales team, Brown and Cotner, for the purpose of reminding the sales team to offer demo units to cost-sensitive doctors who did not want to spend the money on a new iPlus.  In the email Merkin acknowledged that the first quarter was "*a slower than usual 1st Quarter*."  Emphasis added.

238.    On March 15, 2013, the Company filed with the SEC its annual report on Form 10-K for the period ended December 31, 2012 (the "Form 10-K"), wherein Defendants reiterated the Company's previously reported financial results and financial position.  In the Form 10-K, Defendants attributed the reported positive results to "*continued demand for our all-tissue Waterlase systems* and increased sales of imaging systems[,]" which they said were "fueled by increased sales and marketing efforts . . ." as BIOLASE had done in the March 6, 2013 press release and Defendants Pignatelli and Furry had stated during the conference call of the same date.   Emphasis added.

239.    The Form 10-K also stated, in pertinent part, that "the cash generated from operations and the borrowings available under the lines of credit with Comerica Bank [would] be sufficient to fund BIOLASE's working capital requirements for 2013" and

that "[a]s of December 31, 2012, the Company was in compliance with [its debt] covenants" under the revolving lines of credit.

240.   The Form 10-K was signed by the Individual Defendants and certified as to its veracity under §§ 302 and 906 of the Sarbanes Oxley Act of 2002 by Defendants Pignatelli and Furry.

241.   The statements in the Form 10-K (paragraph 238) concerning "continued demand" for the Company's WaterLase systems were materially false and misleading. Defendants knew or, with deliberate recklessness, disregarded that, as alleged in paragraphs 83-126, there was little to no demand for the Company's WaterLase systems, including the iPlus.  As alleged in paragraphs 105-144 above, to the extent there was a "demand" for the WaterLase system, and in particular the iPlus, that "demand" had to be created by the Company/field representatives.  And, in that case, such "demand" was created through the offer of significant discounts and promotions to primarily existing BIOLASE customers, early adopters, and innovators.  As alleged in paragraphs 83-105 above, there was little to no demand for laser dentistry, let alone a BIOLASE WaterLase system, by members of the larger, mainstream dental community.

242.   The statements in the Form 10-K at paragraph 239 concerning cash generated from operations and the available borrowing under the credit facilities being sufficient to fund the Company's working capital requirements for the remainder of the year were materially false and misleading.   As alleged in paragraphs 182-202, Defendants knew that the Company was experiencing a near-term liquidity/cash crisis. Defendants knew that BIOLASE had limited cash and cash equivalents, was increasing its draw-down on its lines of credit, was not generating sufficient cash from sales of the WaterLase systems, and in particular the iPlus, had declining working capital and increasing accounts receivable, and was managing cash – all to address the Company's near-term liquidity/cash flow crisis.  As a result, Defendants' failure to disclose these facts gave a false and misleading picture of the Company's financial condition.

243.   On April 30, 2013, BIOLASE issued its 2013 proxy statement to shareholders, setting a June 6, 2013 date for BIOLASE's annual meeting of shareholders ("2013 Annual Meeting").   Among other things, Defendants sought shareholder approval to amend BIOLASE's 2002 Stock Incentive Plan to increase the shares of common stock reserved for issuance thereunder by 800,000 shares.   As of March 28, 2013, options to acquire only 86,473 shares of common stock remained available for issuance of the 6,950,000 options previously authorized under the 2002 Stock Incentive Plan.   Option grants to Defendant Pignatelli during fiscal 2012 alone far exceeded the number of options remaining for issuance under the 2002 Stock Incentive Plan, with Defendant Pignatelli having been granted 100,000 options in November 2012.   As shareholders would be apprehensive about authorizing such a significant increase in options available for distribution under the 2002 Stock Incentive Plan if they knew that demand for the Company's flagship all-tissue laser (the iPlus) was not what was represented and that the Company was experiencing a near-term liquidity/cash crisis forcing it to further dilute the outstanding BIOLASE stock by issuing additional stock to raise funds, the pendency of the shareholder vote on increasing the number of shares outstanding under the 2002 Stock Incentive Plan provided Defendants with further incentive to conceal the Company's poor financial condition.

244.   On May 7, 2013, BIOLASE issued a press release after the market closed, entitled "BIOLASE Reports 2013 First Quarter Results — Net Revenue Increases 19% to $14.6 Million, Quarter over Quarter; Laser System Revenue Increases 9%, Quarter over Quarter; Imaging Revenue Increases 619%, Quarter over Quarter; 2013 Annual Revenue Guidance Reiterated at $68 Million to $72 Million; Expects to Generate Cash from Operations for 2013 Overall; Gross Profit of 40% in Q1; Projected to Return to Normalized Levels of 44% to 46%."   The press release quoted Defendant Pignatelli, who emphasized the Company's reported first quarter 2013 financial results, stating, in pertinent part, as follows:

While our overall revenue growth was slightly above the midpoint of our guidance, it is to be noted that certain domestic product revenues generated from our WCLI Super Symposium held March 21-24 were not recognized until after the close of the first quarter.  The 2013 first quarter was also heavily geared toward international revenues as a result of the AEEDC Dubai held in February and the bi-annual International Dental Show held in early March.  Our international revenues have grown as a result of these efforts and BIOLASE® now has distributors in 71 countries around the world.  We are confident that these efforts will continue to increase our international business throughout 2013 and beyond.

*Domestically we focused on expanding our efforts as the premier total technology provider in dentistry by intensifying our efforts in selling digital imaging and CAD/CAM intra oral scanners*, which is evidenced by the 619% growth for our imaging revenues quarter over quarter.  *Our Total Technology Solution® is a key component in our strategy to push forward the adoption of lasers as high-tech dentistry and lasers become the standard of care in dentistry versus traditional conventional methods, along with leveraging our significant installed base of diode lasers*.  We believe that BIOLASE is the only company in North America that currently provides a full line of high-tech products, which includes a full range of all-tissue lasers and diode soft-tissue laser products; CBCT digital imaging products; and CAD/CAM intraoral scanners.  *We are pleased with the level of laser sales so far this year and we expect the aggressive marketing efforts we undertook in the first quarter to begin to pay off further as we move forward in the second quarter and the rest of 2013*. [Emphasis added.]

245.   The press release also noted that the Company's gross margins fell quarter-over-quarter "primarily due to higher sales of WaterLase and diode systems internationally, which generally carry a lower margin than our direct sales in North America, and the increase in sales of our licensed imaging systems as a proportion of revenue, which also carries lower margins than our laser products."  Commenting on the decrease in gross margins, Defendant Furry was quoted as stating:

Based on our projected revenues and expenditures, we expect that our gross margin will return to historical levels in the range of 44% to 46% for the second quarter and 2013 overall.

As to "Financial Outlook," the press release stated:

For the year ending December 31, 2013, the Company is reiterating its revenue expectation of approximately $68 million to $72 million. The midpoint of $70 million represents a 22% increase over 2012 net revenue and would also represent record revenue for the Company.

*The Company also reiterates that it expects to generate cash from operations for the year ending December 31, 2013.* [Emphasis added.]

246. On May 7, 2013, after the market closed, the Company also held a conference call with analysts and market participants to discuss its recent results. During the conference call Defendants Pignatelli and Furry continued to tout the adoption of the Company's technology by the mainstream dental community. However, tellingly, Defendants Pignatelli and Furry refused to provide the clarity sought by analysts by breaking down the number of WaterLase systems sold by machine, *e.g.*, WaterLase iPlus, WaterLase MDX, and WaterLase Turbo, as such a breakdown would reveal that the Company was not selling the iPlus in sufficient quantities and amounts to support positive cash flow from operations and would otherwise disclose the truth about demand for the Company's core products within the larger, mainstream dental community:

Suraj Kalia - Northland Security – Analyst:

Okay. Federico, would you care to quantify the number of WaterLase units you all could have potentially sold more in the quarter?

[Defendant] Pignatelli:

*No, we will not enter into the details of how many units.*

Emphasis added.

247. After Defendant Pignatelli shut down analyst Kalia on the level of WaterLase sales, analyst Munda of Sidoti & Co. tried, to no avail, to ascertain the same crucial information:

Gerald Munda - Sidoti & Company – Analyst:

On Friday – and is there any chance you break out – I know somebody else – Suraj, I think – commented – any chance to break out diode or how much has that increase in laser sales was weighted towards WaterLase compared to diode laser?

[Defendant] Furry:

I think we typically just talk about our overall growth in lasers, and we're pretty happy with that.  But we have said a few times that the diode has been a strong contributor to that, and we expect that that will continue.

[Defendant] Pignatelli:

Again, it is very important to understand that diode sales, they will serve as a platform for future sales of WaterLase as a dentist gets a diode laser that is far less expensive.  He switches to laser dentistry and eventually will be later upgraded to a WaterLase that is all-tissue laser.  We believe that 25% of market share today belongs to the diode laser. So it has become a technology widely used by dental offices, and leveraging the diode laser technology in educating the practitioners in the more sophisticated all-tissue WaterLase, it is an effort that will pay down very well for us in making sure that the same rate of adoption occurs for the WaterLase technology.

*     *     *

Lenny Brecken – Brecken Capital – Analyst:

Okay, but, I mean, can you just provide, if Federico and Fred are comfortable, some data points to give us some comfort that productivity is starting to kick in?

[Defendant] Pignatelli:

. . . And, clearly, as we are increasing the salesforce, we are getting to that interesting concept of yours.  I think, if you want, that is a consequence of increased productivity and larger number of sales reps.   Increasing productivity and a larger number will bring you to higher numbers, and – but, again, our confidence in higher numbers comes from a number of factors, not only higher productivity from our sale reps *but also from the fact that there is a real drive towards adoption of lasers in dentistry* and the amount of interest that we see from dentists towards our technology and our expansion in becoming a total technology solution company where we can provide all high-tech equipment to a dental office.  [Emphasis added.]

So – we will grow definitely quite fast.  The imaging side of the business, the Biolase business, because of all of that.  And Q1 was clearly the beginning of this movement.  We want to have the digital imaging division as an important division of Biolase because we'd allow to make our laser division even stronger.  There are a lot of synergies between the two and also the end client is the same – is essentially the high-tech dentist that cares about investing in new technologies.

248.   Defendant Pignatelli then attempted to explain why 2013 was different, and would be different, from prior years in terms of stated growth and acceptance of laser dentistry:

Lenny Brecken – Brecken Capital – Analyst:

Okay, that's fine, and that's why I wanted to clarify that point.  Let me just get into another question.  Conceptually speaking, you were expected to do $70 million or so in 2011, going forward into the 2011 year.  And you were at this run rate before in your history as a Company.  What is different this time around?  Can you summarize it in one or two minutes exactly why you think that this is a true secular growth?  You're at the early stage of a true secular growth time for the Company versus before you had stops and starts.  Thanks.

[Defendant] Pignatelli:

Well, Lenny, these are pretty lengthy and deep questions to answer, but I will try to do my best.  First of all, we reached $70 million – actually, $69.7 million in 2006, and that was because we entered into an agreement with Schein, and Schein purchased a lot of lasers as inventory and as training units.   So the $69.7 million in sales, in reality, they were artificially increased by us entering into a transaction – I'm sorry – into a distribution agreement with Schein.  So that is the first difference.

So – this number – these record numbers this year will be way more solid than what used to be back then because there was a specific factor that inflated sales back then.

*What also is different is that back then we didn't have a level of adoption of lasers as we have now.*  Laser dentistry in the past few years has acquired a lot of recognition in the dental and academic field.  So we have way more clinical papers; we *have a clear mode of acceptance and interest in laser dentistry that we didn't have back then.*  Let's look at the adoption rate of diode lasers in 2006, and seven years later, we grew essentially from 5% or around there to around 25%.  *So we have a base today from which to grow that is way more solid because dentistry has finally adopted laser technology into their practices.*

Clearly, we have a long way to go in becoming standard of care with WaterLase, but not so much as a few years ago.  What we see is that dentists now, they understand the value of laser technology, and they have started clearly, directing their interest towards diodes – much lower cost than a WaterLase, but now they are laser dentists.  They think in a different way than they used to think 10, 15 years ago.  They understand the laser

technology in dentistry is there to stay, and so – and to grow – *and so we have a base of customers now that is very significant to upgrade them – not only to sell them more diodes, but also to upgrade them to the WaterLase technology.*

Emphasis added.

249.   Defendant Pignatelli also touted the Total Technology Solution marketing strategy as a means to increase sales of the Company's WaterLase systems, and in particular, the Company's all-tissue laser, the Waterlase iPlus.  In this regard, Pignatelli stated:

The 2013 first quarter was a very active period in which we focused on our strategic sales and marketing efforts to position Biolase domestically as the premier total technology provider in dentistry and to broaden our profile internationally.

Domestically, we focused on expanding our efforts as the premier total technology provider in dentistry by intensifying our efforts in selling digital imaging and CAD/CAM intraoral scanners, which is evidenced by the 619% growth quarter over quarter.

*Our total technology solution is a key component in our strategy to push forward production of lasers as high-tech dentistry and lasers becomes the standard of care in dentistry versus traditional conventional methods.* We are the only company in North America that currently provides a full line of high-tech products, which includes our wide range of WaterLase all-tissue lasers and diode soft tissue laser products, CBCT digital imaging products and CAD/CAM intraoral scanners.

*While this Q1 shift in revenues negatively impacted our gross profit in the short term, we believe that the long-term benefits will be sound. We have already felt some impact from our marketing efforts, and we are pleased with the level of WaterLase sales we experienced in April. We expect the aggressive marketing efforts we undertook in the first quarter to continue to pay off as we progress in the second quarter and the rest of 2013.*

Emphasis added.

250.   Finally, during the call, Defendant Furry made a passing comment about amendments to the credit facilities with Comerica:

Accounts receivable totaled $10.6 million at March 31, 2013, compared to $11.7 million at December 31, 2012. Stockholders' equity was $9.7 million at March 31, 2013, and March 31, 2013, the Company had two

CONSOLIDATED CLASS ACTION COMPLAINT

revolving credit facilities totaling $8 million, with $4.7 million of available borrowing in excess of the $3.3 million outstanding. Today we amended our credit agreements with Comerica Bank, increased our total credit facilities to $10 million.

Specifically the amended credit agreements increased our domestic revolver from $4 million to $6 million for a combined aggregate commitment of borrowings up to $10 million. Further, the interest rates on the outstanding principal balances of the credit agreements were reduced to 5.25%, which is the prime rate plus 2% for the domestic revolver, a reduction of 1%, and 4.75%, the prime rate plus 1.5% for the XM revolver, which is a reduction of 0.5% from the prior agreement.

In addition, the amended credit agreement will provide for $1 million of additional flexible borrowings against inventories for 30 days during the middle of the quarter.

251.   Also on May 7, 2013, following the issuance of the quarterly earnings report, the Company announced that "Comerica Bank has increased BIOLASE's® credit facility agreements (the "Credit Agreements") from $8 million to $10 million, decreased both the domestic and Ex-Im interest rates, established financial and non-financial covenants for the year ending December 31, 2013, and added $1 million of additional mid-quarter borrowing flexibility."   Commenting on the amended Credit Agreements, Defendant Furry stated: "We are very pleased with the terms established for the second year of our credit facility and thankful for the relationship we have developed with Comerica Bank.   Management has worked diligently throughout the turnaround and the amendment to our Credit Agreements highlights Comerica Bank's confidence in the changes we have made and illustrates their belief in BIOLASE's future potential."

252.   On May 8, 2013, the next trading day after the issuance of the two press releases and conference call, the price of the Company's stock declined modestly, closing at $4.91 per share from $5.11 per share on the prior day.

253.   The statements in the May 7, 2013 press release in paragraph 244 concerning BIOLASE's "intensif[ied] . . . efforts in selling digital imaging and CAD/CAM intra oral scanners" as part of its strategy "to push forward the adoption of

lasers" were materially false and misleading.  Defendants BIOLASE, Pignatelli and Furry knew or, with deliberate recklessness, disregarded that the emphasis on the sale of digital imaging and CAD/CAM intraoral scanners was to compensate for the poor sales of the WaterLase systems, and the iPlus in particular.  These Defendants also knew or, with deliberate recklessness, disregarded that laser dentistry was not on the path to becoming "the standard of care in dentistry versus traditional conventional methods." As alleged above in paragraphs 83-126, the vast majority of dentists within the larger, mainstream dental community was not adopting lasers for their practices.

254.  The statements in paragraphs 247 and 248 made by Defendant Pignatelli during the conference call concerning the acceptance and adoption of laser dentistry, the base of laser customers that can upgrade to WaterLase systems, the Company's Total Technology Strategy as "a key component" in the strategy "to push forward the production of lasers" as "the standard of care in dentistry versus traditional conventional methods," satisfaction "with the level of WaterLase sales" during April, and the demand for the Company's lasers, were materially false and misleading. Pignatelli knew or, with deliberate recklessness, disregarded the following:

a)    Laser dentistry was not on the path to becoming "the standard of care in dentistry versus traditional conventional methods."  Indeed, as alleged above in paragraphs 83-126, and for the reasons discussed therein, the vast majority of dentists within the larger, mainstream dental community was not adopting lasers for their practices.  Pignatelli knew, therefore, that the although there were published articles extolling the positive aspects of laser dentistry, those articles did not mean that the larger, mainstream dental community had, in fact, switched to laser dentistry in place of the traditional, conventional methods of dentistry.

b)    The Total Technology Solution marketing strategy (*i.e.*, emphasis on the sale of digital imaging equipment and CAD/CAM intraoral scanners) was, as Merkin stated in his email of January 29, 2013 (noting that the sale of imaging

products made a difference in Q4:12), intended to compensate for the poor sales of the WaterLase systems, and the iPlus in particular. *See* paragraphs 235-237, above.

  c)   As alleged in paragraphs 106-151 above, to the extent there was a "demand" for the WaterLase system, and in particular the iPlus, that "demand" had to be created by the Company/field representatives. And, in that case, such "demand" was created through the offer of significant discounts and promotions to primarily existing BIOLASE customers, early adopters, and innovators. As alleged in paragraphs 83-126 above, there was little to no demand for laser dentistry, let alone a BIOLASE WaterLase system, by members of the larger, mainstream dental community. And, as to that existing customer base, they were not upgrading to the WaterLase systems in the numbers they had in prior quarters.

  d)   To the extent a field representative could stir up interest in an iPlus or other WaterLase system, as alleged in paragraphs 83-119 and 152-159, he/she encountered a number of issues that impaired his/her ability to sell the product, such as high cost/lack of ROI, poor customer service, and reputation for broken trunk fibers.

255.   Internal documents confirm that sales of WaterLase systems were poor during the quarter, especially at the end of the quarter. In looking back at the quarter, Merkin conceded in an email dated April 2, 2013 that he sent to the sales team, Brown and Cotner, that the end of the first quarter was "rough".

256.   Defendant Pignatelli's purported satisfaction with sales of WaterLase systems during the month of April, as stated in the May 7, 2013 release, was without basis. As alleged in paragraphs 83-119, there remained little to no demand for the WaterLase system, and the iPlus in particular. In the southeast region, for example, a WCLI symposium scheduled for April 25, 2013, was rescheduled to June 21, 2013, due to the lack of interest. In a telling concession that BIOLASE's true customer base was, and is, limited primarily to dentists who already use a laser, Merkin said in an email dated April 22, 2013, that the doctors who show up to the WCLI symposiums are educated about lasers or have met with a representative throughout the quarter prior to

the event.   According to Merkin, only 50% of those who register for the WCLI symposiums actually show up.   The symposiums are used to induce those doctors (the remaining 50%) to purchase a WaterLase system, and in particular the iPlus.

257.   Defendant Furry's statement during the May 7, 2013 conference call about satisfaction with the Company's growth in lasers was materially false and misleading. Furry knew or, with deliberate recklessness, disregarded that, as alleged in paragraphs 83-126, there was little to no growth in the market for the Company's WaterLase systems.

258.   The Company's statement in the May 7, 2013 press release in which it "reiterate[d]" its expectation that it would "generate cash from operations" for 2013 was materially false and misleading and made without a basis in fact.   Defendants knew that the Company had limited cash on hand, was increasing its draw-down on its line of credit, had increased expenses, especially with respect to the WCLI Super Symposium in March, was not generating sufficient cash from sales of the WaterLase systems, and in particular the iPlus, especially since most of the sales of these products occurred overseas where the sales carry small margins, had declining working capital and increasing accounts receivable, and was managing cash – all to address the Company's near-term liquidity/cash flow crisis.

259.   On May 10, 2013, after the close of the market, BIOLASE filed with the SEC on Form 10-Q its quarterly financial report for the period ended March 31, 2013, wherein Defendants BIOLASE, Pignatelli and Furry reiterated the Company's previously reported financial results and financial position.   In this regard, the Form 10-Q provided:

*Net Revenue*.   Net revenue for the three months ended March 31, 2013, ("First Quarter 2013") was $14.6 million, an increase of $2.3 million, or 19%, as compared with net revenue of $12.3 million for the three months ended March 31, 2012 ("First Quarter 2012").   Domestic revenues were $9.0 million, or 62% of net revenue, for First Quarter 2013 versus $8.4 million, or 68% of net revenue, for First Quarter 2012. International revenues for First Quarter 2013 were $5.6 million, or 38% of net revenue,

as compared with $3.9 million, or 32% of net revenue, for First Quarter 2012. The increase in period-over-period net revenue was primarily attributable to increases in international laser system revenue, which grew 38%, as well as increases in domestic imaging revenue, which increased 516% due to increased sales and marketing efforts. Sales of the diode laser systems, which increased 135%, were a key driver of our period-over-period laser system revenue growth.

Laser system net revenue increased by approximately $814,000, or 9%, in the First Quarter 2013 compared to the same quarter of 2012. *We expect that the growth in sales of our core laser systems will be major contributors to our overall growth for the year ending December 31, 2013.* [Emphasis added.]

260.   The Form 10-Q also discussed the Company's liquidity. In this regard, the Form 10-Q stated, in pertinent part, that "$4.7 million of available borrowings [remained] under two revolving credit facility agreements" with Comerica; that "to improve liquidity, management amended the Company's lines of credit increasing the combined aggregate capacity of borrowings to $10.0 million" during the quarter; that "the working capital and borrowings available under the lines of credit should be sufficient to fund the requirements of the Company" during fiscal 2013; and that "[a]s of March 31, 2013, the Company was in compliance with [its debt] covenants" under the Comerica lines of credit.

261.   The Form 10-Q was signed and certified as to veracity under §§ 302 and 906 of the Sarbanes Oxley Act of 2002 by Defendants Pignatelli and Furry.

262.   The statement in the Form 10-Q concerning the Company's expectation that "the growth in sales of our core laser systems will be major contributors to our overall growth for the year ending December 31, 2013" was materially false and misleading and made without a basis in fact. Defendants knew, or with deliberate recklessness, disregarded that sales of the Company's WaterLase systems were not growing and, therefore, would not be "major" contributors to the Company's expected 2013 growth.   As alleged herein in paragraphs 106-151, Defendants knew that there was little to no demand for the Company's core laser products.

263.   The statement in the Form 10-Q concerning the Company's liquidity was materially false and misleading.   Although stating that the Company increased its revolving credit by an aggregate of $2 million "to improve liquidity", Defendants failed to disclose the severity of the liquidity/cash crunch.   Defendants knew that the Company had limited cash on hand, was increasing its draw down on its line of credit, had increased expenses, especially with respect to the WCLI Super Symposium in March, was not generating sufficient cash from sales of the WaterLase systems, and in particular the iPlus, especially since most of the sales of these products occurred overseas where the sales carry small margins, had declining working capital and increasing accounts receivable, and was managing cash – all to address the Company's near-term liquidity/cash flow crisis.

264.   The statement in the Form 10-Q concerning the Company's compliance with the financial ratios and covenants of the Credit Agreements was materially misleading in that it failed to disclose that the Company was then in danger of violating the EBITDA covenant.   Defendants knew that as domestic revenues stagnated and expenses increased, the Company was close to violating the EBITDA covenant.

265.   On May 13, 2013, BIOLASE filed with the SEC a current report on Form 8-K advising that obtaining the increase in the Comerica lines of credit to $10 million had cost the Company $30,000 and that "certain financial and non-financial covenants" had been "revised," while stating that the summary of the changes to the credit agreements was "not complete," and was "qualified in its entirety by reference to the full text of the agreements or forms of the agreements, which" would not be disclosed until the Company filed its quarterly financial report on Form 10-Q with the SEC for the period ended June 30, 2013, stating "Readers should review those agreements or forms of agreements for a more complete understanding of the terms and conditions associated with this transaction."

266.   On May 21, 2013, BIOLASE declared a one-half percent stock dividend payable on June 28, 2013 to stockholders of record as of June 14, 2013.

267.   On May 29, 2013, Defendant Furry presented at a Stifel, Nicolaus & Company investor conference in New York City, making positive statements about the strength of BIOLASE's business and finances and demand for its product offerings, including stating that the Company was still "[p]rojecting revenue of $68M to $72M for 2013."   During the conference, Defendant Furry presented a chart, titled "Investment Considerations and Expectations", in which he emphasized that based on then-present demand for the Company's laser offerings, the Company was experiencing "[o]ngoing growth in core WaterLase products with continued trend of adoption."

268.  Defendant Furry's statement concerning the Company's purported "ongoing growth in core WaterLase products with continued trend of adoption" was materially false and misleading.  Defendant Furry knew or, with deliberate recklessness, disregarded the following:

a)   BIOLASE was not penetrating the mainstream dental community, as alleged in paragraphs 83-126.  Rather, BIOLASE's primary market was the existing customer and innovator.  And, as alleged in paragraphs 127-151, any "growth" was due to the multiple promotions and discounts that BIOLASE offered to induce its primary customer base – existing customers, early adopters, and innovators – to purchase the iPlus and other WaterLase systems.

b)   The adoption of lasers in dental practices was limited primarily to existing customers, early adopters, and innovators.  As alleged in paragraphs 83-126, and for the reasons set forth therein, Furry knew that the vast majority of dentists in the larger, mainstream dental community was content to remain with the drill and scalpel and had no intention to convert to laser dentistry.

c)   There was little to no demand for the Company's WaterLase systems, including the iPlus, by either the smaller customer base or the larger mainstream dental market.  As alleged in paragraphs 106-151 above, to the extent there was a "demand" for the WaterLase system, and in particular the iPlus, that "demand"

had to be created by the Company and field representatives.  And, in that case, such "demand" was created through the offer of significant discounts and promotions.

d)    To the extent a field representative could stir up interest in an iPlus or other WaterLase system, he/she encountered a number of issues that impaired his/her ability to sell the product, such as high cost/lack of ROI, poor customer service, and reputation for broken trunk fibers, as alleged above in paragraphs 83-126, 152-159.

269.   On June 6, 2013, shareholders approved the increase in the 2002 Stock Incentive Plan at the 2013 Annual Meeting.  Following the 2103 Annual Meeting, in response to rumors in the market that Defendant Pignatelli was resigning from his positions as Chairman and CEO of BIOLASE, that same day, BIOLASE issued a press release stating that the Board had "issued the following statement in response to inquiries from a significant number of shareholders," which provided that:

> There is absolutely no truth to rumors that Federico Pignatelli, Chairman and CEO, would resign from the Board or the Company.  Mr. Pignatelli is and will remain Chairman and CEO, as he was elected in August, 2010. *He is fully engaged in all aspects of the Company's business, as he will continue to be.* [Emphasis added.]
>
> Mr. Pignatelli stated, "I am fully committed to BIOLASE now and for the future."

270.   The following day, on June 7, 2013, the Company announced that Defendant Arrow had been named President and Chief Operating Officer ("COO") of the Company.  In these capacities, Arrow would report directly to Defendant Pignatelli. In the press release, Arrow was quoted as stating, among other things, that his "first task will be to expand the proportion of dentists who are enthusiastic owners of BIOLASE's products and make our revolutionary WaterLase technology the standard of care for patients."

271.   On June 10, 2013, BIOLASE filed with the SEC a current report on Form 8-K advising that on June 6, 2013, the Board had entered into a new employment agreement with Defendant Pignatelli pursuant to which "the Board agreed to re-nominate Mr. Pignatelli to serve on the Board at the next three annual meetings, and to

maintain his election as Chairman of the Board until his earlier resignation or removal, or until he is not elected by the shareholders of the Company to be a director of the Company."   The Form 8-K also advised that Defendant Arrow was appointed as the Company's new President and COO.

272.   On June 17, 2013, BIOLASE issued a press release announcing that its common stock had been "preliminarily chosen to be added" to two major indices, the Russell 3000 and the Russell Global Indices, significantly increasing demand for the Company's stock in the market as many investors purchase shares based on their inclusion in these indexes.   Defendant Pignatelli used the announcement to tout the Company's purported growth since the pre-Class Period restructuring that the Individual Defendants were a part of:   "The inclusion of our company in the widely-followed Russell 3000 and Russell Global Indices is the result of the *substantial growth in our business* since new Management and Board of Directors took over in August 2010."  (Emphasis added.)   Defendant Arrow echoed this statement, stating: "We are honored to be included in the Russell 3000 because of the statement this makes about investor *recognition of the prosperity and growth of BIOLASE*." (Emphasis added.)

273.   The statements made by Defendants Pignatelli and Arrow concerning the purported "growth" of the Company were materially false and misleading.   These Defendants knew or, with deliberate recklessness, disregarded that the Company was not growing, especially domestically with regard to the Company's core WaterLase systems, and in particular the iPlus, as alleged above in paragraphs 83-126.

274.   On June 20, 2013, Defendant Pignatelli and Brown conducted an internal conference call with, among others, the sales team for the purpose of meeting and talking with Defendant Arrow and to "outline new strategies and initiatives."

275.   On June 25, 2013, Chris Walinski, Director of Clinical Research and Education, advised the sales team by email that the WCLI Super Symposium planned for Austin, Texas on August 16-18, 2013, at the Lakeway Resort and Spa was postponed until later in the year and the WCLI Super Symposium planned for Miami,

Flordia on August 9-11, 2013, at the Eden Roc Hotel was cancelled.  According to CS 4, the two WCLI Super Symposiums were postponed and cancelled due to the lack of interest and demand.

276.  On July 15, 2013, by email directed to Company employees, Defendant Arrow introduced Orlando Rodrigues ("Rodrigues") as the Vice President of Marketing. In a concession that BIOLASE had problems selling itsWaterLase systems, Arrow told employees that Rodrigues would be able to remedy the problem because he "knows how to create demand creation campaigns so powerful that they persuade clinicians to get involved in marketing a company's product for it."  And, Rodrigues would do so by "shaping our marketing messaging into what he calls an 'Aspirational Sell' – which to me means that we'll be focusing more on how our products make dentist [sic] better – empowering them and making it clear that they need our products to deliver the best care to their patients, and less on the standard specifications comparison of our products."  This change in marketing would be disclosed by Arrow to the market about three weeks later.

277.  On July 26, 2013, BIOLASE filed with the SEC a registration statement on Form S-3 stating that BIOLASE sought to sell up to $30 million of BIOLASE "common stock, preferred stock, and warrants to purchase any such securities" "at various times and at indeterminate prices" upon the SEC declaring the registration statement effective.  Defendants stated that BIOLASE would use the proceeds of the offering to generally fund general and administrative expenses.  Defendants did not explain the import of such funding and failed to disclose that such use of proceeds was needed to address the Company's cash flow problems and the near-term liquidity/cash crunch that the Company was experiencing.

## THE TRUTH BEGINS TO EMERGE

278.  On August 7, 2013, after the close of trading, BIOLASE issued a press release announcing its second quarter 2013 financial results.  Rather than the $15.69 million in revenues Defendants had led the market to expect though their bullish

statements, BIOLASE reported revenues of just $14.2 million – down 2.74% from the $14.6 million the Company had reported in the fourth quarter 2012.  Rather than the $.04 per share loss Defendants had led the market to expect, and had reported in the second quarter of 2012, BIOLASE reported a loss of $.06 per share – a substantial 50% higher.  Attempting to explain the shortfall, Defendant Pignatelli was quoted in the press release issued that day, stating:

> While we experienced 17% net revenue growth for the second quarter of 2013 when compared to the prior year second quarter, this result was approximately 7% to 10% lower than our internal goal for the quarter. While we are experiencing growth in all areas of our business, we fell short of our own internal expectations *due to an unusually slow quarter end for our domestic laser sales*, Germany not performing as expected, a delay in U.S. deliveries of the latest CAD/CAM system model from our European vendor, and a pair of problems that hurt our sales in Canada. Severe flooding in June in parts of Canada impeded sales and we did not receive approval from Health Canada for our EPIC 10, which was anticipated in the second quarter.  Compounding these head winds domestically were the continued uncertainty and confusion over the recent implementation of Obamacare and a sharp rise in interest rates.  [Emphasis added.]

> \*     \*     \*

> We've been following our new direct marketing strategy in the U.S. and Canada of becoming a Total Technology Solution provider to further the adoption of our proprietary WaterLase YSGG technology to a larger community of dentists as a 'must have.'  We therefore focused on selling our entire line of products, including our full line of hard- and soft-tissue lasers and our digital imaging and CAD/CAM intra-oral scanning systems. Concentrating on selling our EPIC 10 diode soft-tissue laser and our lines of licensed digital imaging and CAD/CAM equipment has caused a short term negative impact on our traditional margin, but we expect this strategy to result in opportunities to leverage these relationships and sell those new customers our flagship WaterLase iPlus.

The press release also stated:

> Gross profit as a percentage of net revenue was 39% as compared to 45% for the prior year quarter.  For the six months ended June 30, 2013, gross profit as a percentage of net revenue was 39% as compared to 46% for the year period.  The quarter-over-quarter and year-over-year decreases were

primarily due to higher sales of licensed imaging equipment, which generally carry lower margins than our laser products, and increased international laser sales, which generally carry a lower margin than our domestic laser sales.

279.   The August 7, 2013 press release also quoted Defendant Furry stating that "based on . . . projected revenue mix and expenditures for the remainder of the year, [BIOLASE] expect[ed] that [its] gross margin [would only increase] to the low- to mid-forties for the second half of the year."   The press release also reduced BIOLASE's "Financial Outlook," stating that "[f]or the year ending December 31, 2013, the Company [was now] expecting net revenue to be in the low end of its guidance range for the year of approximately $68 million to $72 million" and that "[t]he Company no longer expect[ed] to generate cash from operations overall for the year ending December 31, 2013."

280.   BIOLASE also specifically highlighted the filing of the registration statement as its source of liquidity when discussing its low cash balance and the situation with its credit facility.

281.   The August 7, 2013 press release also contained the following statements under the heading "Liquidity and Capital Resources":

As of June 30, 2013, BIOLASE had approximately $3.8 million in working capital.  Cash and cash equivalents totaled approximately $2.1 million at June 30, 2013, compared to $2.5 million at December 31, 2012.

Accounts receivable totaled $11.5 million at June 30, 2013, compared to $11.7 million at December 31, 2012.  At June 30, 2013, the Company had two revolving credit facilities totaling $10.0 million, with $1.5 million of available borrowings, in excess of the $6.0 million outstanding.

On July 26, 2013, the Company filed a registration statement on Form S-3 (the "2013 Registration Statement") with the Securities and Exchange Commission (the "SEC") to register an indeterminate number of shares of common stock, preferred stock, and warrants with a total offering price not to exceed $30 million.

282.   During an earnings conference call held later that evening with investors on which the Individual Defendants participated, the market learned that the results

were a consequence of poor sales of the iPlus and the WaterLase systems and marketing execution.   In this regard, Defendant Arrow stated: "I've carefully reviewed the operations at Biolase in the last couple of months, and we surely have opportunities to improve our operational efficiencies such as in planning, product development, execution on new ideas, *and, particularly, in sales and marketing*."   Emphasis added. Arrow further underscored the importance of the iPlus to the Company's financial health and success, while at the same time noting that the Company had not sold the iPlus beyond its primary market of existing customers, early adopters, and innovators:

> As a priority, *we plan to take steps that we need to create a cash flow-positive company that grows consistently*.   This goes hand-in-hand with our challenge to convert the business we have today with a two-year-old transformative lead product into a profitable, faster-growing, and more valuable enterprise.  *We plan to unify our marketing message in order to transition past the innovators who have largely bought the iPlus in its first two years in the market.*
>
> The WaterLase iPlus is the core of our business.  It is the highest-margin, most proprietary product that we sell. While we benefit by selling diode lasers and imaging products for strategic reasons that we speak about elsewhere, *the financial health of Biolase is directly linked to our success with selling WaterLase iPlus units.*
>
> *The fact that WaterLase revenues for the first half of 2013 have not grown is a main reason that the Company is not already cash flow-positive.  As such, the main part of our strategy for the rest of 2013 is geared toward improving our WaterLase iPlus sales.*

Emphasis added.

283.   Defendant Arrow also conceded that the ROI sales pitch used throughout the Class Period as a key selling point to drive increased iPlus sales was not converting fence-sitting dentists within the Company's primary market and the vast majority within the mainstream dental community into purchasers of the iPlus:

> The issue you raised about the ROI and the obstacles to selling – the ROI argument is a very strong one because as most dentists finance their purchases when they buy a WaterLase, so they're paying a monthly payment, and the amount that they make in additional billing greatly

exceeds that by several – by a multiple, so it's a very easy answer – whether the laser pays for itself.

*But that, by itself, is almost never sufficient to sell a laser. That's just what gets us to the table.* And I think our complete understanding of the selling process is maturing in that way – that we don't just pitch on the ROI. We don't just pitch on the large amount of clinical evidence that the WaterLase should be used in almost every dental procedure for the best patient care. *Those things are important, and they're necessary, but they are not the thing that gets the dentist over the edge and makes the purchasing decision.*

\*   \*   \*

So the ROI argument is part of it, the clinical data is part of it, but, at the end of the day, it's what it can do for them. It's the why, it's what it can do for patients, and we're getting – that's part of what our new VP of Marketing is going to be focusing on and what you're going to see our marketing change and mature in the second half of 2013. We're going to be focusing more on that why and that emotional pushing them over the edge.

Emphasis added.

284.   Finally, Defendant Arrow disclosed that the Company had not succeeded in penetrating the larger, mainstream dental community with regard to the iPlus:

Lenny Brecken - Brecken Capital – Analyst:

But do you believe that you haven't hit a brick wall, as a company, in the WaterLase product line in penetrating the innovators. I mean, you must think that because then you wouldn't have taken the role.

Alex Arrow - Biolase Inc. - President and COO:

You're correct. *I think we have* – there is not a brick wall between the innovators and the early adopters and the early majority. *I think what we have is a situation where most of our sales, to date, have been to the innovators and a few of the early adopters.* [Emphasis added.]

285.   On this news, BIOLASE common stock began a decline from a $3.42 per share closing price on August 7, 2013 to close at $2.51 per share on August 8, 2013 on heavy volume of 1,935,300 shares. This was a decline of $0.91 per share, or 26%.

286.   When BIOLASE filed with the SEC its quarterly report on Form 10-Q for the period ended June 30, 2013, on August 9, 2013, it not only reiterated the Company's

previously reported financial results and financial position, but disclosed for the first time that it had violated the covenants of its new May 24, 2013 Credit Agreements with Comerica and that Comerica had agreed to waive its non-compliance:

> The Credit Agreements require the Company to maintain compliance with certain financial and non-financial covenants, as defined therein.  If a default occurs, Comerica Bank may declare the amounts outstanding under the Credit Agreements immediately due and payable.  As of June 30, 2013, the Company was in compliance with these covenants *with the exception of the earnings before income tax, depreciation and amortization ("EBITDA") covenant*.  On August 5, 2013, the Company obtained a waiver for noncompliance of the minimum EBITDA covenant from Comerica Bank as of June 30, 2013, provided that the Company and Comerica Bank establish amended covenants by September 13, 2013 and until the amendment is executed the aggregate borrowing capacity is reduced from $10.0 million to $7.5 million. [Emphasis added.]

> As a result of Amendment No. 2, interest rates on the outstanding principal balance of the Credit Agreements bear interest at annual percentage rates equal to the daily prime rate, plus 2.00% for the Domestic Revolver and 1.50% for the Ex-Im Revolver.  The daily prime rate is subject to a floor of the daily adjusting LIBOR rate plus 2.50% per annum, or if LIBOR is undeterminable, 2.50% per annum.  Prior to the amendment, interest rates were equal to the daily adjusting LIBOR rate (subject to a floor of 1.00% per annum), plus spreads of 5.25% for the Domestic Revolver and 4.25% for the Ex-Im Revolver. The Company is also required to pay an unused commitment fee of 0.25% based on a portion of the undrawn lines of credit, payable quarterly in arrears.  During the three and six months ended June 30, 2013, the Company incurred interest expense associated with the credit facilities of $116,000 and $200,000, respectively, including $43,000 and $81,000 of amortization of deferred debt issuance costs and $18,000 and $36,000 of amortization of the discount on lines of credit, respectively. During the three and six months ended June 30, 2012, the Company incurred interest expense associated with the credit facilities of $38,000, including $15,000 of amortization of deferred debt issuance costs and $7,000 of amortization of the discount on lines of credit. Interest expense payable was approximately $26,000 and $19,000 at June 30, 2013 and December 31, 2012, respectively, and was included in accrued liabilities in the accompanying consolidated financial statements.

> During the year ended December 31, 2012, the Company issued and amended a warrant to Comerica Bank (the "2012 Comerica Warrant") to purchase up to 80,000 shares of the Company's common stock at an

amended exercise price of $2.00.  During the three months ended March 31, 2013, Comerica Bank exercised all 80,000 of the 2012 Comerica Warrant shares on a cashless basis pursuant to the Notice of Exercise resulting in a net issuance of 40,465 shares of common stock.

The Company also disclosed that total stockholder equity had fallen to just $8 million, while BIOLASE owed at least $6 million to Comerica.

287.   On August 13, 2013, before the opening of trading, BIOLASE issued a press release stating that Comerica had agreed to waive the Company's "non-compliance" with the EBITDA covenant "in the Loan and Security Agreement, dated May 24, 2012, by and between BIOLASE and Comerica, as amended (the "Loan Agreement").  The Loan Agreement required that, as of June 30, 2013, BIOLASE's EBITDA could not be less than ($500,000).  According to the press release, "Comerica agreed to waive this requirement, provided that BIOLASE and Comerica [could] agree upon a further amendment to the Loan Agreement containing revised financial covenants by September 13, 2013. . . ."  The parties further agreed that until an agreement is reached, "the total amount borrowed under the Loan Agreement cannot exceed $7.5 million."

288.   After this news, BIOLASE stock declined from an opening price of $1.96 per share on August 13, 2013 to close at $1.81 per share on that day.

289.   Also on August 13, 2013, after the markets closed, BIOLASE filed with the SEC an amended registration statement on Form S-3 for the purpose of reducing the original offering from $30 million to $5 million.  With this filing, the Company finally disclosed that as a consequence of its liquidity/cash crisis, it desperately needed cash such that it would accept proceeds from the offering below the $30 million originally planned.

290.   On this news, the price of BIOLASE stock declined from a closing price of $1.81 per share on August 13, 2013, to $1.20 per share on August 14, 2013, a 33.7% decline.

## ADDITIONAL SCIENTER ALLEGATIONS

291.  As alleged herein, BIOLASE and the Individual Defendants acted with scienter in that they knew that the public documents and statements issued or disseminated in the name of the Company were materially false and misleading; knew that such statements or documents would be issued or disseminated to the investing public; and knowingly and substantially participated or acquiesced in the issuance or dissemination of such statements or documents as primary violations of the federal securities laws.  As set forth elsewhere herein in detail, these Defendants, by virtue of their receipt of information reflecting the true facts regarding BIOLASE, their control over, and/or receipt and/or modification of BIOLASE's allegedly materially misleading statements and/or their associations with the Company which made them privy to confidential proprietary information concerning BIOLASE, participated in the fraudulent scheme alleged herein.

292.  For example, as alleged above, Defendants kept track of potential sales/actual sales of the Company's entire product line through Excel spreadsheet forecasts that were sent to the sales team during each quarter.   During the Class Period, requests for these updates were sent on at least the following days:  January 11, 2013, February 12, 2013, April 11, 2013, May 13, 2013, and July 8, 2013.   Sales representatives were required to populate the spreadsheet with the following information: the week of the quarter in which he/she expected to sell a laser or imaging product; the unit for which a customer expressed interest in purchasing (*e.g.*, iPlus white, iPlus Red, iPlus Black, MDX 450, MD CP0, EIPC, iLase, and various imaging products); and the name, address, and contact information of the customer.   Upon receipt of the forecasts, Merkin consolidated the information into a master forecast which he circulated to the sales team, Brown and Cotner.   On May 13, 2013, for example, Merkin emailed the master forecast, which he titled "Q213 Planner Master" to this group.  The master forecast/planner showed by sales representative, the number of

products sold in April and expected to be sold during the remainder of the second quarter of 2013.

293.   In addition to the Excel spreadsheet forecasts, Defendants kept track of potential sales/actual sales through the CRM computer system.  As Merkin described it in an email dated April 15, 2013, the CRM server was an important tool for "forecasting and funnel management".  In the "CRM Guidelines for Sales" distributed to the sales team on April 15, 2013 by Merkin, "[t]he sales module in CRM is [described as] everything sales.  Sales reps and managers can access and see all of the information pertaining to sales processes, monitor leads, opportunities, create accounts for the potential customers."  The CRM was also a way for the Company to ensure compliance with the Sunshine Act.  As Defendant Furry explained in an email dated July 2, 2013, to the sales team, with a carbon copy to Defendant Pignatelli, "the Sunshine Act requires companies to report payments and transfers of value made to doctors, which includes things such as lunches and gifts.  These are taxable to the doctor which is part of the issue but the failure to report such items will result in a financial penalty to the Company."  Internal documents show that the CRM was used by sales representatives throughout the Class Period.  Use of the CRM became mandatory in or about the time of the email.  (*See* Furry July 2, 2013 email:   "As Federico and Alex mentioned on the recent sales call, CRM use is mandatory for everyone, no exceptions.")

294.   Throughout the Class Period, Defendants kept track of actual sales through the namsales@biolase.net. website.  When a sales representative made a sale, he/she was required to enter the sale information into the website.   As CS 6 said, "Everything that we sold got funneled into that website."  Internal emails show that certain sales representatives also sent copies of the sales order to Cotner.

295.  Defendants also kept track of sales and the marketing of BIOLASE's WaterLase systems through internal meetings and weekly conference calls.  As alleged herein, for example, Defendant Pignatelli often met with Brown and employees

following trade shows to obtain feedback about what they were hearing from attendees about customer service and satisfaction.

296.   Apart from these meetings, CS 5 noted that during CS 5's tenure there were always meetings in which management discussed customer satisfaction, ways to improve sales, and ways to reach potential customers and address customer needs and issues.  In short, CS 5 said there were always discussions about the foregoing issues and "how to better market to the customers . . . ."  According to CS 5, Pignatelli often participated in these meetings.

297. Finally, internal documents show that Brown, Merkin, and Cotner conducted periodic conference calls (*e.g.*, on November 15, 2012, December 20, 2012, and February 15, 2013) with the sales team for the purpose of discussing, among other things, sales opportunities, strategies for obtaining opportunities, and strategies for closing the opportunities and converting those opportunities into sales.  As alleged, Brown reported to, and Cotner was the eyes and ears of, Defendant Pignatelli.

## NO SAFE HARBOR

298. BIOLASE's "Safe Harbor" warnings accompanying its reportedly forward-looking statements issued during the Class Period were ineffective to shield those statements from liability.  To the extent that projected revenues and earnings were included in the Company's financial reports prepared in accordance with GAAP, including those filed with the SEC on Form 8-K, they are excluded from the protection of the statutory Safe Harbor.  *See* 15 U.S.C § 78u-4(b)(2)(A).

299. Defendants are also liable for any false or misleading forward-looking statement pleaded because, at the time each forward-looking statement was made, the speaker knew the forward-looking statement was false or misleading and the forward-looking statement was authorized and/or approved by an executive officer of BIOLASE who knew that the forward-looking statement was false.  None of the historic or present tense statements made by Defendants were assumptions underlying or relating to any plan, projection or statement of future economic performance, as they were not stated to

1   be such assumptions underlying or relating to any projection or statement of future
2   economic performance when made, nor were any of the projections or forecasts made
3   by Defendants expressly related to or stated to be dependent on those historic or present
4   tense statements when made.

### APPLICATION OF PRESUMPTION OF RELIANCE: FRAUD ON THE MARKET

7   300.   Plaintiff will rely upon the presumption of reliance established by the fraud
8   on the market doctrine in that, among other things:

9   a)   Defendants made public misrepresentations or failed to disclose
10   material facts during the Class Period;

11   b)   The omissions and misrepresentations were material;

12   c)   The Company's stock traded in an efficient market;

13   d)   The misrepresentations alleged would tend to induce a reasonable
14   investor to misjudge the value of the Company's common stock; and

15   e)   Lead Plaintiff and other members of the Class purchased BIOLASE
16   stock between the time Defendants misrepresented or failed to disclose material facts
17   and the time the true facts were disclosed, without knowledge of the misrepresented or
18   omitted facts.

19   301.   At all relevant times, the market for BIOLASE common stock was
20   efficient for the following reasons, among others:

21   f)   As a regulated issuer, BIOLASE filed periodic public reports with
22   the SEC; and

23   g)   BIOLASE regularly communicated with public investors via
24   established market communication mechanisms, including through regular
25   disseminations of press releases on the major news wire services and through other
26   wide-ranging public disclosures, such as communications with the financial press,
27   securities analysts, and other similar reporting services.

28

## LOSS CAUSATION/ECONOMIC LOSS

302.   During the Class Period, as detailed herein, Defendants engaged in a scheme to deceive the market and a course of conduct that artificially inflated BIOLASE's stock price and operated as a fraud or deceit on Class Period purchasers of BIOLASE stock by misrepresenting (a) the demand for the WaterLase systems, and in particular the Company's flagship product – the iPlus; (b) the adoption and acceptance of laser dentistry; and (c) the financial and liquidity position of the Company. However, when Defendants' prior misrepresentations and fraudulent course of conduct were disclosed and became apparent to the market, the price of BIOLASE stock fell precipitously as the prior artificial inflation came out of the Company's stock price.  As a result of their purchases of BIOLASE stock during the Class Period, and the subsequent disclosures of the truth, Lead Plaintiff and other members of the Class suffered economic loss, *i.e.*, damages under the federal securities laws.

303.   Defendants' false and misleading statements had the intended effect and caused BIOLASE stock to trade at artificially inflated levels throughout the Class Period – the price of the Company's common stock reached a price as high as $6.05 per share on April 29, 2013.

304.   On May 7, 2013, Defendants announced that they had obtained an increase in the Company's maximum aggregate borrowing under the revolving credit facilities to $10 million from $8 million, to obtain mid-quarter borrowing flexibility.   This explanation hinted at the near-term liquidity/cash crunch, but did not disclose fully the extent of the crisis.

305.   On May 8, 2013, the next trading day after the issuance of the two press releases and conference call, the price of the Company's stock declined modestly, closing at $4.91 per share from $5.11 per share on the prior day.

306.   On August 7, 2013, after the close of trading, BIOLASE announced that for the second quarter 2013, revenues and net earnings failed to meet guidance due to, among other reasons, poor sales of the iPlus, and that the Company was experiencing a

near-term liquidity/cash crisis.   These public revelations indicated that the prior representations about the demand for the iPlus and the Company's liquidity position had been false and misleading.   As investors and the market became aware that BIOLASE's statements had been false and misleading and that the Company's actual business prospects and financial condition were, in fact, poor, the prior artificial inflation partially came out of BIOLASE's stock price, damaging investors.

307.   On August 13, 2013, BIOLASE made two disclosures the first of which, released before the market opened, involved a discussion of the Company's non-compliance with the EBITDA covenant in the Credit Agreements and the bank's agreement to waive that violation.   BIOLASE stock opened at $1.96 per share on August 13, 2013, and closed at $1.81 per share on that day.   The second disclosure, made after the close of the market, came in a filing with the SEC.   In that filing, an amended registration statement on Form S-3, the Company reduced the planned stock offering from $30 million to $5 million.   With this filing, the Company disclosed that as a consequence of its cashflow/liquidity crisis, it desperately needed cash such that it would accept proceeds from the offering below the $30 million originally planned.   BIOLASE stock fell further on the following day, August 14, 2013, closing at $1.20 per share from $1.81 per share on August 13, 2013.   As investors and the market became aware of the full extent to which BIOLASE's statements concerning the financial and liquidity position of the Company had been false and misleading, the remaining artificial inflation came out of BIOLASE's stock price, thereby damaging investors.

308.   As a direct result of Defendants' August 2013 admissions and the final public disclosures of the truth, the price of BIOLASE's stock price plummeted, in total, almost 53%, on unusually high volume, falling from $3.42 per share on August 7, 2013, to $1.20 per share on August 14, 2013.

309.   The declines in the price of BIOLASE's stock price at the end of the Class Period were a direct result of the nature and extent of Defendants' fraud finally being revealed to investors and the market.   The timing and magnitude of BIOLASE's stock

price declines negate any inference that the loss suffered by Lead Plaintiff and other Class members was caused by changed market conditions, macroeconomic or industry factors or Company-specific facts unrelated to the Defendants' fraudulent conduct. The economic loss, *i.e.*, damages, suffered by Lead Plaintiff and other members of the Class, was a direct result of Defendants' fraudulent scheme to artificially inflate BIOLASE's stock price and the subsequent decline in the value of BIOLASE's stock when Defendants' prior misrepresentations and other fraudulent conduct was revealed.

**COUNT I**

**For Violations of § 10(b) of the Exchange Act and Rule 10b-5 Against Defendant BIOLASE and the Individual Defendants**

310.   Lead Plaintiff incorporates ¶¶ 1 – 309 by reference.

311.   During the Class Period, Defendant BIOLASE and the Individual Defendants disseminated or approved the false statements specified above, which they knew or deliberately disregarded were misleading in that they contained misrepresentations and failed to disclose material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading.

312.   Defendant BIOLASE and the Individual Defendants violated § 10(b) of the Exchange Act and Rule 10b-5 in that they:  (a) employed devices, schemes and artifices to defraud; (b) made untrue statements of material facts or omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; or (c) engaged in acts, practices and a course of business that operated as a fraud or deceit upon Lead Plaintiff and others similarly situated in connection with their purchases of BIOLASE common stock during the Class Period.

313.   Lead Plaintiff and the Class have suffered damages in that, in reliance on the integrity of the market, they paid artificially inflated prices for BIOLASE common stock.  Lead Plaintiff and the Class would not have purchased BIOLASE stock at the

prices they paid, or at all, if they had been aware that the market prices had been artificially and falsely inflated by Defendants' false and misleading statements.

## COUNT II

### For Violations of § 20(a) of the Exchange Act Against Defendant BIOLASE and the Individual Defendants

314. Plaintiff incorporates ¶¶ 1-313 by reference.

315. The Individual Defendants acted as controlling persons of BIOLASE within the meaning of § 20(a) of the Exchange Act. By reason of their positions with the Company, and their ownership of BIOLASE common stock, the Individual Defendants had the power and authority to cause BIOLASE to engage in the wrongful conduct complained of herein. BIOLASE controlled the Individual Defendants and all of the Company's employees. By reason of such conduct, Defendants are liable pursuant to § 20(a) of the Exchange Act.

## PRAYER FOR RELIEF

WHEREFORE, Lead Plaintiff prays for relief and judgment, as follows:

a) Determining that this action is a proper class action, and certifying plaintiff as a Class representative under Rule 23 of the Federal Rules of Civil Procedure and Lead Plaintiff's counsel as Lead Counsel;

b) Awarding compensatory damages in favor of Lead Plaintiff and the other Class members against all Defendants, jointly and severally, for all damages sustained as a result of Defendants' wrongdoing, in an amount to be proven at trial, including interest thereon;

c) Awarding Lead Plaintiff and the Class their reasonable costs and expenses incurred in this action, including counsel fees and expert fees; and

d) Awarding such equitable/injunctive or other relief as deemed appropriate by the Court.

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**JURY DEMAND**

Lead Plaintiff demands a trial by jury.

Dated:  February 24, 2014              Respectfully submitted,


**THE WAGNER FIRM**


By:  _s/ Avi Wagner_
AVI WAGNER
1925 Century Park East, Suite 2100
Los Angeles, California   90067
Telephone:  (310) 491-7949
Facsimile:   (310) 694-3967
Email: avi@thewagnerfirm.com

**Liaison Counsel for Lead Plaintiff Pradeep Khurana and Liaison Counsel for the Proposed Class**

**BERNSTEIN LIEBHARD LLP**
SANDY A. LIEBHARD
JEFFREY M. HABER
JOSEPH R. SEIDMAN, JR.
10 East 40th Street
New York, NY  10016
Telephone:   (212) 779-1414
Facsimile:   (212) 779-3218

**Counsel for Lead Plaintiff Pradeep Khurana and Lead Counsel for the Proposed Class**

1  **PROOF OF SERVICE VIA ELECTRONIC POSTING PURSUANT TO**
2  **CENTRAL DISTRICT OF CALIFORNIA LOCAL RULES**
   **AND ECF GENERAL ORDER NO. 10-07**

3  I, the undersigned, say:

4  I am a citizen of the United States and am employed in the office of a member
5  of the Bar of this Court.  I am over the age of 18 and not a party to the within action.
   My business address is 1925 Century Park East, Suite 2100, Los Angeles, California
6  90067.

7  On February 24, 2014, I caused to be served the following document:

8  **CONSOLIDATED CLASS ACTION COMPLAINT**

9  By posting the document to the ECF Website of the United States District Court for
10 the Central District of California, for receipt electronically by the parties as listed on
   the attached Service List.

11 And on any non-ECF registered parties:

12 **By Mail**: By placing true and correct copies thereof in individual sealed
13 envelopes, with postage thereon fully prepaid, which I deposited with my employer
   for collection and mailing by the United States Postal Service.  I am readily familiar
14 with my employer's practice for the collection and processing of correspondence for
   mailing with the United States Postal Service.  In the ordinary course of business, this
15 correspondence would be deposited by my employer with the United States Postal
   Service that same day.

16
17 I certify under penalty of perjury under the laws of the United States of America
   that the foregoing is true and correct.  Executed on February 24, 2014, at Los Angeles,
18 California.

19 *s/ Avi Wagner*
20 Avi Wagner

21
22
23
24
25
26
27
28

PROOF OF SERVICE

# Mailing Information for a Case 8:13-cv-01300-JLS-FFM IN RE BIOLASE, INC. SECURITIES LITIGATION

## Electronic Mail Notice List

The following are those who are currently on the list to receive e-mail notices for this case.

- **Travis Biffar**
  tbiffar@jonesday.com,ecfirvinenotifications@jonesday.com,akreutner@jonesday.com,kamarkwick@jonesday.com

- **Mary K Blasy**
  mblasy@rgrdlaw.com,e_file_sd@rgrdlaw.com

- **Gregory E Del Gaizo**
  GdelGaizo@robbinsarroyo.com,notice@robbinsarroyo.com

- **Jeffrey M Haber**
  haber@bernlieb.com

- **David T. Long**
  nporritt@zlk.com

- **Laurence M Rosen**
  lrosen@rosenlegal.com

- **Joseph R Seidman , Jr**
  seidman@bernlieb.com

- **Jordanna G Thigpen**
  jthigpen@jswlegal.com

- **Avi N Wagner**
  avi@thewagnerfirm.com,anwagneresq@hotmail.com

- **David C Walton**
  davew@rgrdlaw.com,e_file_sd@rgrdlaw.com

## Manual Notice List

The following is the list of attorneys who are **not** on the list to receive e-mail notices for this case (who therefore require manual noticing). You may wish to use your mouse to select and copy this list into your word processing program in order to create notices or labels for these recipients.

```
Sandy              A Liebhard
Bernstein Liebhard LLP
10 East 40th Street
22nd Floor
New York, NY 10016
```